ORIGINAL

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2023 MAY -2  PM 4:10

DEPUTY CLERK **MS**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | CRIMINAL NO. |
| v. | |
| CHRISTOPHER KIRCHNER | **4:23-cr-127-P** |

## <u>INDICTMENT</u>

At all times material to this Indictment:

### <u>The Defendant and Relevant Entities</u>

1.     Defendant **Christopher Kirchner** was the chief executive officer ("CEO")
of Slync.io ("Slync").  Slync was a supply-chain management software company.

2.     In or about 2017, defendant **Christopher Kirchner** founded Slync with
others.  **Kirchner** was Slync's CEO from approximately 2017 until July 2022, when he
was suspended by Slync's Board of Directors.  **Kirchner** was terminated from Slync in
or about August 2022.

3.     Slync was funded in part by private equity investors, both individuals and
venture capital groups.  This funding came largely from two primary fundraising
campaigns: a Series A offering and a Series B offering.  From in or about March 2020 to
May 2020, Slync raised approximately $7.2 million in the Series A preferred stock
offering, which valued Slync at approximately $32 million.  Then, from in or about
December 2020 to May 2021, Slync raised approximately $50 million in the Series B
preferred stock offering, which valued Slync at approximately $175 million.

4.      During his time as CEO, defendant **Christopher Kirchner** maintained close control over Slync's operations, sales, and recordkeeping.  **Kirchner** restricted other employees' access to information about the company's finances and because Slync never implemented formal accounting or financial control functions, **Kirchner** was the sole decisionmaker regarding when, how, and whether the company would record revenue.

5.      In or about July 2017, defendant **Christopher Kirchner** opened a bank account ending in 0392 on behalf of Slync at JPMorgan Chase Bank ("Slync Chase account").  **Kirchner** had sole signatory authority on the Slync Chase account.

6.      In or about October 2019, defendant **Christopher Kirchner** opened a bank account ending in 6437 on behalf of Slync at Silicon Valley Bank ("Slync SVB account").  Both **Kirchner** and another Slync employee known to the Grand Jury as Individual 1 had signatory authority on the Slync SVB account.  Whenever **Kirchner** initiated a wire or transfer of more than $100,000 from the Slync SVB account, Individual 1's approval was required to complete the transfer.  Similarly, whenever Individual 1 initiated a wire or transfer of more than $100,000 from the account, **Kirchner's** approval was required to complete the transfer.

7.      In or about January 2015, defendant **Christopher Kirchner** opened a personal checking account ending in 8697 at JPMorgan Chase Bank.

8.      In or about April 2020, defendant **Christopher Kirchner** opened a personal checking account ending in 2337 at JPMorgan Chase Bank.

9.     In or about June 2020, defendant **Christopher Kirchner** opened a personal checking account ending in 0637 at Silicon Valley Bank.

10.     In or about June 2020, defendant **Christopher Kirchner** opened a personal savings account ending in 0219 at Silicon Valley Bank.

11.     In or about December 2020, defendant **Christopher Kirchner** opened a personal checking account ending in 5469 at Bank of America.

12.     In or about January 2021, defendant **Christopher Kirchner** opened a checking account ending in 3574 in the name of KFIM—a limited liability company which **Kirchner** controlled—at Bank of America.

The Scheme to Defraud

13.     From at least in or about 2020 through in or about August 2022, defendant **Christopher Kirchner** perpetrated a scheme to defraud Slync and Slync investors out of at least $25,000,000 by failing to use investors' funds as represented and converting Slync and Slync investors' money to his own use.  Through bank transfers and direct payments from Slync accounts, **Kirchner** converted to his own use over $25,000,000 in Slync and Slync investors' funds that he had represented would go to the Slync's operations.  Among other things, **Kirchner** spent Slync and Slync investors' money on a private jet, his residence in Westlake, Texas, and personal items such as credit card bills, jewelry, automobiles, and daily living expenses.

14.     On or about March 30, 2020, Slync and persons and entities known to the Grand Jury as Investors 1, 2, 3, 4, 5, and 6 entered into Series A Preferred Stock Purchase Agreements ("Series A Purchase Agreements").  The Series A Purchase Agreements

3

stipulated that Slync would use the proceeds received from the Series A investors "for product development and other general corporate purposes."

15.     After the execution of the Series A Purchase Agreements, Investors 1, 2, 3, 4, 5, and 6 initiated electronic wire transfers to invest money in Slync.  In total, between on or about March 30, 2020, and on or about May 14, 2020, Slync raised approximately $7.2 million in financing through the Series A fundraising, which included the following:

| Date | Payer | Amount |
|---|---|---|
| 3/30/2020 | Investor 1 | $3,999,998.85 |
| 3/31/2020 | Investor 2 | $2,789,026.25 |
| 3/31/2020 | Investor 3 | $24,999.34 |
| 5/13/2020 | Investor 4 | $100,000.00 |
| 5/13/2020 | Investor 5 | $92,820.00 |
| 5/14/2020 | Investor 6 | $207,180.00 |
| | Total | $7,214,024.44 |

16.     On or about December 11, 2020, Slync and persons and entities known to the Grand Jury as Investors 1, 6, 7, 8, 9, and 10 entered into Series B Preferred Stock Purchase Agreements ("Series B Purchase Agreements").  The Series B Purchase Agreements stipulated that Slync would use the proceeds received from the Series B investors to repay an outstanding loan and "for product development and other general corporate purposes."

17.     After the execution of the Series B Purchase Agreements, Investors 1, 6, 7, 8, 9, and 10 initiated electronic wire transfers to invest money in Slync.  In total, between

on or about December 13, 2020, and on or about May 7, 2021, Slync raised approximately $50 million in financing through the Series B fundraising, which included the following:

| Date | Payer | Amount |
|---|---|---|
| 12/11/2020 | Investor 7 | $34,999,997.45 |
| 12/15/2020 | Investor 1 | $499,999.08 |
| 12/28/2020 | Investor 8 | $7,499,995.70 |
| 12/28/2020 | Investor 9 | $199,997.72 |
| 3/3/2021 | Investor 6 | $1,130,235.13 |
| 3/3/2021 | Investor 10 | $420,000.00 |
| 5/7/2021 | Investor 8 | $5,000,009.90 |
| 5/7/2021 | Investor 8 | $239,764.55 |
| | Total | $49,989,999.53 |

Kirchner's Misappropriation of Slync Funds

18.     All the investor funds obtained during the Series A and Series B fundraising rounds were wired to the Slync SVB account.

19.     On or about March 30, 2020, Investor 1 sent $3,999,998.85 via wire transfer to the Slync SVB account.  Prior to Investor 1's wire transfer, which was the first that Slync received from its Series A investors, the Slync SVB account was overdrawn by approximately $693.21.  Pursuant to the Series A Purchase Agreements, the invested funds were to be used for product development and other general corporate purposes.

20.     Between on or about April 6, 2020, and on or about November 23, 2020, defendant **Christopher Kirchner** initiated a series of approximately 27 wire transfers totaling approximately $2,174,000 from the Slync SVB account to the Slync Chase account.  The amounts of these transfers varied between approximately $22,500 and $99,750—each less than the $100,000 threshold requiring Individual 1's approval.  In many instances, after **Kirchner** caused the transfer to the Slync Chase account, he then moved the money to personal bank accounts and used it to fund his lifestyle, including, but not limited to, the following:

a.     Defendant **Christopher Kirchner** transferred approximately $1,311,400 to personal bank accounts that he controlled as follows—

i.     $1,145,900 to **Kirchner's** bank account ending in 2337 at JPMorgan Chase Bank;

ii.     $153,000 to **Kirchner's** bank account ending in 8697 at JPMorgan Chase Bank; and

iii.     $12,500 to **Kirchner's** bank account ending in 0219 at Silicon Valley Bank.

b.     Defendant **Christopher Kirchner** paid approximately $484,895 to two private jet charter companies.

c.     Defendant **Christopher Kirchner** paid approximately $16,957 to a vineyard located in Napa Valley, California.

d.     Defendant **Christopher Kirchner** paid approximately $14,853 on his personal credit cards.

21.     Prior to these 27 wire transfers from the Slync SVB account to the Slync Chase account, the Slync Chase account had a balance of approximately $5,900.

22.     On or about December 11, 2020, Investor 7 sent $34,999,997.45 via wire transfer to the Slync SVB account. Prior to the transfer, which was the first that Slync received from its Series B investors, the Slync SVB account was overdrawn by approximately $232,423. Pursuant to the Series B Purchase Agreements, the invested funds were to be used for the repayment of a loan, product development, and other general corporate purposes.

23.     On or about December 13, 2020, defendant **Christopher Kirchner** communicated with Individual 1 via text message regarding the Slync SVB account. In this exchange, **Kirchner** represented to Individual 1 that he was transferring money from the Slync SVB account to: (1) an "investment account"; and (2) a "chase" account. Presumably because any transfer over $100,000 required Individual 1's approval, **Kirchner** told Individual 1 that he would "have to approve those wires."

24.     Defendant **Christopher Kirchner's** representations to Individual 1 were false. That is, **Kirchner** did not move the funds to either an "investment account" or a "chase" account. Rather, on or about December 14, 2020, **Kirchner** transferred $20,000,000 from the Slync SVB account to **Kirchner's** personal bank account ending in 0637 at Silicon Valley Bank.

25.     On or about December 14, 2020, defendant **Christopher Kirchner** emailed private bankers at Silicon Valley Bank regarding the $20,000,000 transfer from the Slync account to his personal checking account. In the email, **Kirchner** stated:

7

I took a distribution from my company today and am moving money out for a few things that I need to get taken care of before year end.

One, is a wire for $5,000,000 to an escrow company for a plane that I am purchasing. I need this one completed ASAP as it's very time sensitive in order to complete a transaction this month.

Could you make sure this one in particular is done as fast as possible?

26.     At no point did defendant **Christopher Kirchner** receive authorization from Slync's Board of Directors for a $20,000,000 distribution of Series B investor funds into his personal checking account. **Kirchner** misappropriated the $20 million for his personal use, which included, but was not limited to, the following:

a.     Defendant **Christopher Kirchner** paid approximately $16,000,000 for the deposit and purchase of a Gulfstream GV-SP (G550) private jet.

b.     Defendant **Christopher Kirchner** transferred approximately $800,000 to his bank account ending in 5469 at Bank of America.

c.     Defendant **Christopher Kirchner** paid approximately $495,000 to secure a private luxury suite at the stadium of a Dallas-area professional sports team.

d.     Defendant **Christopher Kirchner** paid approximately $22,000 in membership fees for a private golf and social club located in Westlake, Texas, where he was a member.

27.     Between in or about January 15, 2021, and March 22, 2022, defendant **Christopher Kirchner** initiated a series of approximately 70 wire transfers totaling approximately $6,814,016 from the Slync SVB account to the Slync Chase account. The

amount of these transfers varied from $35,000 to $99,987—each less than the $100,000 threshold requiring Individual 1's approval.  In many instances, **Kirchner** then moved money from the Slync Chase account to personal bank accounts and used it to fund his lifestyle, which included, but was not limited to, the following:

      a.    Defendant **Christopher Kirchner** transferred approximately $5,931,100 to personal bank accounts that he controlled as follows—

      i.    $5,167,250 to the KFIM bank account ending in 3574 at Bank of America that **Kirchner** controlled; and

      ii.    $763,850 to **Kirchner's** bank account ending in 2337 at JPMorgan Chase.

      b.    Defendant **Christopher Kirchner** paid at least approximately $516,360 on his personal credit cards.

Kirchner's Acts of Concealment

28.    On multiple occasions in or about April, May, and June 2022, Slync paid employees late or missed payroll.

29.    As Slync struggled to pay payroll, defendant **Christopher Kirchner** took steps to replace some of the money that he had misappropriated.  That is, in or about April and May 2022, **Kirchner** induced at least four persons known to the Grand Jury as Investors 11, 12, 13, and 14 to wire money to Slync as part of a purported "Series C" round of fundraising.  **Kirchner** provided Investors 11, 12, 13, and 14 with copies of a document titled "Series C Preferred Stock Purchase Agreement."  Each investor signed the document and, at **Kirchner's** instruction, caused wire transfers to transmit between

9

approximately $200,000 and $250,000 to the Slync Chase account. **Kirchner** then transferred a portion of the funds to the Slync SVB account. The money was then used to pay Slync's employees.

30.     Between on or about April 25, 2022, and on or about May 9, 2022, Slync received approximately $850,000 in funds from these supposed "Series C" investors, which included the following:

| Date | Payer | Amount |
|------|-------|--------|
| 4/25/2022 | Investor 11 | $199,975.22 |
| 4/25/2022 | Investor 12 | $199,975.22 |
| 4/29/2022 | Investor 13 | $250,000.00 |
| 5/9/2022 | Investor 14 | $199,975.22 |
| | Total | $849,925.66 |

31.     Defendant **Christopher Kirchner** obtained these funds for Slync using misrepresentations because there was no "Series C" offering. **Kirchner's** misrepresentations included, but were not limited to, the following:

a.     On or about April 17, 2022, defendant **Christopher Kirchner** met with Investor 13 and asked if Investor 13 would like to invest in Slync during the company's Series C fundraising round.

b.     On or about April 18, 2022, defendant **Christopher Kirchner** emailed Investor 13 a link to an "overview of the business" titled "Slync Series C." **Kirchner** wrote: "Good catching up last night… spoke to my attorneys last night and the min for the round is $250k. Happy to chat more about it, but we are

closing it [in two days]." On or about April 27, 2022, Investor 13 signed the document titled Series C Preferred Stock Purchase Agreement.

32.     Slync's Board of Directors did not authorize this "Series C" securities offering, as would have been required. Defendant **Christopher Kirchner's** misrepresentation that there was a "Series C" fundraising round was material and caused Investors 11, 12, 13, and 14 to wire Slync money.

33.     In the summer of 2022, news outlets including Business Insider and Forbes published stories detailing the payroll issues at Slync and highlighting defendant **Christopher Kirchner's** lavish lifestyle. As these news articles started to emerge, the "Series C" investors learned of derogatory allegations against defendant **Christopher Kirchner** and asked for a return of their money. These requests went unfulfilled until in or about August 2022, when **Kirchner** sold his Gulfstream jet after instructing his aircraft broker to arrange a sale. **Kirchner** then used a portion of the aircraft sale proceeds to repay the "Series C" investors.

34.     Specifically, on or about August 19, 2022, the KFIM bank account ending in 3574 at Bank of America, that defendant **Christopher Kirchner** controlled, received a wire transfer of approximately $2,303,126.78 from an aircraft title company for the sale of **Kirchner's** Gulfstream jet. **Kirchner** then caused a series of wire transfers from the KFIM bank account ending in 3574 at Bank of America—not one of Slync's—to repay the "Series C" investors:

11

| Date | Payee | Amount |
|---|---|---|
| 8/22/2022 | Investor 13 | $250,000.00 |
| 8/23/2022 | Investor 14 | $200,000.00 |
| 8/23/2022 | Investor 11 | $200,000.00 |
| 8/24/2022 | Investor 12 | $200,000.00 |
| | Total | $850,000.00 |

35.     While defendant **Christopher Kirchner** was obtaining money from these Series C Investors, he misled others about the cause of Slync's payroll issues.  That is, **Kirchner** told Slync's Board of Directors that the company's cash was invested in illiquid assets and Slync was having difficulty making payroll because it could not divest those assets quickly enough.  **Kirchner** repeated a similar explanation to employees in meetings and company emails.  Thereafter, **Kirchner** told members of Slync's Board of Directors that the United States government had frozen Slync's accounts because **Kirchner** had transacted in his personal capacity with sanctioned entities in Russia.  All these explanations were untrue.

36.     On or about May 5, 2022, a representative from Slync's payroll management provider emailed Individual 1 that it had not received Slync's payroll payment.  Individual 1 forwarded the email to defendant **Christopher Kirchner** and asked him to send the provider confirmation that **Kirchner** had initiated a wire transfer. **Kirchner** told Individual 1 that the delay was because he had sent the wire from the Slync Chase account instead of the Slync SVB account, which was the account usually used for payroll.

37.     On or about May 6, 2022, defendant **Christopher Kirchner** emailed the representative at Slync's payroll management provider and wrote: "Please see wire confirmation for our payroll below."  An accompanying message purported to be confirmation that Chase began processing a wire transfer of $566,241.06 on May 5, 2022. That confirmation message was falsified.

38.     Defendant **Christopher Kirchner** also fired Slync employees who raised concerns over his management of the company's finances.  A Slync employee known to the Grand Jury as Individual 2 joined Slync in or about September 2021.  Individual 2's job responsibilities included managing Slync's financial records, which **Kirchner** had previously been doing by himself.  From in about September 2021 to May 2022, Individual 2 repeatedly asked **Kirchner** for access to Slync's financial records. **Kirchner** never provided that access to Individual 2.

39.     On or about May 26, 2022, Investor 7 sent Individual 2 a Slync financial statement that defendant **Christopher Kirchner** had provided to Investor 7.  The statement listed certain financial metrics for 2020 and 2021, including quarterly annual recurring revenue ("ARR") and revenue figures, and the number of customers that Slync had at the end of each quarter.

40.     Based on Individual 2's review of Slync's customer contracts and conversations with other Slync employees, Individual 2 believed that several of the figures on the financial statement were false, including the ARR and revenue figures, and the number of Slync's customers.

41.     On or about May 26, 2022, as a result of Individual 2's observations about the financial statement, Individual 2 called two members of Slync's Board of Directors known to the Grand Jury as Board Member 1 and Board Member 2.  Individual 2 expressed concern that defendant **Christopher Kirchner** was falsely exaggerating Slync's financial performance and reported concerns regarding Slync's payroll issues. Thereafter, Board Members 1 and 2 spoke with **Kirchner**.  On or about May 30, 2022, **Kirchner** directed Slync's information technology staff to remove Individual 2's access to Slync systems.  On or about June 17, 2022, Individual 2 received a termination letter from Slync.

42.     On or about June 5, 2022, after Slync missed a payroll payment, Individual 3, a manager in Slync's engineering department, emailed Slync's Board of Directors to raise concerns about defendant **Christopher Kirchner's** management of Slync.

43.     On or about June 6, 2022, defendant **Christopher Kirchner** informed Slync executives that he decided to fire Individual 3.  The following week, Individual 3 lost access to Slync's computer systems.  On or about August 6, 2022, Individual 3 received a termination letter from Slync.

44.     On or about July 20, 2022, defendant **Christopher Kirchner** reported to Board Members 1 and 2 that Slync had paid its payroll.  Board Members 1 and 2 asked **Kirchner** to prove that he was telling the truth.  In response, **Kirchner** emailed Board Member 2 a document that purported to be an outgoing wire report showing that payroll had been paid.  Board Member 2 forwarded the document to Board Member 1.  Board Member 1 then called Individual 1—who prepared payroll for **Kirchner's** approval—to

14

confirm that Slync had in fact paid payroll.  Individual 1 notified Board Member 1 that Slync had not paid payroll.  The document **Kirchner** provided to Board Member 2 was falsified.

45.    On or about July 24, 2022, Slync's Board of Directors suspended defendant **Christopher Kirchner**.  Soon thereafter, **Kirchner** removed certain information technology administrator privileges from key Slync employees, preventing the employees from accessing Slync's computer systems.  **Kirchner** then attempted to delete approximately 18 gigabytes of Slync data, including emails.

46.    In or about August 2022, Slync terminated defendant **Christopher Kirchner**.

Counts One through Five
Wire Fraud
[Violation of 18 U.S.C. § 1343]

47.     The allegations contained in paragraphs 1 through 46 of this Indictment are repeated and realleged as if fully set forth herein.

48.     On or about the dates set forth below, in the Northern District of Texas and elsewhere, **Christopher Kirchner**, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, **Kirchner**, through the use of interstate wire communications, made material misrepresentations and omissions to Slync and Slync investors, and misappropriated funds for his own use as more particularly described in each count below:

| Count | Date | Description of Wire Transmission |
|-------|------|----------------------------------|
| 1 | 10/15/2020 | Transfer of approximately $45,000 from Slync SVB account ending in 6347 to Slync Chase account ending in 0392. |
| 2 | 12/14/2020 | Transfer of approximately $20,000,000 from Slync SVB account ending in 6347 to **Kirchner's** SVB account ending in 0637. |
| 3 | 3/2/2021 | Transfer of approximately $99,950 from Slync SVB account ending in 6347 to Slync Chase account ending in 0392. |
| 4 | 3/4/2021 | Transfer of approximately $500,000 from Slync Chase bank account ending in 0392 to KFIM Bank of America Account ending in 3574. |

| Count | Date | Description of Wire Transmission |
|-------|------|--------------------------------|
| 5 | 4/29/2022 | Transfer of approximately $250,000 from Investor 13 to Slync Chase account ending in 0392. |

Each in violation of 18 U.S.C. § 1343.

<u>Counts Six through Thirteen</u>
Engaging in Monetary Transactions in Property
Derived from Specified Unlawful Activity
[Violation of 18 U.S.C. § 1957]

49.     The allegations contained in paragraphs 1 through 46 of this Indictment are repeated and realleged as if fully set forth herein.

50.     On or about the dates set forth below, in the Northern District of Texas and elsewhere, **Christopher Kirchner**, the defendant, did knowingly engage in monetary transactions, affecting interstate commerce, in criminally derived property of a value greater than $10,000.00, that is, numerous purchases, including vehicles, an airplane, and real and personal property, with checks and wire transfers drawn on accounts at financial institutions engaged in interstate commerce, the funds used to purchase such property having been derived from wire fraud, a criminal offense under 18 U.S.C. § 1343, a specified unlawful activity.

| Count | Date | Description of Monetary Transaction | Amount |
|-------|------|-------------------------------------|--------|
| 6 | 6/17/2020 | Wire transfer from **Kirchner's** SVB account ending in 0637 for down payment for residence in Westlake, Texas. | $669,453.05 |
| 7 | 12/14/2020 | Wire transfer from **Kirchner's** SVB account ending in 0637 for deposit for Gulfstream GV-SP (G550) private jet aircraft. | $5,000,000.00 |
| 8 | 12/14/2020 | Wire transfer from **Kirchner's** SVB account ending in 0637 for lease payment for luxury suite at the stadium of a local professional sports team. | $495,000.00 |
| 9 | 12/22/2020 | Wire transfer from **Kirchner's** SVB account ending in 0219 to pay the remaining balance for the purchase of Gulfstream GV-SP (G550) private jet aircraft. | $11,131,500.00 |

18

| Count | Date | Description of Monetary Transaction | Amount |
|-------|------|-------------------------------------|--------|
| 10 | 3/5/2021 | Wire transfer from **Kirchner's** Bank of America account ending in 3574 for purchase of residential lot in Westlake, Texas. | $1,411,470.07 |
| 11 | 6/9/2021 | Personal check drawn on **Kirchner's** Bank of America account ending in 5469 for purchase of 2021 Porsche 911 Turbo S Cabriolet, VIN WP0CD2A90MS263853. | $287,106.72 |
| 12 | 8/16/2021 | Cashier's check drawn on **Kirchner's** Bank of America account ending in 5469 for purchase of 2021 Mercedes-Benz AMG G63, VIN W1NYC7HJ9MX401228. | $283,261.12 |
| 13 | 3/15/2022 | Personal check drawn on **Kirchner's** Bank of America account ending in 5469 for down payment for 2022 Rolls-Royce Cullinan, VIN SLATV4C05NU211445. | $75,000.00 |
| | | Total | $19,352,790.96 |

Each in violation of 18 U.S.C. § 1957.

Notice of Forfeiture
[18 U.S.C § 981(a)(1)(C) and 28 U.S.C. § 2461(c); 18 U.S.C. § 982(a)(2)(A); 18 U.S.C. § 982(a)(1)]

51.     Upon conviction for any offense charged in Counts One through Five of this Indictment, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and 18 U.S.C. § 982(a)(2)(A), the defendant, **Christopher Kirchner**, shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the respective offense.

52.     Upon conviction for any offense charged in Counts Six through Thirteen of this Indictment, pursuant to 18 U.S.C. § 982(a)(1), the defendant, **Christopher Kirchner**, shall forfeit to the United States any property, real or personal, involved in, or traceable to property involved in, the respective offense.

53.     The property subject to forfeiture includes, but is not limited to, the following:

a.  The proceeds traceable to each of Counts One through Five, as well as the scheme to defraud underlying those Counts, in the form of a "money judgment" in the amount of at least $25,000,000.
b.  The value of the property involved in each of Counts Six through Thirteen, in the form of a "money judgment" in the amount of the respective laundering transaction.
c.  2021 Mercedes Benz AMG G63, VIN W1NYC7HJ9MX401228.
d.  2022 Rolls Royce Cullinan, VIN SLATV4C05NU211445.
e.  Richard Mille 95% Platinum Watch with Sports Rubber Bracelet, Model RM008/AFPT/27, Serial No. PT950.
f.  Men's Rolex Oyster Cosmograph Dayton Watch, 18K Yellow Gold, Model 116508, Serial No. 124741T1.
g.  Ladies' Rolex Oyster Perpetual Date Just Watch in 18K Rose Gold, Model 81285, Serial No. J0560855.
h.  Men's Rolex Oyster Perpetual Cosmograph Daytona Watch in 18K White Gold, Model 116509, Serial No. Z071060.

20

i.  Ladies Rolex Oyster Perpetual Date Just Watch in Stainless, Model 178240 Serial No. 538M19L0.

j.  Cartier Panther-Style Pendant Necklace in 18K Yellow Gold, seized on February 14, 2023.

k.  *Round Monette with Pink Roses* Painting by Sarah Ashley Longshore.

l.  Eleven cases of wine, including bottles of wine from the Lokoya winery, seized from on February 14, 2023.

m.  The real property located at 1209 Perdenalas Trail, Westlake, Tarrant County, Texas, a 2.313 acre tract of land situated in the Josiah Walker Survey, Abstract No. 1604, Town of Westlake, Tarrant County, Texas, and being all of Lots 19 and 20, Block L of the Vaquero ~ Arthur Addition, Phase 3 according to the Plat thereof recorded in Instrument No. D203426028 of said Map or Plat Records of Tarrant County, Texas, said 2.313 acre tract of land being more particularly described by metes and bounds as follows:

BEGINNING at a ½" iron rod found for corner in the South line of Perdenalas Trail (35 foot wide Right-of-Way), at the Northwest corner of said Lot 20, same being the Southwest corner of Lot 21, Block L;

THENCE South 64°32'49" East with the North line of said Lot 20, same being the south line of Lot 21 a distance of 284.19 feet to ½" iron rod found at the Northeast corner of said Lot 20, same being the Southeast corner of said Lot 21, and being in the West line of Lot 23, Block L;

THENCE South 00°33'08" East with the West line of said Lot 20, same being the East line of said Lot 23 a distance of 233.51 feet to a point for corner at the Southeast corner of said Lot 20, same being the Southwest corner of said Lot 23, and being in the South line of said Block L of the above referenced Phase 3;

THENCE South 89°47'42" West with the South line of said Lot 20, Block L at a distance of 172.19 feet passing a point for corner at the Southwest corner of said Lot 20, same being the Southeast corner of said Lot 19 and continuing a total distance of 362.80 feet to a point for corner in the South line of said Block L, and being at the Southwest corner of said Lot 19, same being the Southeast corner of Lot 18, Block L of said Vaquero – Arthur Addition Phase 3;

THENCE North 00°37'05" West with the common line between said Lots 18 and 19 distance of 243.55 feet to a ½" iron rod found in the South line of Perdenalas Trail, at the Northwest corner of said Lot 19, same being the Northeast corner of Lot 18, and being at the beginning of a non-tangent curve to the left;

THENCE in a Northeasterly direction with the South line of said Perdenalas Trail, the North line of said Lot 19, and with said curve to the left having a radius of 129.50 feet, whose chord bears North

79°03'05" East, a distance of 2.59 feet, for an arc length of 2.59 feet at the beginning of a reverse curve to the right;

THENCE in a Southeasterly direction with the Said North and South lines and with said reverse curve to the right having a radius of 14.00 feet, whose chord bears South 69°39'36" East, a distance of 14.78 feet, for an arc length of 15.57 feet at the beginning of a reverse curve to the left;

THENCE in a Northeasterly direction continuing with the said South line of Perdenalas with said reverse curve to the left having a radius of 50.00 feet, whose chord bears North 53°11'56" East, a distance of 99.98 feet, at an arc length of 128.85 feet passing a point for corner at the Northeast corner of Lot 19, same being an angle corner in the West line of Lot 20, and continuing with said curve to the left a total length of 155.08 feet to a point for corner at the beginning of a reverse curve to the right;

THENCE in the Northwesterly direction with the common line of Perdenalas Trail and said Lot 20 and with said reverse curve to the right having a radius of 14.00 feet, whose chord bears North 10°06'14" West, a distance of 12.14 feet, for an arc length of 12.56 feet to a point for corner in said common line;

THENCE North 15°35'44" East continuing with said common line a distance of 26.33 feet to ½" iron rod found at the beginning of a curve to the left;

THENCE in the Northeasterly direction with said common line and with said curve to the left having a radius of 367.50 feet, whose chord bears North 13°55'20" East, a distance of 21.47 feet, for an arc length of 21.47 feet;

Back to the POINT OF BEGINNING and CONTAINING 100,740 square feet or 2313 acres of land, more or less.

n. All funds currently contained in Bank of America Account No. XXXXXXXX3574, in the name of KFIM, LLC.

o.  All funds currently contained in Bank of America Account No. XXXXXXXX1186, in the name of Alyssa Kirchner.

p. All funds currently contained in Bank of America Account No. XXXXXXXX5469, in the name of Christopher Kirchner and/or Alyssa Kirchner.

q. All funds currently contained in Bank of America Account No. XXXXXXXX5472, in the name of Christopher Kirchner and/or Alyssa Kirchner.

54.     Pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b), if any of the above property subject to forfeiture, as a result of any act or omission of the defendant, cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third person; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be subdivided without difficulty, it is the intent of the United States of America to seek forfeiture of any other property of the defendant up to the value of the above-described property subject to forfeiture.

A TRUE BILL

_____
FOREPERSON

LEIGHA SIMONTON
UNITED STATES ATTORNEY

_____
JOSHUA D. DETZKY
Assistant United States Attorney
New Jersey No. 037172011
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8600; Fax: 214-659-8805
Email: joshua.detzky@usdoj.gov

_____
BLAKE J. ELLISON
Assistant United States Attorney
Texas No. 24117203
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8600; Fax: 214-659-8805
Email: blake.ellison@usdoj.gov

_____
JOHN J. DELAGARZA
Assistant United States Attorney
Texas No. 00796455
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8818; Fax: 214-659-8805
Email: john.delagarza@usdoj.gov

24

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

---

THE UNITED STATES OF AMERICA

v.

CHRISTOPHER KIRCHNER

---

INDICTMENT

18 U.S.C. § 1343
Wire Fraud
(Counts 1 through 5)

18 U.S.C. § 1957
Engaging in Monetary Transactions in Property Derived from Specified Unlawful
Activity
(Counts 6 through 13)

18 U.S.C § 981(a)(1)(C) and 28 U.S.C. § 2461(c); 18 U.S.C. § 982(a)(2)(A); 18
U.S.C. § 982(a)(1)
Forfeiture Notice

13 Counts

---

A true bill rendered

_FOREPERSON_

DALLAS

Filed in open court this _____ day of May, 2023.

---

**No Warrant Needed**

---

UNITED STATES MAGISTRATE JUDGE
Magistrate Court Number:  4:23-MJ-121