**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | No. 4:23-CR-00127-P |
| | § | |
| **CHRISTOPHER KIRCHNER,** | § | |
| | § | |
| **Defendant.** | § | |

**DEFENDANT'S UNOPPOSED MOTION FOR AN ENDS
OF JUSTICE CONTINUANCE OF TRIAL TO FACILITATE
LITIGATION OF ADVANCEMENT AND PREPARATION BY
RETAINED OR APPOINTED DEFENSE COUNSEL**

COMES NOW, Defendant Christopher Kirchner ("Mr. Kirchner"), by and through his

undersigned counsel, respectfully moves the Court, without opposition from the government, to

continue the current December 18, 2023 trial date of the above-referenced criminal indictment

for a period of 90 days.

Such continuance will facilitate Mr. Kirchner's litigation in Delaware Chancery Court of

his statutory, corporate and contractual rights to advancement by his former employer of his

legal fees and costs in connection with this criminal action. It will also ensure adequate

preparation for trial by Mr. Kirchner's chosen counsel and the government if he is successful in

securing advancement, as well as orderly preparation for trial by his current appointed counsel

and the government if he is unsuccessful in obtaining advancement.

Mr. Kirchner respectfully states as follows in support of this motion:

1.      The government charged Mr. Kirchner with wire fraud in violation of 18 U.S.C. § 1343, by a criminal complaint, No. 4:23-MJ-121-BJ, filed in the Fort Worth division of this judicial district on February 10, 2023.

2.      The U.S. Securities and Exchange Commission ("SEC") initiated a civil enforcement proceeding against Mr. Kirchner, *SEC v. Kirchner, et al.*, No. 4:23-CV-147-P, by a complaint filed in the Fort Worth division of this judicial district on February 14, 2023. The complaint, assigned to this Court, alleged his violation of the general anti-fraud provisions of the federal securities laws, Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, along with a pendent unjust enrichment claim against an organizational relief defendant.

3.      The government obtained a criminal indictment against Mr. Kirchner, *United States v. Kirchner*, No. 4:23-CR-127-P, charging him with a wire fraud and money laundering scheme in violation of 18 U.S.C. §§ 1343 and 1957 on May 2, 2023. (Doc. 19). The undersigned was appointed to represent Mr. Kirchner shortly after his May 17, 2023 arraignment. (Doc. 31). The indictment, filed in the Fort Worth division of this district and also assigned to this Court, makes many of the same allegations that are made in the SEC's parallel enforcement complaint.

4.      In particular, the government's criminal indictment alleges that, as chief executive officer of Slync, Inc. ("Slync"), Mr. Kirchner "perpetrated a scheme to defraud Slync and Slync investors out of at least $25,000,000 by failing to use investors' funds as represented and converting Slync and Slync investors' money to his own use." (Doc. 19 at ¶ 13). The SEC's complaint alleges similarly that, "This case concerns an offering fraud orchestrated by Kirchner, the co-founder and former Chief Executive Officer . . . of Slync, Inc. . . . , involving his brazen theft of over $28 million of investor funds to fund his lavish lifestyle." (SEC Case Doc. 1 at ¶ 1).

- 2 -

5.     On July 14, 2023, the Court granted the government's motion to intervene in the SEC case and stayed the SEC's enforcement action against Mr. Kirchner in view of the overlap in witnesses and subject matter between the criminal and civil enforcement actions. (SEC Case Docs. 28, 29 and 32).

6.     Mr. Kirchner's criminal indictment was initially set for trial on June 20, 2023. (Doc. 32). The Court granted Mr. Kirchner's unopposed motion to continue this trial date and re-set trial of Mr. Kirchner's indictment for September 11, 2023. (Docs. 35 and 36).

7.     On June 30, 2023, Mr. Kirchner again moved to continue his trial date. (Doc. 39). The basis for this renewed motion to continue was twofold. First, the government's Rule 16 material was at the time comprised of over 500 GBs of data, requiring the Federal Public Defender to acquire specialized review software and to devote three times the normal resources from the Dallas and Fort Worth offices to Mr. Kirchner's defense. *Id.* ¶ 9. Second, Mr. Kirchner's motion advised the Court that he was concurrently seeking to secure Slync's advancement of his legal defense fees and costs, as required by Delaware statute, Slync's incorporating documents, and an indemnification agreement between Mr. Kirchner and Slync, through the services of Alston & Bird LLP ("Alston & Bird"). *Id.* ¶¶ 6-8.

8.     On July 12, 2023, the Court granted Mr. Kirchner's continuance motion, re-setting his trial date for December 18, 2023, and excluding the intervening time period under the ends of justice provision of the Speedy Trial Act, 18 U.S.C. § 3161(h)(7)(A). (Doc. 41).

9.     As related in the attached declaration of Alston & Bird partner Paul Monnin, because Slync initially denied Mr. Kirchner's advancement demand based on assertions of purported lack of liquidity to fund advancement, he was forced to fund part of an advance fee deposit to Alston & Bird to facilitate its pursuit of advancement, including through retention of

- 3 -

Delaware counsel and preparation of an advancement complaint. (Ex. A ¶¶ 24-33). The process of fully engaging Alston & Bird was delayed for multiple weeks, however, due to the government's forfeiture activity in connection with this case and, apparently, Mr. Kirchner's status as a federally indicted defendant. *Id.* ¶¶ 29-30.

10.     As also stated in the attached declaration, Alston & Bird's advance fee request was calibrated to the expedited nature of a Delaware advancement proceeding (*i.e.*, the request was a fraction of the legal costs typically associated with litigation matters handled by that firm, specifically including federal criminal jury trials) and has to date only been partially funded. *Id.* ¶¶ 29-33. Alston & Bird has been willing to proceed, however, because Mr. Kirchner's advancement rights are clear. Slync has raised purported lack of liquidity (despite the backing of significant investors) rather than lack of liability as a defense to advancement; however, the firm's investment is secured by an expedited proceeding for which taxation of fees and costs is expressly contemplated under Delaware law. *Id.*

11.     The attached declaration further relates that, following a delay in securing the services of Alston & Bird, Mr. Kirchner presented a written advancement demand to Slync on August 16, 2023. *Id.* ¶ 31. As an indication of Mr. Kirchner's willingness to litigate advancement, a form of Delaware advancement complaint was attached to his demand. *Id.* ¶ 34. A form of undertaking reflecting Slync's ability to recoup advanced funds in the event of a finding of bad faith (within the meaning of Delaware law and the parties' indemnification agreement) was also attached. *Id.*

12.     When Slync did not respond by the requested date, Alston & Bird emailed Slync's outside counsel on August 30, forwarding a signed undertaking by Mr. Kirchner and advising that he intended to proceed with filing of his advancement action later that day. *Id.* ¶ 36.

13.     Slync's outside counsel responded by email on August 30, stating expressly that Slync "will agree to advance," and that Alston & Bird should reach out to Slync's CEO "regarding logistics." *Id.* ¶ 37.

14.     As related in the attached declaration, this led Mr. Monnin to advise the undersigned of Slync's agreement to advance. *Id.* ¶ 38. It also led him to instruct Alix Allison, a senior associate in Alston & Bird's Fort Worth office, to prepare *pro hac vice* applications for Mr. Monnin and another Alston & Bird Atlanta associate and entries and substitutions of appearance for Mr. Monnin, Ms. Allison and the other firm associate. *Id.*

15.     Alston & Bird presented a letter to Slync proposing to resolve all outstanding advancement claims and further proposing a protocol for advancement of Mr. Kirchner's criminal defense fees and costs on September 14. *Id.* ¶ 39.

16.     When Slync failed to respond, Mr. Monnin emailed Slync's outside counsel on September 18 and spoke with him by phone later that day. *Id.* ¶¶ 40-41. Contrary to the representation just a few weeks before that Slync would agree to advance Mr. Kirchner's criminal defense fees, the company's counsel represented that the company lacked sufficient operating capital to do so. *Id.* ¶ 42.

17.     This about-face forced Mr. Kirchner to initiate an advancement action against Slync, styled *Kirchner v. Slync, Inc.*, C.A. No. 2023-973-MTZ, in Delaware Chancery Court on September 26, 2023. *Id.* ¶¶ 43-44. A copy of Mr. Kirchner's advancement complaint is attached as Exhibit A to Mr. Monnin's declaration. A summons was served on Slync's registered agent on September 28, and Mr. Kirchner has moved for an expedited proceeding. *Id.*

18.     In terms of the ends of justice nature of this motion, the attached declaration discusses Mr. Monnin's career-long background and experience prosecuting and defending

- 5 -

alleged federal wire fraud and money laundering schemes, including in parallel with SEC enforcement actions alleging securities fraud and seeking disgorgement and civil monetary penalties. *Id.* ¶¶ 6-22.

19.     As related by Mr. Monnin, he believes that if Mr. Kirchner prevails in obtaining advancement from Slync in connection with the Delaware proceeding, this background and experience, accompanied by the associate staffing and document review capabilities afforded by Alston & Bird for large-scale white collar defense matters, will enable him and his colleagues to prepare for trial efficiently and effectively once they are able to appear on Mr. Kirchner's behalf in this criminal action. *Id.* ¶¶ 21-22.

20.     To be clear, however, in light of the protective order entered in this case, (Doc. 37), none of the government's discovery material has been tendered to Alston & Bird. The scope of Alston & Bird's current engagement by Mr. Kirchner is also confined largely to prosecution of his advancement claims in Delaware. (Ex. A ¶ 25). And while Delaware advancement actions are intended to be expedited proceedings, it may take a month or more to secure either a judgment or settlement related to Mr. Kirchner's advancement claims.

21.     As a result, Mr. Kirchner respectfully requests a 90-day, ends of justice continuance of the December 18, 2023 trial date in this criminal action. Such continuance will enable Alston & Bird, Mr. Kirchner's chosen counsel, to prosecute his advancement claims in Delaware, and, if these claims are successfully resolved, to appear on Mr. Kirchner's behalf in sufficient time to prepare for trial. A 90-day continuance of trial also serves as a hedge against unsuccessful resolution of Mr. Kirchner's advancement rights, and the need for Mr. Kirchner's appointed counsel to prepare for trial in that event.

22.     Mr. Kirchner is enlarged on bond, any delays to date in securing advancement have been due to factors external to him, he has initiated an expedited advancement action in Delaware Chancery Court, and the continuance contemplated by this motion will enable the Federal Public Defender's office to devote its resources to other assigned criminal matters while Mr. Kirchner litigates advancement.

23.     Further, in addition to the efficiencies and subject matter expertise presented by Alston & Bird's anticipated appearance in this matter and the parallel SEC enforcement action also pending before the Court, a 90-day continuance will still result in setting of a criminal trial date that is merely ten months after Mr. Kirchner's indictment – long before most criminal matters of this size and complexity are typically tried.

24.     Counsel for Mr. Kirchner have conferred with counsel for the government, who has indicated the government does not oppose an ends of justice continuance of Mr. Kirchner's trial date. *See id.* ¶¶ 45-47.

WHEREFORE, Mr. Kirchner respectfully requests, without opposition from the government, that the Court continue the December 18, 2023 trial date of the above-captioned indictment for a period of 90 days based on the ends of justice considerations stated herein and in the attached declaration, and that the intervening period be excluded for Speedy Trial Act computation purposes under 18 U.S.C. § 3161(h)(7)(A).

Respectfully submitted,

JASON HAWKINS
Federal Public Defender
Northern District of Texas

*/s/ Christopher J. Weinbel*
CHRISTOPHER J. WEINBEL
Assistant Federal Public Defender
Texas Bar No. 24121196
819 Taylor Street, Room 9A10
Fort Worth, Texas 76102
817.978.2753
Christopher_weinbel@fd.org

## CERTIFICATE OF CONFERENCE

I certify that on October 3rd, 2023, I was able to confer with Assistant United States Attorney Josh Detzky concerning the foregoing motion.

/s/ Christopher J. Weinbel
CHRISTOPHER J. WEINBEL
Assistant Federal Public Defender
TX Bar No. 24121196
819 Taylor Street, Room 9A10
Fort Worth, Texas 76102
817.978.2753
christopher_weinbel@fd.org

## CERTIFICATE OF SERVICE

I, Christopher Weinbel, hereby certify that on this the 5th day of October, 2023, I electronically filed this document with the Clerk of the United States District Court, Northern District of Texas, using the Court's electronic filing system. This system sent a "Notice of Electronic Filing" to the United States Attorney.

*_/s/ Christopher Weinbel*
CHRISTOPHER WEINBEL
Assistant Federal Public Defender

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| v. | NO. 4:23-CR-127-P |
| CHRISTOPHER KIRCHNER | |
| Defendant | |

**DECLARATION OF PAUL N. MONNIN IN SUPPORT
OF ENDS OF JUSTICE CONTINUANCE OF TRIAL DATE**

Now comes Paul N. Monnin, who declares and states under penalty of perjury as follows:

1.      I am a resident of the State of Georgia, over 18 years of age, and competent to make this declaration. The facts contained in this declaration are based on my personal knowledge, information, and belief, and are true and correct to the best of such knowledge, information, and belief.  If sworn as a witness, I could testify competently to the facts stated herein.

2.      This declaration is submitted in support of defendant Christopher Kirchner's ("Mr. Kirchner's") unopposed motion for an ends of justice continuance of his trial on the above-referenced indictment, currently set for December 18, 2023. It describes the status of advancement of his legal fees and costs by his former employer, Slync, Inc. ("Slync"), which is necessary to facilitate

my appearance on Mr. Kirchner's behalf in both the above-captioned criminal action and the parallel civil enforcement proceeding, *SEC v. Kirchner, et al.*, No. 4:23-cv-147-P, also pending before this Court.

3.      In sum, this declaration is intended to inform the Court of the progress of Mr. Kirchner's efforts to secure advancement, both before and after the Court entered its July 12, 2023 order, (Doc. 41), setting Mr. Kirchner's criminal trial for December 18, 2023, and how a continuance of Mr. Kirchner's trial will serve the ends of justice here.

4.      I represent Mr. Kirchner in relation to an underlying advancement action, styled *Christopher S. Kirchner v. Slync, Inc.*, C.A. No. 2023-973-MTZ, now pending as of September 26, 2023 in Delaware Chancery Court. Many of the facts stated herein are otherwise treated in Mr. Kirchner's Delaware advancement complaint against Slync, a true and correct copy of which is attached hereto as Exhibit A.

5.      In addition to authorizing the attached lawsuit, Mr. Kirchner has authorized me to share certain facts relevant to my engagement in relation to the Delaware advancement action and, more broadly, the timing of my anticipated appearance on Mr. Kirchner's behalf in this criminal action, pending resolution of the Delaware advancement matter.

- 2 -

## Background and Experience in Parallel
## <u>Wire and Securities Fraud Proceedings</u>

6.     I graduated from Vanderbilt University Law School in 1996 and
became a member of the Illinois bar that same year. I have continuously been an
active member in good standing of the Illinois bar and the U.S. District Court for
the Northern District of Illinois since 1996.

7.     I clerked for U.S. District Judge Thomas A. Wiseman, Jr. of the United
States District Court for the Middle District of Tennessee from 1996-1997.

8.     I was employed as a litigation associate in the Chicago office of
Winston & Strawn LLP from 1997-2002, where I worked on complex commercial
litigation, white collar criminal, and regulatory enforcement matters.

9.     In 2002, I joined the United States Attorney's Office for the Northern
District of Georgia as an assistant United States attorney ("AUSA") in that office's
Criminal Division. I served as deputy chief of the Criminal Division's Economic
Crimes Section from 2006-2008. During that time, I supervised the investigations
and prosecutions of approximately 25 AUSAs. I left government service in 2008.

10.     I became a member of the State Bar of Georgia in 2003. I have been a
member in good standing of the State Bar of Georgia and the U.S. District Court for
the Northern District of Georgia continually since that time.

11.     Since leaving the U.S. Attorney's Office in 2008, I have practiced in

the areas of white collar criminal defense, regulatory and administrative enforcement, and complex commercial litigation in the Atlanta offices of DLA Piper LLP (US) (2008-2014), Paul Hastings LLP (2014-2017), and Alston & Bird LLP (2017-present).

12.    As an AUSA, I conducted dozens of confidential grand jury investigations, related mostly to criminal violations of the federal anti-fraud (*e.g.*, mail fraud, wire fraud, bank fraud, securities fraud, tax fraud, and healthcare fraud), money laundering, false statements, obstruction, and perjury statutes.

13.    I also personally tried a dozen jury cases as an AUSA, each lasting from one to three weeks in duration, along with multiple bench trials. And I conducted dozens of probable cause, detention, suppression, forfeiture, change-of-plea, sentencing and other evidentiary hearings before the magistrate and district judges of the Northern District of Georgia.

14.    When I was hired as an AUSA, I was asked to formalize a working relationship between the U.S. Attorney's Office and the Atlanta Regional Office of the U.S. Securities and Exchange Commission ("SEC"). This led to the formation in or about 2002 of a working group involving myself and representatives from the Enforcement Division and Trial Unit of the SEC's Atlanta Regional Office, among other federal law enforcement agencies.

15.    My involvement on behalf of the U.S. Attorney's Office meant that I

- 4 -

was the first point of contact if the SEC wished to refer a matter for criminal prosecution. It further meant that many of my investigations, prosecutions, and trials involved parallel civil, administrative, and receivership proceedings brought by the SEC.

16.    During my past fifteen years of private practice, I have represented individuals, companies and other entities in response to grand jury investigations and indictments implicating the foregoing anti-fraud provisions. These criminal matters have been led by the Criminal Division of the U.S. Department of Justice ("DOJ" or "Justice Department") and multiple U.S. Attorney's Offices around the country. Many have involved parallel investigations and civil and administrative proceedings by the SEC.

17.    I have also routinely represented companies, their boards and audit committees in connection with accounting, securities, healthcare, bank and tax fraud investigations involving c-suite officials, including many matters that have been referred for Justice Department or SEC Enforcement Division investigation. And I have represented dozens of current and former company officers who have been subjects of corporate internal investigations and targets of DOJ investigations.

18.    I have served for the past 10 years as co-chair of an annual securities litigation and regulatory practice seminar currently sponsored by the Atlanta Bar Association that is attended by the Enforcement Division and Regional Trial

Counsel staff of the SEC's Atlanta Regional Office, and that has in the past featured appearances from an SEC commissioner and the national leadership of the SEC's Enforcement Division. For the past 15 years, I have lectured to a forensic accounting class in the Masters in Accountancy program at the University of Georgia's Terry College of Business about civil and criminal accounting fraud investigations and court proceedings.

19.     I also write frequently on federal criminal matters, including construction and application of the federal wire and securities fraud statutes. Recent articles include: "How to Mitigate Sentencing Liability in Complex Fraud Cases," Law360 (March 16, 2022), and "DOJ May Face Hurdles in Individual Wire Fraud Prosecutions," Law360 (December 10, 2021).

20.     Finally, I have been a member of the Criminal Justice Act panels of the U.S. Court of Appeals for the Eleventh Circuit and the U.S. District Court for the Northern District of Georgia since leaving the Justice Department in 2008. As a CJA lawyer, I accept multiple appointments each year, including appointments that have been resolved by jury trial and that have involved contested suppression and sentencing issues, along with direct and post-conviction appeals.

21.     I raise this experience not to belabor my background and qualifications, but rather to show the Court that calibrating the timing of Mr. Kirchner's criminal trial by reference to resolution of the parallel Delaware

- 6 -

advancement action would serve the ends of justice. It would facilitate the appearance not only of Mr. Kirchner's chosen counsel in response to the criminal and civil actions pending before the Court, but also the appearance of defense counsel with a lengthy history of litigating parallel DOJ and SEC enforcement actions, including at trial, arising out of an underlying corporate internal investigation centered on financing, banking and accounting issues.

22.     In sum, if afforded the opportunity to secure advancement on Mr. Kirchner's behalf (which he has now been forced to litigate) through a 90-day, ends of justice continuance of trial, I believe my experience litigating parallel DOJ and SEC proceedings as both a former federal prosecutor and long-time defense counsel in this space would enable me not only to represent Mr. Kirchner's interests across the range of wire fraud, securities fraud and forfeiture allegations he currently faces, but also to prepare for trial of his criminal case efficiently and effectively for the benefit of the Court, the government, and certainly Mr. Kirchner.

## **Pursuit of Advancement from Slync**

23.     Mr. Kirchner has authorized me to disclose the following facts going to the ends of justice nature of his motion to continue.

24.     Mr. Kirchner initially contacted me about potentially representing him at the end of May 2023. This was after he had been sued by the SEC on February

14, 2023, and indicted by DOJ on May 2, 2023. Although I reviewed the criminal and civil dockets of the DOJ and SEC actions, my early communications with Mr. Kirchner were focused on his statutory, corporate and contractual rights to advancement of his legal fees and costs.

25.    In view of the fact that Mr. Kirchner was at the time represented by the Federal Public Defender's Office of the Northern District of Texas in response to his indictment, the scope of Alston & Bird's initial engagement was confined to pursuing advancement from Slync.

26.    I spoke with Slync's outside counsel about the company's position on advancement of Mr. Kirchner's legal fees on June 8, 2023. As alleged in the attached advancement complaint, Slync's counsel claimed the company lacked sufficient liquidity to fund advancement.

27.    Following this phone call, I continued to confer with Mr. Kirchner and the assistant federal public defender appointed to defend him in the instant criminal case about advancement. These discussions culminated in two developments.

28.    First, Mr. Kirchner's current counsel in the criminal case filed a successful motion to continue his trial date. (Doc. 39). This was to facilitate not only the government's production of its Rule 16 material and the assistant FPD's review of same, but also to facilitate pursuit of advancement from Slync. In

granting the motion, the Court set Mr. Kirchner's criminal trial for December 18, 2023. (Doc. 41).

29.     Second, Mr. Kirchner agreed to fund a moderate advance fee deposit with my law firm calibrated to the expectation that securing advancement would be a straightforward proposition, given his clear statutory, corporate and contractual advancement rights, the fact that Slync had raised liquidity, rather than lack of liability, as a defense, and that Delaware advancement matters are conducted with expedition.

30.     Mr. Kirchner was unable to secure the necessary funds, however, for an extended period of time, due not only to the government's forfeiture contentions and seizure activity, but also presumably due to Mr. Kirchner's status as a federally indicted defendant facing pending wire fraud counts.

31.     On August 16, 2023, after securing certain of the funds necessary to prosecute Mr. Kirchner's advancement claims (including through the engagement of Delaware counsel), I sent a letter on Mr. Kirchner's behalf to Slync's outside counsel, demanding the company's advancement of his legal fees and costs and advising Slync that Mr. Kirchner was prepared to litigate his advancement claims.

32.     To be clear, Mr. Kirchner has to date funded merely a portion of my law firm's advance fee request through the contribution of a third party individual who anticipates being paid back from the taxation of legal fees and costs incurred

to secure advancement ("fees on fees") available under Delaware law. Alston &
Bird has to date been willing to invest in Mr. Kirchner's pursuit of advancement
because, once again, his advancement rights are clear, Slync has raised solely
liquidity as an advancement defense (despite the backing of significant investors),
and the firm's investment is secured by the fees on fees associated with the
anticipated expeditious resolution of his advancement rights.

33.    In other words, Alston & Bird's advance fee request was merely a
fraction of the legal costs typically associated with the litigation matters we handle,
specifically including a federal criminal jury trial. And while it was only partially
funded, we have been willing to proceed because we perceive the firm's
investment to be secured by an expedited proceeding for which taxation of fees and
costs is available.

34.    As evidence of Mr. Kirchner's willingness to litigate, a form of
Delaware advancement complaint was attached to my August 16 letter. Also
attached was an undertaking in the form required by Slync (*i.e.*, an undertaking
including Mr. Kirchner's express agreement to refund advanced fees if he is found
to have acted in bad faith within the meaning of Delaware law, Slync's charter and
bylaws, and his indemnification agreement with the company), which my letter
represented Mr. Kirchner would sign.

35.    My August 16 letter gave Slync until August 23 to respond, which did

not happen.

36.     On August 30, I emailed Slync's outside counsel, forwarding a signed undertaking by Mr. Kirchner in the same form as the undertaking attached to my August 16 letter.  My email also stated that Mr. Kirchner intended to proceed with filing of his advancement complaint later that afternoon.

37.     That same day, Slync's outside counsel sent me an email stating expressly as follows: "Paul, Apologies for the delay. The company will agree to advance. Please reach out to John Urban at the company regarding logistics. Note that John is cc'd above. Best, Jim[.]"

38.     I reported Slync's willingness to advance to Mr. Kirchner's current criminal defense counsel. I also reached out to my colleague Alix Allison, a senior associate in Alston & Bird's Fort Worth office, to prepare *pro hac vice* applications for me and another firm associate, along with entries and substitutions of appearance by me, her and the other firm associate for filing on the dockets of Mr. Kirchner's criminal and SEC cases.

39.     After conferring with Mr. Kirchner, I sent Mr. Urban, Slync's CEO, a September 12, 2023 letter, proposing to settle all outstanding advancement claims and also proposing a protocol for advancement of Mr. Kirchner's criminal defense fees and costs. Slync's outside counsel was copied on this letter.

40.     On September 14, I emailed Slync's outside counsel, advising him

that (i) I had not heard from Slync's CEO, (ii) I was uncomfortable further communicating with Mr. Urban directly given that the company is represented, and (iii) we needed some comfort about funding of my law firm's fees on fees and advancement of defense fees "to appear in the Northern District of Texas criminal case."

41.     I received no response to this September 14 email communication. I therefore followed-up with Slync's outside counsel by email on September 18 and spoke with him by phone later that day.

42.     Despite Slync's express, written representation on August 30 that it was willing to advance Mr. Kirchner's criminal defense fees, Slync's outside counsel informed me by phone on September 18 that the company purportedly lacks sufficient liquidity to fund advancement.

43.     Mr. Kirchner has now been forced to proceed with an advancement action against Slync in Delaware Chancery Court, initiated by filing of the attached advancement complaint on September 26. Slync has since been served with a summons through its registered agent in Delaware.

44.     Mr. Kirchner has elected to proceed with an advancement action not only because Slync told him just a few weeks ago that it would advance his legal fees, but also because a legal proceeding is apparently the only way to secure advancement, including by testing what Mr. Kirchner believes to be Slync's

- 12 -

misplaced lack of liquidity contentions. As noted above, my law firm is willing to proceed with litigation of advancement despite a moderate advance fee deposit that has only been partially funded because Delaware advancement proceedings are expedited and fees on fees are available.

## Communication with the Government
## About an Ends of Justice Continuance

45.     Finally, I spoke by phone with AUSA Joshua Detzky of the U.S. Attorney's Office for the Northern District of Texas on September 21 about the status of my anticipated appearance on Mr. Kirchner's behalf in response to the criminal case AUSA Detzky is prosecuting.

46.     I related many of the facts and circumstances contained herein to the government pertaining to the chronology of Mr. Kirchner's advancement demands and Slync's responses, including the fact that Mr. Kirchner would soon be proceeding with a Delaware advancement action. I also advised the government that, if Mr. Kirchner is able to secure advancement, I would be appearing in both the DOJ and SEC actions. I further told the government that, while I had not reviewed any of its Rule 16 material due both to the pending protective order and the scope of my engagement by Mr. Kirchner, my belief is that I should be able to prepare for trial quickly given my background and experience in similar matters.

47.     At the conclusion of our call, the government indicated that it would not oppose a motion to continue seeking an ends of justice continuance to

accommodate resolution of the parallel advancement matter and my and my

colleague's anticipated entries of appearance on Mr. Kirchner's behalf in the DOJ

and SEC cases pending before the Court. This has since been confirmed by email.

I declare under penalty of perjury that the foregoing statements are true and

correct to the best of my knowledge and belief.

_____

Paul N. Monnin

Sworn to and subscribed

before me this ___3rd___ day

of October, 2023.

_Brianna C. Goines_

Notary Public

My Commission Expires:

_May 4, 2025_ _____

- 14 -

# EXHIBIT A

EFiled: Sep 26 2023 04:27PM EDT
Transaction ID 70749954
Case No. 2023-0973-

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CHRISTOPHER S. KIRCHNER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. _____ |
| ) | |
| SLYNC, INC., ) | |
| ) | |
| Defendant. ) | |

## VERIFIED COMPLAINT FOR ADVANCEMENT

Plaintiff Christopher S. Kirchner, by and through the undersigned counsel, brings this advancement action against defendant Slync, Inc. ("Slync") pursuant to Section 145(k) of the Delaware General Corporation Law (the "DGCL"), and alleges as follows:

## NATURE OF THE ACTION

1.     Through this action, Plaintiff ("Mr. Kirchner") seeks advancement of the reasonable costs, expenses, and fees (the "Expenses"), specifically including his attorneys' fees and expenses, he has incurred and will continue to incur in connection with defending himself in response to, among other proceedings for which he is entitled to advancement, *United States v. Kirchner*, No. 4:23-cr-127-P (N.D. Tex.), and *SEC v. Kirchner*, No. 4:23-cv-147-P (N.D. Tex.) (collectively, the "Underlying Actions").

2.      Mr. Kirchner also seeks reimbursement of the Expenses he has incurred and will continue to incur in enforcing his advancement rights, including the Expenses incurred in bringing and prosecuting this advancement action ("Fees on Fees").

3.      Slync was incorporated as a Delaware corporation on June 16, 2017.

4.      Mr. Kirchner served as the chief executive officer ("CEO") of Slync (formerly known as SupplyLinc, Inc.) from June 2017 until July 2022.

5.      The Delaware General Corporation Law provides expressly for indemnification of expenses, including attorneys' fees, of corporate officers of Delaware companies in connection with any proceeding instituted by reason of the fact that the indemnitee was a Delaware corporate officer. 8 *Del. C.* § 145(a). Subsection 145(e) of the Delaware General Corporation Law provides further that expenses may be paid by the corporation in advance of final disposition of any such proceeding.

6.      In accordance with Delaware law, Mr. Kirchner is entitled to mandatory advancement from Slync under the parties' Indemnification Agreement and Slync's Certificate of Incorporation and Bylaws for the Expenses he has incurred and will continue to incur in connection with proceedings related to Slync, including the Underlying Actions, each of which arises out of alleged wrongdoing Mr. Kirchner

2

purportedly committed in his capacity as CEO of Slync, and therefore by reason of his role as a Slync officer.

7.     Mr. Kirchner's counsel in this advancement action contacted Slync's outside counsel in June 2023 regarding the company's advancement obligations in relation to the Underlying Actions. At that time, Slync did not meaningfully contest its advancement obligations, but rather asserted an inability to fund advancement of Mr. Kirchner's Expenses in connection with the Underlying Actions.

8.     On August 30, 2023, following a period in which Mr. Kirchner's counsel communicated in writing with Slync's outside counsel about Mr. Kirchner's entitlement to advancement in connection with the Underlying Actions and also shared a draft of this complaint with Slync's outside counsel, the below counsel from Alston & Bird LLP ("Alston & Bird") forwarded Mr. Kirchner's signed undertaking to Slync's outside counsel and informed counsel that Mr. Kirchner would be filing a complaint for advancement that afternoon.

9.     Later that day, Slync's outside counsel responded by stating, in writing, that Slync would agree to advance Mr. Kirchner's Expenses. Despite this acknowledgment, on which Mr. Kirchner has relied to his detriment given that his criminal case in the Northern District of Texas is currently scheduled for trial on December 18, 2023, Slync has since reasserted its putative inability to fund advancement.

10.    On information and belief, Slync has sufficient operational funds to satisfy its advancement obligations to Mr. Kirchner related to his defense of the Underlying Actions. Slync, however, has to date refused to honor its advancement obligations to Mr. Kirchner, as authorized by statute and as required by Slync's Certificate of Incorporation, Bylaws and the parties' Indemnification Agreement.

11.    As a result, Mr. Kirchner has been forced to bring this action seeking a Court order: (1) declaring that Mr. Kirchner is entitled to advancement from Slync for the Expenses he has incurred and will continue to incur in connection with the Underlying Actions; (2) ordering Slync to pay Mr. Kirchner Fees on Fees; (3) granting Mr. Kirchner pre- and post-judgment interest on the Expenses and Fees on Fees awarded to Mr. Kirchner; (4) establishing a procedure for Mr. Kirchner to present his requests for advancement of his Expenses and for Slync to fund such advancement in a timely manner, particularly given his status as an indicted defendant in a federal criminal action that relates to purported victimization of Slync; and (5) granting such other relief that the Court deems just and proper under the circumstances.

## **PARTIES**

12.    Plaintiff Christopher S. Kirchner resides in Westlake, Texas. He is the founder of Slync and served as its CEO from June 2017 to July 2022.

13.     Defendant Slync is a Delaware corporation, with its principal place of business in Southlake, Texas. Slync develops and maintains an eponymous process automation software system that facilitates global supply chain logistics for its customers, which include international shippers and service providers.

## JURISDICTION

14.     The Court has subject matter jurisdiction over this action pursuant to Subsection 145(k) of the Delaware General Corporation Law. 8 *Del. C.* § 145(k).

15.     The Court has personal jurisdiction over Slync because it is a Delaware corporation.

## FACTUAL BACKGROUND

### A.     DGCL Section 145

16.     Subsection 145(a) of the Delaware General Corporation Law provides expressly for indemnification of expenses, including attorneys' fees, of corporate officers of Delaware companies in connection with any threatened or pending action or proceeding, whether civil, criminal, administrative or investigative, instituted by reason of the fact that the indemnitee was a Delaware corporate officer, provided the officer acted in good faith and in a manner which the officer reasonably believed was not opposed to the best interests of the corporation, typically evidenced by an undertaking to that effect. 8 *Del. C.* § 145(a).

5

17.     Subsection 145(e) of the Delaware General Corporation Law provides further that: "Expenses (including attorneys' fees) incurred by an officer or director of the corporation in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the corporation as authorized in this section." *Id.* § 145(e).

### B.     The Parties' Indemnification Agreement

18.     On January 28, 2018, Mr. Kirchner and Slync entered an Indemnification Agreement (attached hereto as **Exhibit A**) under which Slync agreed to "hold harmless and indemnify [Mr. Kirchner] to the fullest extent permitted by law" for all Expenses actually and reasonably incurred by Mr. Kirchner in connection with any "Proceeding" or claim brought against Mr. Kirchner by reason of the fact that he was an officer of Slync. Ex. A. § 1 ("Indemnity of Indemnitee").

19.     The Indemnification Agreement broadly defines the term "Proceeding" to include "any threatened, pending or completed action, suit, arbitration, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or any other actual, threatened or completed proceeding, whether brought by or in the right

6

of [Slync] or otherwise and whether civil, criminal, administrative or investigative, in which [Mr. Kirchner] was, is or will be involved as a party or otherwise, by reason of [Mr. Kirchner's] Corporate Status, by reason of any action taken by [Mr. Kirchner] or of any inaction on [Mr. Kirchner's] part while acting in [Mr. Kirchner's] Corporate Status[.]" *Id*. § 13(f).

20.    The Indemnification Agreement also obligates Slync to advance Expenses incurred by Mr. Kirchner in connection with any "Proceeding." *Id*. § 5.

21.    The Indemnification Agreement makes clear that it is a "supplement to and in furtherance of the [Slync] Bylaws" and does not "diminish or abrogate any rights of Indemnitee" under the Bylaws, which are in turn consistent with the statutory indemnity and advancement provisions of Delaware law. *Id*. at p. 1. The Indemnification Agreement also states that "all agreements and obligations of [Slync] contained herein shall continue during the period Indemnitee is a director or officer . . . and shall continue thereafter so long as Indemnitee shall be subject to any Proceeding . . . by reason of Indemnitee's Corporate Status, whether or not Indemnitee is acting or serving in any such capacity at the time any liability or expense is incurred for which indemnification can be provided under this Agreement." *Id*. § 10.

### C.    Slync's Certificate of Incorporation

22.    Slync's Certificate of Incorporation (attached hereto as **Exhibit B**) provides that the company is "authorized to provide indemnification of (and advancement of expenses to) directors, officers and agents of [Slync] (and any other persons to which [the Delaware] General Corporation Law permits [Slync] to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the General Corporation Law." Ex. B at 25.

### D.    Slync's Bylaws

23.    Pursuant to its Bylaws (attached hereto as **Exhibit C**), Slync is obligated to provide indemnification to persons serving as Slync's officers for all Expenses incurred in any action brought against them by reason of the fact that "such person is or was an agent of the corporation." Ex. C, Art. VI § 6.1.

24.    This obligation is mandatory. Section 6.1 of Slync's Bylaws provide expressly that:

> The corporation shall, to the maximum extent and in the matter permitted by the Delaware General Corporation Law, indemnify each of its directors and officers against expenses (including attorneys' fees), judgments, fines, settlements and other amounts actually and reasonably incurred in connection with any proceeding, arising by

reason of the fact that such person is or was an agent of the corporation.

25.    Section 6.3 further expressly obligates the company to advance Expenses as follows:

> Expenses incurred in defending any action or proceeding for which indemnification is required pursuant to Section 6.1 . . . shall be paid by the corporation in advance of the final disposition of such action or proceeding upon receipt of an undertaking by or on behalf of the indemnified party to repay such amount if it shall ultimately be determined by final judicial decision . . . that the indemnified party is not entitled to be indemnified as authorized in this Article VI.

### E.    The Underlying Actions

26.    On February 10, 2023, the United States Attorney's Office for the Northern District of Texas (the "Justice Department") filed a criminal complaint against Mr. Kirchner, alleging that he had defrauded Slync investors in his corporate capacity when raising funds for the company, and that he had misappropriated company funds for personal use. That complaint was superseded by a criminal indictment on May 2, 2023, which similarly alleges that Mr. Kirchner, again in his corporate capacity, defrauded Slync investors and misappropriated company funds for personal use. The trial of this indictment is currently set for December 18, 2023.

27.    On February 14, 2023, the United States Securities and Exchange Commission (the "SEC") filed a parallel civil enforcement action against Mr. Kirchner based on the same purported misconduct and raising largely the same

allegations as those made in the Justice Department's criminal complaint. Mr. Kirchner was also arrested on the same day. On July 14, 2023, the presiding district court stayed the SEC civil enforcement action until resolution of the criminal case.

28.    As plainly reflected in the Justice Department's criminal complaint and indictment and the SEC's complaint, the federal government's claims against Mr. Kirchner arise out of alleged wrongdoing Mr. Kirchner purportedly committed in his capacity as CEO of Slync.

### F.    **Mr. Kirchner's Prior Advancement Demands**

29.    On July 19, 2022, former Slync employee Jason Selvidge filed a civil complaint against Mr. Kirchner and Slync in California Superior Court for the County of San Francisco (the "Selvidge Suit"), alleging retaliatory termination and failure to pay wages.

30.    On July 28, 2022, Mr. Kirchner tendered a written demand for advancement to Slync for the legal fees and costs "that have been or will be incurred by him in connection with" the Selvidge Suit, as well as in relation to an internal investigation being conducted by the Slync board of directors (the "Slync Internal Investigation") that was initiated in response to and proceeded in parallel with the Selvidge Suit.

31.     On information and belief, the fruits of the Slync Internal Investigation were tendered to the SEC and the Justice Department, culminating in Mr. Kirchner's status as a defendant in both of the Underlying Actions.

32.     On August 5, 2022, Slync responded to Mr. Kirchner's demand for advancement by asserting that it would be unreasonable for Mr. Kirchner to incur any expenses related to the Selvidge Suit because he had yet to be served. Slync, however, did not dispute that it was obligated to advance Mr. Kircher's Expenses in connection with the Selvidge Suit.

33.     Following Slync's termination of Mr. Kirchner in August 2022, Mr. Kirchner once again tendered a written demand for advancement to Slync on September 8, 2022. Attached to this demand were invoices of all expenses incurred by Mr. Kirchner in connection with the Selvidge Suit and the Slync Internal Investigation. The demand was also accompanied by a written undertaking signed by Mr. Kirchner, the terms of which were consistent with Section 145 of the Delaware General Corporation Law.

34.     On September 15, 2022, Slync wrote to Mr. Kirchner, once again contesting the reasonableness of the Expenses incurred by Mr. Kirchner in connection with the Selvidge Suit and Slync Internal Investigation. But despite these objections, Slync acknowledged its statutory, corporate and contractual obligations to "advance 'reasonable' attorneys' fees" under, among other things, the parties'

11

Indemnification Agreement. Indeed, Slync proposed redlined edits to Mr. Kirchner's written undertaking in the same September 15, 2022, response. These edits delineated that advancement of Mr. Kirchner's legal fees and expenses does not waive Slync's capacity to recoup advancement from Mr. Kirchner through an indemnification proceeding, which is consistent with Delaware law. Mr. Kirchner has never been opposed to recoupment of advanced Expenses and has in fact signed an undertaking to that effect, which has been tendered to Slync.

35.    As noted above, on February 10, 2023, the Justice Department filed a criminal complaint against Mr. Kirchner, alleging that he, in his corporate capacity, had defrauded Slync investors when raising funds for the company, and that he had misappropriated company funds for personal use.

36.    On February 14, 2023, the SEC filed a parallel civil enforcement action against Mr. Kirchner based on the same purported misconduct and raising largely the same allegations as those made in the Justice Department's criminal complaint, including that Mr. Kirchner had acted in his corporate capacity. Mr. Kirchner was also arrested that same day.

37.    Following the Justice Department's indictment of Mr. Kirchner, the below counsel from Alston & Bird first reached out to Slync's outside counsel in June 2023, regarding Slync's advancement obligations in relation to the Underlying Actions. Slync's counsel has not denied that Mr. Kirchner is entitled to advancement

for Expenses incurred in connection with the Underlying Actions. Rather, Slync has asserted that it purportedly lacks funds to advance Mr. Kirchner's Expenses.

38.     On August 16, 2023, the below counsel from Alston & Bird sent a letter to Slync's outside counsel demanding that Slync honor its obligation to advance Mr. Kirchner's reasonable Expenses in connection with the Underlying Actions. Attached to this August 16 letter was a clean form of undertaking, consistent with the form of undertaking Slync's outside counsel had previously sent to Mr. Kirchner. Slync's outside counsel did not respond to this letter.

39.     On August 30, 2023, the below counsel from Alston & Bird furnished Slync's outside counsel with an undertaking signed by Mr. Kirchner. This undertaking was in the same form as the undertaking attached to Alston & Bird's August 16 letter (*i.e.*, inclusive of Mr. Kirchner's recoupment obligation) and in the same form as the undertaking Slync had previously directed Mr. Kirchner to sign. Mr. Kirchner's counsel further informed Slync's outside counsel that Mr. Kirchner would be filing a complaint for advancement that afternoon.

40.     Slync's outside counsel responded in writing later that day by stating that Slync would agree to advance and directing Alston & Bird to confer directly with Slync's current CEO regarding advancement logistics. A copy of this communication is attached hereto as **Exhibit D**.

41.    Pursuant to these instructions, Mr. Kirchner's counsel sent a letter to Slync's current CEO on September 12, 2023, on which Slync's outside counsel was copied, requesting that Slync make two advancement payments – one in relation to Mr. Kirchner's Expenses incurred in connection with the Selvidge Suit, Slync's Internal Investigation, and the SEC enforcement action, and another in relation to his fees on fees incurred in pursuing advancement through Slync's August 30 agreement to advance Mr. Kirchner's Expenses. This September 12 correspondence from Mr. Kirchner's counsel further proposed a procedure for obtaining future advancement in connection with the Underlying Actions.

42.    Slync's CEO did not acknowledge receipt of or otherwise respond to this letter.

43.    On September 19, 2023, Mr. Kirchner's counsel spoke by phone with Slync's outside counsel regarding Mr. Kirchner's September 12 letter to Slync's CEO, specifically Slync's prior agreement to advance Mr. Kirchner's Expenses. During that phone conversation, Slync's counsel once again asserted the company's putative inability to fund advancement – despite Slync having previously and expressly agreed to advance Mr. Kirchner's Expenses in a writing transmitted to Mr. Kirchner's counsel on August 30 and never contested by Slync until September 19.

44.    While Mr. Kirchner had hoped to avoid invoking this Court's jurisdiction to enforce his advancement rights – and, indeed, had believed such

litigation would not be needed given Slync's express agreement to advance Mr. Kirchner's Expenses – Slync's renewed refusal to advance, based on its purported inability to fund advancement, has necessitated this action.

45.    Moreover, Mr. Kirchner has been and continues to be substantially prejudiced by Slync's conduct. Although the SEC's enforcement action in the Northern District of Texas has been stayed, trial of Mr. Kirchner's criminal indictment in the Northern District of Texas, for which the Justice Department has pursued forfeiture and will undoubtedly seek substantial prison time if it obtains Mr. Kirchner's conviction, is set for December 18, 2023. Entry of an appearance in the Northern District of Texas by his chosen counsel will continue to be delayed through resolution of this advancement action.

46.    On information and belief, Slync has sufficient operational funds to satisfy its advancement obligations to Mr. Kirchner related to his defense of the Underlying Actions. Slync is not in bankruptcy and recently completed a round of financing backed by a large institutional investor.

47.    The Expenses Mr. Kirchner has incurred to date include the cost of retaining counsel from Alston & Bird and from Morris James LLP to prosecute this advancement action. Slync's failure to reimburse such Expenses and to otherwise honor its advancement obligations to Mr. Kirchner in connection with the Underlying Actions has caused (and will continue to cause) substantial prejudice to

Mr. Kirchner, particularly insofar as his criminal indictment is currently set for trial in the Northern District of Texas on December 18, 2023.

48.    Mr. Kirchner has complied with all statutory and contractual requirements pertinent to advancement of his Expenses in connection with the Underlying Actions. For its part, Slync has been and remains in material breach of its statutory and contractual obligations to provide advancement, which excuses any technical failure or noncompliance on Mr. Kirchner's part, particularly given the substantial prejudice he has suffered and will continue to suffer due to the nature and progress of the Underlying Actions.

## COUNT I
### (Advancement of Expenses)

49.    Mr. Kirchner realleges the allegations of the foregoing paragraphs as if fully set forth herein.

50.    Section 145(a) of the DGCL authorizes a Delaware corporation "to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding . . . by reason of the fact that the person is or was a director, officer, employee or agent of the corporation . . . against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with such action, suit or proceeding."

51.     Section 145(e) of the DGCL provides further that "Expenses (including attorneys' fees) incurred by an officer or director of the corporation in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the corporation as authorized in this section."

52.     Under the parties' Indemnification Agreement and Slync's Certificate of Incorporation and Bylaws, Slync is obligated to provide mandatory advancement to Mr. Kirchner for all Expenses incurred in any action brought against him by reason of the fact that he is or was an officer of Slync.

53.     Mr. Kirchner served as Slync's CEO from June 2017 to July 2023.

54.     Mr. Kirchner was made a party to the Underlying Actions by reason of the fact that he served as Slync's CEO.

55.     Mr. Kirchner demanded advancement of the Expenses he has incurred and will continue to incur in the Underlying Actions, which includes a retainer payment sent to his counsel.

56.     Mr. Kirchner delivered signed and written undertakings to repay any amounts advanced to him to cover his Expenses in the Underlying Actions if and to

the extent that it is ultimately determined that he is entitled to indemnification for such amounts.

57.     Although Slync has acknowledged its advancement obligations, and even expressly agreed to fund advancement, it has to date refused to satisfy its mandatory obligation to advance Mr. Kirchner his Expenses.

58.     Slync has therefore breached and continues to breach its advancement obligations arising under Section 145 of the DGCL, the Slync Bylaws and the parties' Indemnification Agreement.

## COUNT II
### (Fees on Fees)

59.     Mr. Kirchner repeats and realleges the allegations of the foregoing paragraphs as if fully set forth herein.

60.     As a result of Slync's failure to comply with its advancement obligations, Mr. Kirchner has incurred and will continue to incur Expenses enforcing his advancement rights, including Expenses that Mr. Kirchner has incurred and will continue to incur in connection with the initiation and prosecution of this action.

61.     Under Delaware law, Mr. Kirchner is entitled to an award of Fees on Fees in connection with the enforcement of his advancement rights, including the initiation and prosecution of this action.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Mr. Kirchner respectfully requests that the Court enter an order:

a.     declaring that Mr. Kirchner is entitled to advancement from Slync for the Expenses that he has incurred and will continue to incur in connection with the Selvidge Suit, Slync's Internal Investigation, and the Underlying Actions;

b.     ordering Slync to pay Mr. Kirchner Fees on Fees;

c.     granting Mr. Kirchner pre- and post-judgment interest on the Expenses and Fees on Fees awarded to Mr. Kirchner in this litigation;

d.     establishing a procedure for Mr. Kirchner's presentment of future requests for advancement with respect to Expenses incurred in defending the Underlying Actions; and

e.     granting such other and further relief as the Court deems just and proper.

19

                                        **MORRIS JAMES LLP**

OF COUNSEL:                             */s/ K. Tyler O'Connell*
                                        K. Tyler O'Connell (#4514)
**ALSTON & BIRD LLP**                   Samuel E. Bashman (#6751)
                                        500 Delaware Avenue, Suite 1500
Paul N. Monnin                          Wilmington, DE 19801
Thomas Grantham                         (302) 888-6800
1201 West Peachtree Street              *Attorneys for Plaintiff*
Atlanta, GA 30309
(404) 881-7000

Dated: September 26, 2023

16328405

EFiled: Sep 26 2023 04:27PM EDT
Transaction ID 70749954
Case No. 2023-0973-

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| CHRISTOPHER S. KIRCHNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 2023- |
| | ) | |
| SLYNC, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>VERIFICATION</u>

| STATE OF TEXAS | ) | |
| | ) ss | |
| COUNTY OF <u>Fort Bend</u> | ) | |

I, Christopher S. Kirchner, declare under penalty of perjury under the law of Delaware that:

1.    I am the former Chief Executive Officer of Slync, Inc. and the plaintiff in this Delaware proceeding.

2.    I have read the foregoing Verified Complaint for Advancement and attest that, to the extent it concerns acts or matters of which I have direct personal knowledge, I know those allegations to be true and correct.

3.    To the extent that it concerns matters of which I do not have direct personal knowledge, I believe those to be true and correct upon information and belief.

4.     I declare under penalty of perjury under the laws of the State of Delaware that the foregoing is true and correct.

_____
Christopher S. Kirchner

SWORN TO AND SUBSCRIBED before me this __26th__ day of September, 2023.

_____
Notary Public



State of Texas

County of Fort Bend

Sworn to and subscribed before me

on 09/26/2023 by Christopher Steven Kirchner.

Notarized online using audio-video communication

Jeremiah Spencer

ID NUMBER
13176602-5
COMMISSION EXPIRES
December 9, 2026

EFiled:  Sep 26 2023 04:27PM EDT
Transaction ID 70749954
Case No. 2023-0973-

# EXHIBIT A

DocuSign Envelope ID: 3A87A40A-FFD1-4694-AC3F-E20B5A20429A

# INDEMNIFICATION AGREEMENT

This INDEMNIFICATION AGREEMENT (the "**Agreement**") is made and entered into as of January 28, 2018 by and between Slync, Inc., a Delaware corporation (the "**Company**"), and _Christopher S. Kirchner_ ("**Indemnitee**").

**WITNESSETH THAT:**

**WHEREAS**, highly competent persons have become more reluctant to serve corporations as directors or in other capacities unless they are provided with adequate protection through insurance or adequate indemnification against inordinate risks of claims and actions against them arising out of their service to and activities on behalf of the corporation;

**WHEREAS**, the Board of Directors of the Company (the "**Board**") has determined that, in order to attract and retain qualified individuals, the Company will attempt to maintain on an ongoing basis, at its sole expense, liability insurance to protect persons serving the Company and its subsidiaries from certain liabilities.  Although the furnishing of such insurance has been a customary and widespread practice among United States-based corporations and other business enterprises, the Company believes that, given current market conditions and trends, such insurance may be available to it in the future only at higher premiums and with more exclusions.  At the same time, directors, officers, and other persons in service to corporations or business enterprises are being increasingly subjected to expensive and time-consuming litigation relating to, among other things, matters that traditionally would have been brought only against the Company or business enterprise itself.  Section 7.5 of the Bylaws of the Company (the "**Bylaws**") requires indemnification of the officers and directors of the Company.  Indemnitee may also be entitled to indemnification pursuant to the laws of the State of Delaware ("**Delaware Law**").  The indemnification provisions set forth therein are not exclusive, and thereby contemplate that contracts may be entered into between the Company and members of the Board, officers and other persons with respect to indemnification;

**WHEREAS**, the uncertainties relating to such insurance and to indemnification have increased the difficulty of attracting and retaining such persons;

**WHEREAS**, the Board has determined that the increased difficulty in attracting and retaining such persons is detrimental to the best interests of the Company's stockholders and that the Company should act to assure such persons that there will be increased certainty of such protection in the future;

**WHEREAS**, it is reasonable, prudent and necessary for the Company contractually to obligate itself to indemnify, and to advance expenses on behalf of, such persons to the fullest extent permitted by applicable law so that they will serve or continue to serve the Company free from undue concern that they will not be so indemnified;

**WHEREAS**, this Agreement is a supplement to and in furtherance of the Bylaws and any resolutions adopted pursuant thereto, and shall not be deemed a substitute therefor, nor to diminish or abrogate any rights of Indemnitee thereunder; and

**WHEREAS**, Indemnitee does not regard the protection available under the Bylaws and insurance as adequate in the present circumstances, and may not be willing to serve as a director

DocuSign Envelope ID: 3A87A40A-FFD1-4694-AC3F-E20B5A20429A

and officer without adequate protection, and the Company desires Indemnitee to serve in such capacity.  Indemnitee is willing to serve, continue to serve and to take on additional service for or on behalf of the Company on the condition that Indemnitee be so indemnified.

**NOW, THEREFORE**, in consideration of Indemnitee's agreement to serve as a director from and after the date hereof, the parties hereto agree as follows:

1.      Indemnity of Indemnitee.  The Company hereby agrees to hold harmless and indemnify Indemnitee to the fullest extent permitted by law, as such may be amended from time to time.  In furtherance of the foregoing indemnification, and without limiting the generality thereof:

(a)      Proceedings Other Than Proceedings by or in the Right of the Company.  Indemnitee shall be entitled to the rights of indemnification provided in this Section l(a) if, by reason of Indemnitee's Corporate Status (as hereinafter defined), the Indemnitee is, or is threatened to be made, a party to or participant in any Proceeding (as hereinafter defined) other than a Proceeding by or in the right of the Company.  Pursuant to this Section 1(a), Indemnitee shall be indemnified against all Expenses (as hereinafter defined), judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by Indemnitee, or on Indemnitee's behalf, in connection with such Proceeding or any claim, issue or matter therein, if the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and with respect to any criminal Proceeding, had no reasonable cause to believe the Indemnitee's conduct was unlawful.

(b)      Proceedings by or in the Right of the Company.  Indemnitee shall be entitled to the rights of indemnification provided in this Section 1(b) if, by reason of Indemnitee's Corporate Status, the Indemnitee is, or is threatened to be made, a party to or participant in any Proceeding brought by or in the right of the Company.  Pursuant to this Section 1(b), Indemnitee shall be indemnified against all Expenses actually and reasonably incurred by the Indemnitee, or on the Indemnitee's behalf, in connection with such Proceeding if the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in or not opposed to the best interests of the Company; provided, however, if applicable law so provides, no indemnification against such Expenses shall be made in respect of any claim, issue or matter in such Proceeding as to which Indemnitee shall have been adjudged to be liable to the Company unless and to the extent that a federal or state court located in Wilmington, Delaware shall determine that such indemnification may be made.

(c)      Indemnification for Expenses of a Party Who is Wholly or Partly Successful.  Notwithstanding any other provision of this Agreement, to the extent that Indemnitee is, by reason of Indemnitee's Corporate Status, a party to and is successful, on the merits or otherwise, in any Proceeding, Indemnitee shall be indemnified to the maximum extent permitted by law, as such may be amended from time to time, against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection therewith.  If Indemnitee is not wholly successful in such Proceeding but is successful, on the merits or otherwise, as to one or more but less than all claims, issues or matters in such Proceeding, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection with each successfully resolved claim, issue or matter.  For purposes of this Section and without limitation, the termination of any claim,

DocuSign Envelope ID: 3A87A40A-FFD1-4694-AC3F-E20B5A20429A

issue or matter in such a Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

2.    <u>Additional Indemnity</u>.  In addition to, and without regard to any limitations on, the indemnification provided for in <u>Section 1</u> of this Agreement, the Company shall and hereby does indemnify and hold harmless Indemnitee against all Expenses, judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by Indemnitee or on Indemnitee's behalf if, by reason of Indemnitee's Corporate Status, Indemnitee is, or is threatened to be made, a party to or participant in any Proceeding (including a Proceeding by or in the right of the Company), including, without limitation, all liability arising out of the negligence or active or passive wrongdoing of Indemnitee.  The only limitation that shall exist upon the Company's obligations pursuant to this Agreement shall be that the Company shall not be obligated to make any payment to Indemnitee that is finally determined (under the procedures, and subject to the presumptions, set forth in <u>Sections 6</u> and <u>7</u> hereof) to be unlawful.

3.    <u>Contribution</u>.

(a)    Whether or not the indemnification provided in <u>Sections 1</u> and <u>2</u> hereof is available, in respect of any threatened, pending or completed action, suit or proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), the Company shall pay, in the first instance, the entire amount of any judgment or settlement of such action, suit or proceeding without requiring Indemnitee to contribute to such payment and the Company hereby waives and relinquishes any right of contribution it may have against Indemnitee.  The Company shall not enter into any settlement of any action, suit or proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding) unless such settlement provides for a full and final release of all claims asserted against Indemnitee.

(b)    Without diminishing or impairing the obligations of the Company set forth in the preceding subparagraph, if, for any reason, Indemnitee shall elect or be required to pay all or any portion of any judgment or settlement in any threatened, pending or completed action, suit or proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), the Company shall contribute to the amount of Expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred and paid or payable by Indemnitee in proportion to the relative benefits received by the Company and all officers, directors or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), on the one hand, and Indemnitee, on the other hand, from the transaction or events from which such action, suit or proceeding arose; <u>provided</u>, <u>however</u>, that the proportion determined on the basis of relative benefit may, to the extent necessary to conform to law, be further adjusted by reference to the relative fault of the Company and all officers, directors or employees of the Company other than Indemnitee who are jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), on the one hand, and Indemnitee, on the other hand, in connection with the transaction or events that resulted in such expenses, judgments, fines or settlement amounts, as well as any other equitable considerations which applicable law may require to be considered. The relative fault of the Company and all officers, directors or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), on the one hand, and Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to

3

gain personal profit or advantage, the degree to which their liability is primary or secondary and the degree to which their conduct is active or passive.

(c)     The Company hereby agrees to fully indemnify and hold Indemnitee harmless from any claims of contribution which may be brought by officers, directors, or employees of the Company, other than Indemnitee, who may be jointly liable with Indemnitee.

(d)     To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes, amounts paid or to be paid in settlement and/or for Expenses, in connection with any claim relating to an indemnifiable event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Proceeding in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Proceeding and/or (ii) the relative fault of the Company (and its directors, officers, employees and agents) and Indemnitee in connection with such event(s) and/or transaction(s).

4.      <u>Indemnification for Expenses of a Witness</u>.  Notwithstanding any other provision of this Agreement, to the extent that Indemnitee is, by reason of Indemnitee's Corporate Status, a witness, or is made (or asked) to respond to discovery requests, in any Proceeding to which Indemnitee is not a party, Indemnitee shall be indemnified against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection therewith.

5.      <u>Advancement of Expenses</u>.    Notwithstanding any other provision of this Agreement, the Company shall advance all Expenses incurred by or on behalf of Indemnitee in connection with any Proceeding by reason of Indemnitee's Corporate Status within thirty (30) days after the receipt by the Company of a statement or statements from Indemnitee requesting such advance or advances from time to time, whether prior to or after final disposition of such Proceeding.  Such statement or statements shall reasonably evidence the Expenses incurred by Indemnitee and shall include or be preceded or accompanied by a written undertaking by or on behalf of Indemnitee to repay any Expenses advanced if it shall ultimately be determined that Indemnitee is not entitled to be indemnified against such Expenses.  Any advances and undertakings to repay pursuant to this <u>Section 5</u> shall be unsecured and interest free.

6.      <u>Procedures and Presumptions for Determination of Entitlement to Indemnification</u>.  It is the intent of this Agreement to secure for Indemnitee rights of indemnity that are as favorable as may be permitted under Delaware Law and public policy of the State of Delaware.  Accordingly, the parties agree that the following procedures and presumptions shall apply in the event of any question as to whether Indemnitee is entitled to indemnification under this Agreement:

(a)     To obtain indemnification under this Agreement, Indemnitee shall submit to the Company a written request, including therein or therewith such documentation and information as is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification.  The Secretary of the Company shall, promptly upon receipt of such a request for indemnification, advise the Board in writing that Indemnitee has requested indemnification.  Notwithstanding the foregoing, any failure of Indemnitee to provide such a request to the Company, or to provide such a request in a

timely fashion, shall not relieve the Company of any liability that it may have to Indemnitee unless, and to the extent that, such failure actually and materially prejudices the interests of the Company.

(b)     Upon written request by Indemnitee for indemnification pursuant to the first sentence of Section 6(a) hereof, a determination with respect to Indemnitee's entitlement thereto shall be made in the specific case by one of the following four methods, which shall be at the election of the Board (1) by a majority vote of the disinterested directors, even though less than a quorum, (2) by a committee of disinterested directors designated by a majority vote of the disinterested directors, even though less than a quorum, (3) if there are no disinterested directors or if the disinterested directors so direct, by independent legal counsel in a written opinion to the Board, a copy of which shall be delivered to the Indemnitee, or (4) if so directed by the Board, by the stockholders of the Company.   For purposes hereof, disinterested directors are those members of the Board who are not parties to the action, suit or proceeding in respect of which indemnification is sought by Indemnitee.

(c)     If the determination of entitlement to indemnification is to be made by Independent Counsel pursuant to Section 6(b) hereof, the Independent Counsel shall be selected as provided in this Section 6(c).   The Independent Counsel shall be selected by the Board. Indemnitee may, within ten (10) days after such written notice of selection shall have been given, deliver to the Company a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not meet the requirements of "**Independent Counsel**" as defined in Section 13 of this Agreement, and the objection shall set forth with particularity the factual basis of such assertion.  Absent a proper and timely objection, the person so selected shall act as Independent Counsel.  If a written objection is made and substantiated, the Independent Counsel selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit.  If, within twenty (20) days after submission by Indemnitee of a written request for indemnification pursuant to Section 6(a) hereof, no Independent Counsel shall have been selected and not objected to, either the Company or Indemnitee may file in any federal or state court located in Wilmington, Delaware or other court of competent jurisdiction for resolution of any objection which shall have been made by the Indemnitee to the Company's selection of Independent Counsel and/or for the appointment as Independent Counsel of a person selected by the court or by such other person as the court shall designate, and the person with respect to whom all objections are so resolved or the person so appointed shall act as Independent Counsel under Section 6(b) hereof.  The Company shall pay any and all reasonable fees and expenses of Independent Counsel incurred by such Independent Counsel in connection with acting pursuant to Section 6(b) hereof, and the Company shall pay all reasonable fees and expenses incident to the procedures of this Section 6(c), regardless of the manner in which such Independent Counsel was selected or appointed.

(d)     In making a determination with respect to entitlement to indemnification hereunder, the person or persons or entity making such determination shall presume that Indemnitee is entitled to indemnification under this Agreement.  Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence.   Neither the failure of the Company (including by its directors or independent legal counsel) to have made a determination prior to the commencement of any action pursuant to this Agreement that indemnification is proper in the circumstances because Indemnitee has met the applicable standard of conduct, nor an actual determination by the

5

Company (including by its directors or independent legal counsel) that Indemnitee has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that Indemnitee has not met the applicable standard of conduct.

(e)     Indemnitee shall be deemed to have acted in good faith if Indemnitee's action is based on the records or books of account of the Enterprise (as hereinafter defined), including financial statements, or on information supplied to Indemnitee by the officers of the Enterprise in the course of their duties, or on the advice of legal counsel for the Enterprise or on information or records given or reports made to the Enterprise by an independent certified public accountant or by an appraiser or other expert selected with reasonable care by the Enterprise.  In addition, the knowledge and/or actions, or failure to act, of any director, officer, agent or employee of the Enterprise shall not be imputed to Indemnitee for purposes of determining the right to indemnification under this Agreement.  Whether or not the foregoing provisions of this Section 6(e) are satisfied, it shall in any event be presumed that Indemnitee has at all times acted in good faith and in a manner Indemnitee reasonably believed to be in or not opposed to the best interests of the Company.  Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence.

(f)     If the person, persons or entity empowered or selected under Section 6 to determine whether Indemnitee is entitled to indemnification shall not have made a determination within sixty (60) days after receipt by the Company of the request therefor, the requisite determination of entitlement to indemnification shall be deemed to have been made and Indemnitee shall be entitled to such indemnification absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statement not materially misleading, in connection with the request for indemnification, or (ii) a prohibition of such indemnification under applicable law; provided, however, that such sixty (60) day period may be extended for a reasonable time, not to exceed an additional thirty (30) days, if the person, persons or entity making such determination with respect to entitlement to indemnification in good faith requires such additional time to obtain or evaluate documentation and/or information relating thereto; and provided further, that the foregoing provisions of this Section 6(f) shall not apply if the determination of entitlement to indemnification is to be made by the stockholders pursuant to Section 6(b) of this Agreement and if (A) within fifteen (15) days after receipt by the Company of the request for such determination, the Board or the Disinterested Directors, if appropriate, resolve to submit such determination to the stockholders for their consideration at an annual meeting thereof to be held within seventy five (75) days after such receipt and such determination is made threat, or (B) a special meeting of stockholders is called within fifteen (15) days after such receipt for the purpose of making such determination, such meeting is held for such purpose within sixty (60) days after having been so called and such determination is made threat.

(g)     Indemnitee shall cooperate with the person, persons or entity making such determination with respect to Indemnitee's entitlement to indemnification, including providing to such person, persons or entity upon reasonable advance request any documentation or information which is not privileged or otherwise protected from disclosure and which is reasonably available to Indemnitee and reasonably necessary to such determination.  Any Independent Counsel, member of the Board or stockholder of the Company shall act reasonably and in good faith in making a determination regarding the Indemnitee's entitlement to indemnification under this Agreement.  Any costs or expenses (including attorneys' fees and disbursements) incurred by Indemnitee in so cooperating with the person, persons or entity

making such determination shall be borne by the Company (irrespective of the determination as to Indemnitee's entitlement to indemnification) and the Company hereby indemnifies and agrees to hold Indemnitee harmless therefrom.

(h)     The Company acknowledges that a settlement or other disposition short of final judgment may be successful if it permits a party to avoid expense, delay, distraction, disruption and uncertainty.  In the event that any action, claim or proceeding to which Indemnitee is a party is resolved in any manner other than by adverse judgment against Indemnitee (including, without limitation, settlement of such action, claim or proceeding with or without payment of money or other consideration) it shall be presumed that Indemnitee has been successful on the merits or otherwise in such action, suit or proceeding.  Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence.

(i)     The termination of any Proceeding or of any claim, issue or matter therein, by judgment, order, settlement or conviction, or upon a plea of nolo contendere or its equivalent, shall not (except as otherwise expressly provided in this Agreement) of itself adversely affect the right of Indemnitee to indemnification or create a presumption that Indemnitee did not act in good faith and in a manner which Indemnitee reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal Proceeding, that Indemnitee had reasonable cause to believe that Indemnitee's conduct was unlawful.

7.     <u>Remedies of Indemnitee</u>.

(a)     In the event that (i) a determination is made pursuant to <u>Section 6</u> of this Agreement that Indemnitee is not entitled to indemnification under this Agreement, (ii) advancement of Expenses is not timely made pursuant to <u>Section 5</u> of this Agreement, (iii) no determination of entitlement to indemnification is made pursuant to <u>Section 6(b)</u> of this Agreement within ninety (90) days after receipt by the Company of the request for indemnification, (iv) payment of indemnification is not made pursuant to this Agreement within ten (10) days after receipt by the Company of a written request therefor, or (v) payment of indemnification is not made within ten (10) days after a determination has been made that Indemnitee is entitled to indemnification or such determination is deemed to have been made pursuant to <u>Section 6</u> of this Agreement, Indemnitee shall be entitled to an adjudication in a federal or state court located in Wilmington, Delaware, or in any other court of competent jurisdiction, of Indemnitee's entitlement to such indemnification.  Indemnitee shall commence such proceeding seeking an adjudication within one hundred eighty (180) days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this <u>Section 7(a)</u>.  The Company shall not oppose Indemnitee's right to seek any such adjudication.

(b)     In the event that a determination shall have been made pursuant to <u>Section 6(b)</u> of this Agreement that Indemnitee is not entitled to indemnification, any judicial proceeding commenced pursuant to this <u>Section 7</u> shall be conducted in all respects as a de novo trial on the merits, and Indemnitee shall not be prejudiced by reason of the adverse determination under <u>Section 6(b)</u>.

(c)     If a determination shall have been made pursuant to <u>Section 6(b)</u> of this Agreement that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding commenced pursuant to this <u>Section 7</u>, absent (i) a

7

DocuSign Envelope ID: 3A87A40A-FFD1-4694-AC3F-E20B5A20429A

misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's misstatement not materially misleading in connection with the application for indemnification, or (ii) a prohibition of such indemnification under applicable law.

(d)     In the event that Indemnitee, pursuant to this <u>Section 7</u>, seeks a judicial adjudication of Indemnitee's rights under, or to recover damages for breach of, this Agreement, or to recover under any directors' and officers' liability insurance policies maintained by the Company, the Company shall pay on Indemnitee's behalf, in advance, any and all expenses (of the types described in the definition of Expenses in <u>Section 13</u> of this Agreement) actually and reasonably incurred by Indemnitee in such judicial adjudication, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, advancement of expenses or insurance recovery.

(e)     The Company shall be precluded from asserting in any judicial proceeding commenced pursuant to this <u>Section 7</u> that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate in any such court that the Company is bound by all the provisions of this Agreement.  The Company shall indemnify Indemnitee against any and all Expenses and, if requested by Indemnitee, shall (within ten (10) days after receipt by the Company of a written request therefore) advance, to the extent not prohibited by law, such expenses to Indemnitee, which are incurred by Indemnitee in connection with any action brought by Indemnitee for indemnification or advance of Expenses from the Company under this Agreement or under any directors' and officers' liability insurance policies maintained by the Company, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, advancement of Expenses or insurance recovery, as the case may be.

(f)     Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement to indemnification under this Agreement shall be required to be made prior to the final disposition of the Proceeding.

8.     <u>Non-Exclusivity; Survival of Rights; Insurance; Primacy of Indemnification; Subrogation</u>.

(a)     The rights of indemnification as provided by this Agreement shall not be deemed exclusive of any other rights to which Indemnitee may at any time be entitled under applicable law, the Certificate of Incorporation, the Bylaws, any agreement, a vote of stockholders, a resolution of directors of the Company, or otherwise.  No amendment, alteration or repeal of this Agreement or of any provision hereof shall limit or restrict any right of Indemnitee under this Agreement in respect of any action taken or omitted by such Indemnitee in Indemnitee's Corporate Status prior to such amendment, alteration or repeal.  To the extent that a change in Delaware Law, whether by statute or judicial decision, permits greater indemnification than would be afforded currently under the Certificate of Incorporation, Bylaws and this Agreement, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change.  No right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

(b)     To the extent that the Company maintains an insurance policy or policies providing liability insurance for directors, officers, employees, or agents or fiduciaries of the Company or of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise that such person serves at the request of the Company, Indemnitee shall be covered by such policy or policies in accordance with its or their terms to the maximum extent of the coverage available for any director, officer, employee, agent or fiduciary under such policy or policies.  If, at the time of the receipt of a notice of a claim pursuant to the terms hereof, the Company has directors' and officers' liability insurance in effect, the Company shall give prompt notice of the commencement of such proceeding to the insurers in accordance with the procedures set forth in the respective policies.  The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of the Indemnitee, all amounts payable as a result of such proceeding in accordance with the terms of such policies.

(c)     In the event of any payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights.

(d)     The Company shall not be liable under this Agreement to make any payment of amounts otherwise indemnifiable hereunder if and to the extent that Indemnitee has otherwise actually received such payment under any insurance policy, contract, agreement or otherwise.

(e)     The Company's obligation to indemnify or advance Expenses hereunder to Indemnitee who is or was serving at the request of the Company as a director, officer, employee or agent of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise shall be reduced by any amount Indemnitee has actually received as indemnification or advancement of expenses from such other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise.

9.     <u>Exception to Right of Indemnification</u>. Notwithstanding any provision in this Agreement, the Company shall not be obligated under this Agreement to make any indemnity in connection with any claim made against Indemnitee:

(a)     for which payment has actually been made to or on behalf of Indemnitee under any insurance policy or other indemnity provision, except with respect to any excess beyond the amount paid under any insurance policy or other indemnity provision, provided, that the foregoing shall not affect the rights of Indemnitee set forth in <u>Section 8(c)</u> above; or

(b)     for an accounting of profits made from the purchase and sale (or sale and purchase) by Indemnitee of securities of the Company within the meaning of <u>Section 16(b)</u> of the Securities Exchange Act of 1934, as amended, or similar provisions of state statutory law or common law; or

(c)     in connection with any Proceeding (or any part of any Proceeding) initiated by Indemnitee, including any Proceeding (or any part of any Proceeding) initiated by Indemnitee against the Company or its directors, officers, employees or other indemnitees, unless (i) the Board authorized the Proceeding (or any part of any Proceeding) prior to its

9

initiation, or (ii) the Company provides the indemnification, in its sole discretion, pursuant to the powers vested in the Company under applicable law.

10. <u>Duration of Agreement</u>. All agreements and obligations of the Company contained herein shall continue during the period Indemnitee is a director or officer of the Company (or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise) and shall continue thereafter so long as Indemnitee shall be subject to any Proceeding (or any proceeding commenced under <u>Section 7</u> hereof) by reason of Indemnitee's Corporate Status, whether or not Indemnitee is acting or serving in any such capacity at the time any liability or expense is incurred for which indemnification can be provided under this Agreement. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business or assets of the Company), assigns, spouses, heirs, executors and personal and legal representatives.

11. <u>Security</u>. To the extent requested by Indemnitee and approved by the Board, the Company may at any time and from time to time provide security to Indemnitee for the Company's obligations hereunder through an irrevocable bank line of credit, funded trust or other collateral. Any such security, once provided to Indemnitee, may not be revoked or released without the prior written consent of the Indemnitee.

12. <u>Enforcement</u>.

(a) The Company expressly confirms and agrees that it has entered into this Agreement and assumes the obligations imposed on it hereby in order to induce Indemnitee to serve as a director of the Company, and the Company acknowledges that Indemnitee is relying upon this Agreement in serving as an a director of the Company.

(b) This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof.

(c) The Company shall not seek from a court, or agree to, a "bar order" which would have the effect of prohibiting or limiting the Indemnitee's rights to receive advancement of expenses under this Agreement.

13. <u>Definitions</u>. For purposes of this Agreement:

(a) "**Corporate Status**" describes the status of a person who is or was a director, officer, employee, agent or fiduciary of the Company or of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise that such person is or was serving at the express written request of the Company.

(b) "**Disinterested Director**" means a director of the Company who is not and was not a party to the Proceeding in respect of which indemnification is sought by Indemnitee.

(c)      "**Enterprise**" shall mean the Company and any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise that Indemnitee is or was serving at the express written request of the Company as a director, officer, employee, agent or fiduciary.

(d)      "**Expenses**" shall include all reasonable attorneys' fees, retainers, court costs, transcript costs, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, participating, or being or preparing to be a witness in a Proceeding, or responding to, or objecting to, a request to provide discovery in any Proceeding.   Expenses also shall include Expenses incurred in connection with any appeal resulting from any Proceeding, including without limitation the premium, security for, and other costs relating to any cost bond, supersedeas bond, or other appeal bond or its equivalent. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(e)      "**Independent Counsel**" means a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither presently is, nor in the past five years has been, retained to represent (i) the Company or Indemnitee in any matter material to either such party (other than with respect to matters concerning Indemnitee under this Agreement, or of other indemnitees under similar indemnification agreements), or (ii) any other party to the Proceeding giving rise to a claim for indemnification hereunder.   Notwithstanding the foregoing, the term "Independent Counsel" shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.   The Company agrees to pay the reasonable fees of the Independent Counsel referred to above and to fully indemnify such counsel against any and all Expenses, claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto.

(f)      "**Proceeding**" includes any threatened, pending or completed action, suit, arbitration, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or any other actual, threatened or completed proceeding, whether brought by or in the right of the Company or otherwise and whether civil, criminal, administrative or investigative, in which Indemnitee was, is or will be involved as a party or otherwise, by reason of Indemnitee's Corporate Status, by reason of any action taken by Indemnitee or of any inaction on Indemnitee's part while acting in Indemnitee's Corporate Status; in each case whether or not Indemnitee is acting or serving in any such capacity at the time any liability or expense is incurred for which indemnification can be provided under this Agreement; including one pending on or before the date of this Agreement, but excluding one initiated by an Indemnitee pursuant to Section 7 of this Agreement to enforce Indemnitee's rights under this Agreement.

14.      Severability.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.   Without limiting the generality of the foregoing, this Agreement is intended to confer upon Indemnitee indemnification rights to the fullest extent permitted by applicable laws.   In the event any provision hereof conflicts with any applicable law, such provision shall be deemed modified, consistent with the aforementioned intent, to the extent necessary to resolve such conflict.

15.    Modification and Waiver.   No supplement, modification, termination or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar) nor shall such waiver constitute a continuing waiver.

16.    Notice By Indemnitee.   Indemnitee agrees promptly to notify the Company in writing upon being served with or otherwise receiving any summons, citation, subpoena, complaint, indictment, information or other document relating to any Proceeding or matter which may be subject to indemnification covered hereunder.  The failure to so notify the Company shall not relieve the Company of any obligation which it may have to Indemnitee under this Agreement or otherwise unless and only to the extent that such failure or delay materially prejudices the Company.

17.    Notices.   All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be sent:

(a)    To Indemnitee at the address set forth below Indemnitee signature hereto.

(b)    To the Company at: 2219 Reserve Ct., Lexington, KY 40514

E-mail: contact@slync.io

or to such other address as may have been furnished to Indemnitee by the Company or to the Company by Indemnitee, as the case may be.

18.    Counterparts.   This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or as a PDF or similar attachment to an electronic communication shall have the same effect as delivery of a manually executed counterpart to this Agreement.

19.    Headings.   The headings of the paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

20.    Governing Law and Consent to Jurisdiction.   This Agreement shall be governed by and construed in accordance with the law of the State of Delaware as to matters within the scope thereof, and as to all other matters shall be governed by and construed in accordance with the internal laws of the State of Delaware, without regard to its principles of conflicts of laws.  Any suit involving any dispute or matter arising under this Agreement may only be brought in federal or state courts located in Wilmington, Delaware.  The Company and Indemnitee hereby consent to the exercise of personal jurisdiction by any such court with respect to any such suit.

Indemnification Agreement (180116)

DocuSign Envelope ID: 3A87A40A-FFD1-4694-AC3F-E20B5A20429A

**REMAINDER OF PAGE HAS INTENTIONALLY BEEN LEFT BLANK**

Indemnification Agreement (180116)

IN WITNESS WHEREOF, the parties hereto have executed this Indemnification Agreement on and as of the day and year first above written.

**COMPANY:**

SLYNC, INC.

Name:  Christopher Kirchner

Title:  President.

**INDEMNITEE**

Name:   Christopher S. Kirchner

Address:  2219 Reserve Ct.
Lexington, KY 40514

# EXHIBIT B



# Delaware

Page 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE RESTATED CERTIFICATE OF "SLYNC, INC.", FILED IN
THIS OFFICE ON THE SEVENTH DAY OF DECEMBER, A.D. 2020, AT 3:22
O`CLOCK P.M.

Jeffrey W. Bullock, Secretary of State

6447707  8100
SR# 20208577851

Authentication: 204248992
Date: 12-07-20

You may verify this certificate online at corp.delaware.gov/authver.shtml

State of Delaware
Secretary of State
Division of Corporations
Delivered 03:22 PM 12/07/2020
FILED 03:22 PM 12/07/2020
SR 20208577851 - File Number 6447707

AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
SLYNC, INC

(Pursuant to Sections 242 and 245 of the
General Corporation Law of the State of Delaware)

Slync, Inc., a corporation organized and existing under and by virtue of the provisions of the General Corporation Law of the State of Delaware (the "**General Corporation Law**"),

**DOES HEREBY CERTIFY**:

**1.**     That the name of this corporation is Slync, Inc., and that this corporation was originally incorporated pursuant to the General Corporation Law on June 16, 2017 under the name SupplyLinc, Inc.

**2.**     That the Board of Directors duly adopted resolutions proposing to amend and restate the Certificate of Incorporation, and any Certificates of Designation, of this corporation, declaring said amendment and restatement to be advisable and in the best interests of this corporation and its stockholders, and authorizing the appropriate officers of this corporation to solicit the consent of the stockholders therefor, which resolution setting forth the proposed amendment and restatement is as follows:

**RESOLVED**, that the Certificate of Incorporation of this corporation be amended and restated in its entirety to read as follows:

**FIRST**: The name of this corporation is Slync, Inc. (the "**Corporation**").

**SECOND**: The address of the registered office of the Corporation in the State of Delaware is 3500 South DuPont Highway, in the City of Dover, County of Kent, zip code 19901. The name of its registered agent at such address is Incorporating Services, Ltd.

**THIRD**: The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law.

**FOURTH**: The total number of shares of all classes of stock which the Corporation shall have authority to issue is (i) 51,500,000 shares of Common Stock, $0.001 par value per share ("**Common Stock**") and (ii) 26,729,140 shares of Preferred Stock, $0.001 par value per share ("**Preferred Stock**").

The following is a statement of the designations and the powers, privileges and rights, and the qualifications, limitations or restrictions thereof in respect of each class of capital stock of the Corporation.

4135-6350-6214.8

A.    COMMON STOCK

1.    General. The voting, dividend and liquidation rights of the holders of the Common Stock are subject to and qualified by the rights, powers and preferences of the holders of the Preferred Stock set forth herein.

2.    Voting. The holders of the Common Stock are entitled to one vote for each share of Common Stock held at all meetings of stockholders (and written actions in lieu of meetings); provided, however, that, except as otherwise required by law, holders of Common Stock, as such, shall not be entitled to vote on any amendment to this Amended and Restated Certificate of Incorporation that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to this Amended and Restated Certificate of Incorporation or pursuant to the General Corporation Law. There shall be no cumulative voting. The number of authorized shares of Common Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by (in addition to any vote of the holders of one or more series of Preferred Stock that may be required by the terms of this Amended and Restated Certificate of Incorporation) the affirmative vote of the holders of shares of capital stock of the Corporation representing a majority of the votes represented by all outstanding shares of capital stock of the Corporation entitled to vote, irrespective of the provisions of Section 242(b)(2) of the General Corporation Law.

B.    PREFERRED STOCK

3,176,102 shares of the authorized Preferred Stock of the Corporation are hereby designated "**Series Seed Preferred Stock**" with the following rights, preferences, powers, privileges and restrictions, qualifications and limitations. 9,055,675 shares of the authorized Preferred Stock of the Corporation are hereby designated "**Series A-1 Preferred Stock**" with the following rights, preferences, powers, privileges and restrictions, qualifications and limitations. 1,966,825 shares of the authorized Preferred Stock of the Corporation are hereby designated "**Series A-2 Preferred Stock**" with the following rights, preferences, powers, privileges and restrictions, qualifications and limitations. 12,530,538 shares of the authorized and unissued Preferred Stock of the Corporation are hereby designated "**Series B Preferred Stock**" with the following rights, preferences, powers, privileges and restrictions, qualifications and limitations. The Series A-1 Preferred Stock and Series A-2 Preferred Stock are collectively referred to as the "**Series A Preferred Stock.**" Unless otherwise indicated, references to "sections" or "subsections" in this Part B of this Article Fourth refer to sections and subsections of Part B of this Article Fourth.

1.    Dividends.

The holders of shares of Series A Preferred Stock and Series B Preferred Stock shall be entitled to receive dividends, out of any assets legally available therefor, on a pari passu basis, prior and in preference to any declaration or payment of any dividend (payable other than in Common Stock or other securities and rights convertible into or entitling the holder thereof to receive, directly or indirectly, additional shares of Common Stock of this Corporation) on shares of any other class or series of capital stock of the Corporation, at the rate per annum of eight percent

2

(8%) of the Applicable Original Issue Price (as defined below), payable when, as, and if declared by the Board of Directors (the "**Preferred Dividend**"). The Preferred Dividend shall not be cumulative. Any partial payment of the Preferred Dividend shall be made ratably among the holders of Series A Preferred Stock and Series B Preferred Stock in proportion to the payment each such holder would receive if the full amount of such dividends were paid. After payment of the Preferred Dividend, any additional dividends paid to the stockholders of the Corporation shall be distributed among the holders of Common Stock and Preferred Stock, pro rata on an as-converted basis. The "**Applicable Original Issue Price**" shall mean, (i) with respect to the Series B Preferred Stock, $4.7883 per share (ii) with respect to the Series A-1 Preferred Stock, $1.3186 per share, (iii) with respect to the Series A-2 Preferred Stock, $1.1500 per share, and (iv) with respect to the Series Seed Preferred Stock, $1.4184 per share, in each case subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to any applicable series of Preferred Stock.

        2.        <u>Liquidation, Dissolution or Winding Up: Certain Mergers, Consolidations and Asset Sales</u>.

        2.1.        <u>Preferential Payments to Holders of Series A Preferred Stock and Series B Preferred Stock</u>. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, the holders of shares of Series A Preferred Stock and Series B Preferred Stock then outstanding shall be entitled to be paid on a pari passu basis out of the assets of the Corporation available for distribution to its stockholders, and in the event of a Deemed Liquidation Event (as defined below), the holders of shares of Series A Preferred Stock and Series B Preferred Stock then outstanding shall be entitled to be paid on a pari passu basis out of the consideration payable to stockholders in such Deemed Liquidation Event or out of the Available Proceeds (as defined below), as applicable, before any payment shall be made to the holders of the Series Seed Preferred Stock or the Common Stock by reason of their ownership thereof, an amount per share on a pari passu basis equal to the greater of (i) the Applicable Original Issue Price, plus any dividends declared but unpaid thereon, or (ii) such amount per share of Series A Preferred Stock and Series B Preferred Stock, as would have been payable had all shares of Series A Preferred Stock or Series B Preferred Stock, respectively, been converted into Common Stock pursuant to <u>Section 4</u> immediately prior to such liquidation, dissolution, winding up or Deemed Liquidation Event (the amount payable pursuant to this sentence is hereinafter referred to as the "**Preferred Liquidation Amount**"). If upon any such liquidation, dissolution or winding up of the Corporation or Deemed Liquidation Event, the assets of the Corporation available for distribution to its stockholders shall be insufficient to pay the holders of shares of Series A Preferred Stock and Series B Preferred Stock the full amount to which they shall be entitled under this <u>Subsection 2.1</u>, the holders of shares of Series A Preferred Stock and Series B Preferred Stock shall share ratably in any distribution of the assets available for distribution in proportion to the respective amounts which would otherwise be payable in respect of the shares held by them upon such distribution if all amounts payable on or with respect to such shares were paid in full.

        2.2.        <u>Preferential Payments to Holders of Series Seed Preferred Stock</u>. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, after payment or setting aside for payment for the Preferred Liquidation Amount, the holders of shares of Series Seed Preferred Stock then outstanding shall be entitled to be paid out of the assets of the Corporation available for distribution to its stockholders, and in the event of a Deemed

3

Liquidation Event (as defined below), after payment or setting aside for payment for the Preferred Liquidation Amount, the holders of shares of Series Seed Preferred Stock then outstanding shall be entitled to be paid out of the consideration payable to stockholders in such Deemed Liquidation Event or out of the Available Proceeds (as defined below), as applicable, before any payment shall be made to the holders of Common Stock by reason of their ownership thereof, an amount per share equal to the greater of (i) the Applicable Original Issue Price, plus any dividends declared but unpaid thereon, or (ii) such amount per share as would have been payable had all shares of Series Seed Preferred Stock been converted into Common Stock pursuant to Section 4 immediately prior to such liquidation, dissolution, winding up or Deemed Liquidation Event (the amount payable pursuant to this sentence is hereinafter referred to as the "**Series Seed Liquidation Amount**"). If upon any such liquidation, dissolution or winding up of the Corporation or Deemed Liquidation Event, after payment or setting aside for payment for the Preferred Liquidation Amount, the assets of the Corporation available for distribution to the holders of Series Seed Preferred Stock shall be insufficient to pay the holders of shares of Series Seed Preferred Stock the full amount to which they shall be entitled under this Subsection 2.2, the holders of shares of Series Seed Preferred Stock shall share ratably in any distribution of the assets available for distribution to the holders of Series Seed Preferred Stock in proportion to the respective amounts which would otherwise be payable in respect of the shares held by them upon such distribution if all amounts payable on or with respect to such shares were paid in full.

2.3.    Payments to Holders of Common Stock.    In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, after the payment in full of the Preferred Liquidation Amount and the Series Seed Liquidation Amount required to be paid to the holders of shares of Series A Preferred Stock, the holders of shares of Series B Preferred Stock and the holders of shares of Series Seed Preferred Stock, respectively, the remaining assets of the Corporation available for distribution to its stockholders or, in the case of a Deemed Liquidation Event, the consideration not payable to the holders of shares of Series A Preferred Stock, Series B Preferred Stock or the Series Seed Preferred Stock pursuant to Subsections 2.1 and 2.2 or the remaining Available Proceeds, as the case may be, shall be distributed among the holders of shares of Common Stock, pro rata based on the number of shares held by each such holder.

2.4.    Deemed Liquidation Events.

2.4.1    Definition.    Each of the following events shall be considered a "**Deemed Liquidation Event**" unless the holders of (i) at least a majority of the outstanding shares of Preferred Stock (voting together as a single class on an as-converted basis), (ii) at least a majority of the outstanding shares of Series A Preferred Stock (voting as a separate class) and (iii) at least a majority of the outstanding shares of Series B Preferred Stock (voting as a separate class) (the "**Requisite Holders**") elect otherwise by written notice sent to the Corporation at least five (5) days prior to the effective date of any such event:

(a)    a merger or consolidation in which

(i)    the Corporation is a constituent party or

4

(ii)    a subsidiary of the Corporation is a constituent party and the Corporation issues shares of its capital stock pursuant to such merger or consolidation,

except any such merger or consolidation involving the Corporation or a subsidiary in which the shares of capital stock of the Corporation outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital stock of (1) the surviving or resulting corporation; or (2) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation; or

(b)    (1) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Corporation or any subsidiary of the Corporation of all or substantially all the assets of the Corporation and its subsidiaries taken as a whole, or (2) the sale or disposition (whether by merger, consolidation or otherwise, and whether in a single transaction or a series of related transactions) of one or more subsidiaries of the Corporation if substantially all of the assets of the Corporation and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Corporation.

2.4.2    <u>Effecting a Deemed Liquidation Event</u>.

(a)    The Corporation shall not have the power to effect a Deemed Liquidation Event referred to in <u>Subsection 2.4.1(a)(i)</u> unless the agreement or plan of merger or consolidation for such transaction (the "**Merger Agreement**") provides that the consideration payable to the stockholders of the Corporation in such Deemed Liquidation Event shall be paid to the holders of capital stock of the Corporation in accordance with <u>Subsections 2.1</u>, <u>2.2</u> and <u>2.3</u>.

(b)    In the event of a Deemed Liquidation Event referred to in <u>Subsection 2.4.1(a)(ii)</u> or <u>2.4.1(b)</u>, if the Corporation does not effect a dissolution of the Corporation under the General Corporation Law within ninety (90) days after such Deemed Liquidation Event, then (i) the Corporation shall send a written notice to each holder of Preferred Stock no later than the ninetieth (90th) day after the Deemed Liquidation Event advising such holders of their right (and the requirements to be met to secure such right) pursuant to the terms of the following clause; (ii) to require the redemption of such shares of Preferred Stock, and (iii) unless the Requisite Holders request otherwise in a written instrument delivered to the Corporation not later than thirty (30) days after such Deemed Liquidation Event, the Corporation shall use the consideration received by the Corporation for such Deemed Liquidation Event (net of any retained liabilities associated with the assets sold or technology licensed, as determined in good faith by the Board of Directors of the Corporation), together with any other assets of the Corporation available for distribution to its stockholders, all to the extent permitted by Delaware law governing distributions to stockholders (the "**Available Proceeds**"), on the one hundred fiftieth (150th) day after such Deemed Liquidation Event, to redeem all outstanding shares of

4135-6350-6214.8

Preferred Stock at a price per share equal to the Preferred Liquidation Amount or Series Seed Liquidation Amount, as applicable. Notwithstanding the foregoing, in the event of a redemption pursuant to the preceding sentence, (i) if the Available Proceeds are not sufficient to redeem all outstanding shares of Series A Preferred Stock and Series B Preferred Stock, the Corporation shall redeem a pro rata portion of each holder's shares of Series A Preferred Stock and Series B Preferred Stock to the fullest extent of such Available Proceeds, based on the respective amounts which would otherwise be payable in respect of the shares to be redeemed if the Available Proceeds were sufficient to redeem all such shares, and shall redeem the remaining shares as soon as it may lawfully do so under Delaware law governing distributions to stockholders, and (ii) if, after payment in full to the Series A Preferred Stock and Series B Preferred Stock pursuant to the foregoing clause (i) the Available Proceeds are not sufficient to redeem all outstanding shares of Series Seed Preferred Stock, the Corporation shall redeem a pro rata portion of each holder's shares of Series Seed Preferred Stock to the fullest extent of such Available Proceeds, based on the respective amounts which would otherwise be payable in respect of the shares to be redeemed if the Available Proceeds were sufficient to redeem all such shares, and shall redeem the remaining shares as soon as it may lawfully do so under Delaware law governing distributions to stockholders. Prior to the distribution or redemption provided for in this <u>Subsection 2.4.2(b)</u>, the Corporation shall not expend or dissipate the consideration received for such Deemed Liquidation Event, except to discharge expenses incurred in connection with such Deemed Liquidation Event or in the ordinary course of business.

2.4.3   <u>Amount Deemed Paid or Distributed</u>. The amount deemed paid or distributed to the holders of capital stock of the Corporation upon any such merger, consolidation, sale, transfer, exclusive license, other disposition or redemption shall be the cash or the value of the property, rights or securities to be paid or distributed to such holders pursuant to such Deemed Liquidation Event. The value of such property, rights or securities shall be determined in good faith by the Board of Directors of the Corporation, including the Series B Director.

2.4.4   <u>Allocation of Escrow and Contingent Consideration</u>. In the event of a Deemed Liquidation Event pursuant to <u>Subsection 2.4.1(a)(i)</u>, if any portion of the consideration payable to the stockholders of the Corporation is payable only upon satisfaction of contingencies (the "**Additional Consideration**"), the Merger Agreement shall provide that (a) the portion of such consideration that is not Additional Consideration (such portion, the "**Initial Consideration**") shall be allocated among the holders of capital stock of the Corporation in accordance with <u>Subsections 2.1</u>, <u>2.2</u>, and <u>2.3</u> as if the Initial Consideration were the only consideration payable in connection with such Deemed Liquidation Event; and (b) any Additional Consideration which becomes payable to the stockholders of the Corporation upon satisfaction of such contingencies shall be allocated among the holders of capital stock of the Corporation in accordance with <u>Subsections 2.1</u>, <u>2.2</u>, and <u>2.3</u> after taking into account the previous payment of the Initial Consideration as part of the same transaction. For the purposes of this <u>Subsection 2.4.4</u>, consideration placed into escrow or retained as a holdback to be available for satisfaction of indemnification or similar obligations in connection with such Deemed Liquidation Event shall be deemed to be Additional Consideration.

3.   <u>Voting</u>.

3.1.    <u>General</u>.    On any matter presented to the stockholders of the Corporation for their action or consideration at any meeting of stockholders of the Corporation (or by written consent of stockholders in lieu of meeting), each holder of outstanding shares of Preferred Stock shall be entitled to cast the number of votes equal to the number of whole shares of Common Stock into which the shares of Preferred Stock held by such holder are convertible as of the record date for determining stockholders entitled to vote on such matter.    Except as provided by law or by the other provisions of this Amended and Restated Certificate of Incorporation, holders of Preferred Stock shall vote together with the holders of Common Stock as a single class and on an as-converted to Common Stock basis.

3.2.    <u>Election of Directors</u>.    (i) For so long as there are issued and outstanding at least 3,654,741 shares of Series B Preferred Stock (subject to appropriate adjustment in the event of any stock dividend, stock split, combination, or other similar recapitalization with respect to any applicable series of Series B Preferred Stock), the holders of record of the shares of Series B Preferred Stock, exclusively and as a separate class, shall be entitled to elect one (1) director of the Corporation (the "**Series B Director**"), (ii) for so long as there are issued and outstanding at least 4,108,248 shares of Series A Preferred Stock (subject to appropriate adjustment in the event of any stock dividend, stock split, combination, or other similar recapitalization with respect to any applicable series of Series A Preferred Stock), the holders of record of the shares of Series A Preferred Stock, exclusively and as a separate class, shall be entitled to elect one (1) director of the Corporation (the "**Series A Director**") and (iii) the holders of record of the shares of Common Stock, exclusively and as a separate class, shall be entitled to elect three (3) directors of the Corporation.    Any director elected as provided in the preceding sentence may be removed without cause by, and only by, the affirmative vote of the holders of the shares of the class or series of capital stock entitled to elect such director or directors, given either at a special meeting of such stockholders duly called for that purpose or pursuant to a written consent of stockholders.    If the holders of shares of Series B Preferred Stock, Series A Preferred Stock or Common Stock, as the case may be, fail to elect a sufficient number of directors to fill all directorships for which they are entitled to elect directors, voting exclusively and as a separate class, pursuant to the first sentence of this <u>Subsection 3.2</u>, then any directorship not so filled shall remain vacant until such time as the holders of the Series B Preferred Stock, Series A Preferred Stock or Common Stock, as the case may be, elect a person to fill such directorship by vote or written consent in lieu of a meeting; and no such directorship may be filled by stockholders of the Corporation other than by the stockholders of the Corporation that are entitled to elect a person to fill such directorship, voting exclusively and as a separate class.    The holders of record of the shares of Common Stock, Series B Preferred Stock and Series A Preferred Stock, exclusively and voting together as a single class, shall be entitled to elect the balance of the total number of directors of the Corporation.    At any meeting held for the purpose of electing a director, the presence in person or by proxy of the holders of a majority of the outstanding shares of the class or series entitled to elect such director shall constitute a quorum for the purpose of electing such director.    Except as otherwise provided in this <u>Subsection 3.2</u>, a vacancy in any directorship filled by the holders of any class or series shall be filled only by vote or written consent in lieu of a meeting of the holders of such class or series or by any remaining director or directors elected by the holders of such class or series pursuant to this <u>Subsection 3.2</u>; provided that for administrative convenience, the vacancy for the initial director to be elected as the Series B Director may be filled by the Board of Directors.

4135-6350-6214.8

3.3.    Series B Protective Provisions.  At any time when any shares of Series B Preferred Stock are outstanding,  the Corporation shall not, either directly or indirectly by amendment, merger, consolidation,  operation of law or otherwise, do any of the following without (in addition to any other vote required by law or this Amended and Restated Certificate of Incorporation) the written consent or affirmative vote of the holders of a majority of the outstanding shares of Series B Preferred Stock, voting as a separate class, given in writing or by vote at a meeting,  and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect:

3.3.1    liquidate, dissolve or wind-up the business and affairs of the Corporation,  effect any merger or consolidation  or any other Deemed Liquidation Event,  or consent to any of the foregoing  if such transaction would result in payment to the holders of Series B Preferred Stock in an amount  equal to less than two times (2x) the Applicable  Original  Issuance Price for the Series B Preferred Stock in cash at the closing  of such transaction (subject to appropriate adjustment  for any stock splits,  stock dividends,  combinations,  recapitalizations and the like);

3.3.2    sell shares of Common Stock of the Corporation to the public in a firm-commitment  underwritten  public offering  pursuant to an effective  registration  statement under the Securities  Act of 1933, as amended, at a price per share (prior to underwriting  discounts) equal to less than two times (2x) the Applicable  Original  Issuance Price for the Series B Preferred Stock (subject to appropriate adjustment  for any stock splits,  stock dividends,  combinations, recapitalizations  and the like);

3.3.3    amend, alter, repeal, or waive any provision of this Amended and Restated Certificate  of Incorporation  or the Bylaws of the Corporation;

3.3.4    create, or authorize  the creation of, or issue or obligate  itself to issue shares of, any equity securities (including  convertible  debt or Simple Agreements  for Future Equity)  other than with respect to "Exempted Securities"  (as defined below)  that are approved by the Board of Directors,  including  the Series B Director,  or increase the number of shares reserved for issuance under any equity incentive  plan or adopt any new equity incentive plan other than any such increase or adoption that is approved by the Board of Directors,  including the Series B Director;

3.3.5    increase or decrease the authorized  number of members  of the Board of Directors  or change the method of selecting  members  of the Board of Directors;

3.3.6    purchase or redeem (or permit any subsidiary to purchase or redeem) any shares of capital stock of the Corporation other than (i) redemptions  of the Preferred Stock as expressly authorized herein or (ii) repurchases of stock from former employees, officers, directors,  consultants  or other persons who performed services for the Corporation or any subsidiary in connection with the cessation of such employment  or service at no greater than the original  purchase price thereof;

3.3.7    make any fundamental  change to the nature of the business of the Corporation; or

8

3.3.8   enter into any material transaction with any officer, director or other affiliate of the Corporation on other than arm's length terms, unless otherwise approved by the Board of Directors, including the Series B Director.

3.4.   <u>Series A Protective Provisions</u>.   At any time when any shares of Series A Preferred Stock are outstanding, the Corporation shall not, either directly or indirectly by amendment, merger, consolidation, operation of law or otherwise, do any of the following without (in addition to any other vote required by law or this Amended and Restated Certificate of Incorporation) the written consent or affirmative vote of the holders of a majority of the outstanding shares of Series A Preferred Stock, voting as a separate class, given in writing or by vote at a meeting, and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect:

3.4.1   increase or decrease the authorized number of shares of Series A Preferred Stock;

3.4.2   alter or change the powers, rights, preferences, privileges or restrictions of the Series A Preferred Stock so as to adversely affect the shares of such series; provided, however, that for the avoidance of doubt, the authorization or issuance of any equity security (including any other security convertible into or exercisable or exchangeable for any such equity security) having a preference over, or being on a parity with, the Series A Preferred Stock with respect to dividends, liquidation or redemption, shall not be deemed to adversely affect the holders of Series A Preferred Stock;

3.4.3   create, or authorize the creation of, or issue, or authorize the issuance of any debt security or create any lien or security interest (except for purchase money liens or statutory liens of landlords, mechanics, materialmen, workmen, warehousemen and other similar persons arising or incurred in the ordinary course of business) or incur other indebtedness for borrowed money, including but not limited to obligations and contingent obligations under guarantees, or permit any subsidiary to take any such action with respect to any debt security lien, security interest or other indebtedness for borrowed money, if the aggregate indebtedness of the Corporation and its subsidiaries for borrowed money following such action would exceed $10,000,000 other than equipment leases, bank lines of credit or trade payables incurred in the ordinary course unless such debt security has received the prior approval of the Board of Directors, including the approval of the Series A Director; or

3.4.4   pay or declare any dividend or make any distribution on, any shares of capital stock of the Corporation other than (i) dividends or distributions on the Preferred Stock as expressly authorized herein or (ii) dividends or other distributions payable on the Common Stock solely in the form of additional shares of Common Stock.

3.5.   <u>Preferred Stock Protective Provisions</u>.   At any time when any shares of Preferred Stock are outstanding, the Corporation shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by law or this Amended and Restated Certificate of Incorporation) the written consent or affirmative vote of the holders of (i) at least a majority of the outstanding shares of Preferred Stock (voting together as a single class on an as-converted basis) and (ii) at least a

9

majority of the outstanding shares of Series B Preferred Stock (voting as a separate class on an as-converted basis), given in writing or by vote at a meeting, and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect:

3.5.1   create, or authorize the creation of, or issue, or authorize the issuance of any debt security or create any lien or security interest (except for purchase money liens or statutory liens of landlords, mechanics, materialmen, workmen, warehousemen and other similar persons arising or incurred in the ordinary course of business) or incur other indebtedness for borrowed money, including but not limited to obligations and contingent obligations under guarantees, or permit any subsidiary to take any such action with respect to any debt security lien, security interest or other indebtedness for borrowed money, if the aggregate indebtedness of the Corporation and its subsidiaries for borrowed money following such action would exceed $10,000,000 other than equipment leases, bank lines of credit or trade payables incurred in the ordinary course unless such debt security has received the prior approval of the Board of Directors, including the approval of the Series B Director;

3.5.2   acquire or divest any assets of the Corporation pursuant to a transaction where the aggregate consideration to be received or paid by the Corporation pursuant to such transaction is in excess of $10,000,000, other than with respect to such transactions that are approved by the Board of Directors, including the Series B Director; or

3.5.3   pay or declare any dividend or make any distribution on, any shares of capital stock of the Corporation other than (i) dividends or distributions on the Preferred Stock as expressly authorized herein or (ii) dividends or other distributions payable on the Common Stock solely in the form of additional shares of Common Stock.

4.      Optional Conversion.

The holders of Preferred Stock shall have conversion rights as follows (the "**Conversion Rights**"):

4.1.    Right to Convert.

4.1.1   Conversion Ratio.  Each share of Preferred Stock shall be convertible, at the option of the holder thereof, at any time and from time to time, and without the payment of additional consideration by the holder thereof, into such number of fully paid and non-assessable shares of Common Stock as is determined by dividing the Applicable Original Issue Price of such series of Preferred Stock by the Applicable Conversion Price (as defined below) of such series of Preferred Stock in effect at the time of conversion.  The "**Applicable Conversion Price**" of each Series of Preferred Stock shall initially be equal to the Applicable Original Issue Price of such series of Preferred Stock.  Such initial Applicable Conversion Price, and the rate at which shares of Preferred Stock may be converted into shares of Common Stock, shall be subject to adjustment as provided below.

4.1.2   Termination of Conversion Rights.   In the event of a liquidation, dissolution or winding up of the Corporation or a Deemed Liquidation Event, the Conversion Rights shall terminate at the close of business on the last full day preceding the date

10

fixed for the payment of any such amounts distributable on such event to the holders of Preferred Stock.

        4.2.    <u>Fractional Shares</u>. No fractional shares of Common Stock shall be issued upon conversion of the Preferred Stock. In lieu of any fractional shares to which the holder would otherwise be entitled, the Corporation shall pay cash equal to such fraction multiplied by the fair market value of a share of Common Stock as determined in good faith by the Board of Directors of the Corporation. Whether or not fractional shares would be issuable upon such conversion shall be determined on the basis of the total number of shares of Preferred Stock the holder is at the time converting into Common Stock and the aggregate number of shares of Common Stock issuable upon such conversion.

        4.3.    <u>Mechanics of Conversion</u>.

        4.3.1    <u>Notice of Conversion</u>. In order for a holder of Preferred Stock to voluntarily convert shares of Preferred Stock into shares of Common Stock, such holder shall (a) provide written notice to the Corporation's transfer agent at the office of the transfer agent for the Preferred Stock (or at the principal office of the Corporation if the Corporation serves as its own transfer agent) that such holder elects to convert all or any number of such holder's shares of Preferred Stock and, if applicable, any event on which such conversion is contingent and (b), if such holder's shares are certificated, surrender the certificate or certificates for such shares of Preferred Stock (or, if such registered holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate), at the office of the transfer agent for the Preferred Stock (or at the principal office of the Corporation if the Corporation serves as its own transfer agent). Such notice shall state such holder's name or the names of the nominees in which such holder wishes the shares of Common Stock to be issued. If required by the Corporation, any certificates surrendered for conversion shall be endorsed or accompanied by a written instrument or instruments of transfer, in form satisfactory to the Corporation, duly executed by the registered holder or his, her or its attorney duly authorized in writing. The close of business on the date of receipt by the transfer agent (or by the Corporation if the Corporation serves as its own transfer agent) of such notice and, if applicable, certificates (or lost certificate affidavit and agreement) shall be the time of conversion (the "**Conversion Time**"), and the shares of Common Stock issuable upon conversion of the specified shares shall be deemed to be outstanding of record as of such date. The Corporation shall, as soon as practicable after the Conversion Time (i) issue and deliver to such holder of Preferred Stock, or to his, her or its nominees, a notice of issuance of uncertificated shares and may, upon written request, issue and deliver a certificate or certificates for the number of full shares of Common Stock issuable upon such conversion in accordance with the provisions hereof and, may, if applicable and upon written request, issue and deliver a certificate for the number (if any) of the shares of Preferred Stock represented by any surrendered certificate that were not converted into Common Stock, (ii) pay in cash such amount as provided in <u>Subsection 4.2</u> in lieu of any fraction of a share of Common Stock otherwise issuable upon such conversion and (iii) pay all declared but unpaid dividends on the shares of Preferred Stock converted.

4.3.2   Reservation of Shares.  The Corporation shall at all times when the Preferred Stock shall be outstanding, reserve and keep available out of its authorized but unissued capital stock, for the purpose of effecting the conversion of the Preferred Stock, such number of its duly authorized shares of Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding Preferred Stock; and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Preferred Stock, the Corporation shall take such corporate action as may be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purposes, including, without limitation, engaging in best efforts to obtain the requisite stockholder approval of any necessary amendment to this Amended and Restated Certificate of Incorporation.   Before taking any action which would cause an adjustment reducing the Applicable Conversion Price below the then par value of the shares of Common Stock issuable upon conversion of the applicable series of Preferred Stock, the Corporation will take any corporate action which may, in the opinion of its counsel, be necessary in order that the Corporation may validly and legally issue fully paid and non-assessable shares of Common Stock at such adjusted Applicable Conversion Price.

4.3.3   Effect of Conversion.  All shares of Preferred Stock which shall have been surrendered for conversion as herein provided shall no longer be deemed to be outstanding and all rights with respect to such shares shall immediately cease and terminate at the Conversion Time, except only the right of the holders thereof to receive shares of Common Stock in exchange therefor, to receive payment in lieu of any fraction of a share otherwise issuable upon such conversion as provided in Subsection 4.2 and to receive payment of any dividends declared but unpaid thereon.  Any shares of Preferred Stock so converted shall be retired and cancelled and may not be reissued as shares of such series, and the Corporation may thereafter take such appropriate action (without the need for stockholder action) as may be necessary to reduce the authorized number of shares of Preferred Stock accordingly.

4.3.4   No Further Adjustment.   Upon any such conversion, no adjustment to the Applicable Conversion Price shall be made for any declared but unpaid dividends on the Preferred Stock surrendered for conversion or on the Common Stock delivered upon conversion.

4.3.5   Taxes.  The Corporation shall pay any and all issue and other similar taxes that may be payable in respect of any issuance or delivery of shares of Common Stock upon conversion of shares of Preferred Stock pursuant to this Section 4.  The Corporation shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of shares of Common Stock in a name other than that in which the shares of Preferred Stock so converted were registered, and no such issuance or delivery shall be made unless and until the person or entity requesting such issuance has paid to the Corporation the amount of any such tax or has established, to the satisfaction of the Corporation, that such tax has been paid.

4.4.   Adjustments to Applicable Conversion Price of the Preferred Stock for Diluting Issues.

12

4.4.1   Special Definitions.   For purposes of this Article Fourth, the following definitions shall apply:

(a)   "**Option**" shall mean rights, options or warrants to subscribe for, purchase or otherwise acquire Common Stock or Convertible Securities.

(b)   "**Series B Original Issue Date**" shall mean the date on which the first share of Series B Preferred Stock was issued.

(c)   "**Convertible Securities**" shall mean any evidences of indebtedness, shares or other securities directly or indirectly convertible into or exchangeable for Common Stock, but excluding Options.

(d)   "**Additional Shares of Common Stock**" shall mean all shares of Common Stock issued (or, pursuant to Subsection 4.4.3 below, deemed to be issued) by the Corporation after the Series B Original Issue Date, other than (1) the following shares of Common Stock and (2) shares of Common Stock deemed issued pursuant to the following Options and Convertible Securities (clauses (1) and (2), collectively, "**Exempted Securities**"):

(i)   shares of Common Stock, Options or Convertible Securities issued as a dividend or distribution on Preferred Stock;

(ii)   shares of Common Stock, Options or Convertible Securities issued by reason of a dividend, stock split, split-up or other distribution on shares of Common Stock that is covered by Subsection 4.5, 4.6, 4.7 or 4.8;

(iii)   shares of Common Stock or Options issued to employees or directors of, or consultants or advisors to, the Corporation or any of its subsidiaries pursuant to a plan, agreement or arrangement approved by the Board of Directors of the Corporation;

(iv)   shares of Common Stock or Convertible Securities actually issued upon the exercise of Options or shares of Common Stock actually issued upon the conversion or exchange of Convertible Securities, in each case provided such issuance is pursuant to the terms of such Option or Convertible Security;

(v)   shares of Common Stock, Options or Convertible Securities issued to banks, equipment lessors or other financial institutions, or to real property lessors,

13

pursuant to a debt financing, equipment leasing or real property leasing transaction approved by the Board of Directors of the Corporation, including the Series B Director if then in office;

(vi)    shares of Common Stock, Options or Convertible Securities issued to suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions approved by the Board of Directors of the Corporation, including the Series B Director if then in office;

(vii)    shares of Common Stock, Options or Convertible Securities issued as acquisition consideration pursuant to the acquisition of another corporation by the Corporation by merger, purchase of substantially all of the assets or other reorganization or to a joint venture agreement, _provided_ that such issuances are approved by the Board of Directors of the Corporation, including the Series B Director if then in office; or

(viii)    shares of Common Stock, Options or Convertible Securities issued in connection with sponsored research, collaboration, technology license, development, OEM, marketing or other similar agreements or strategic partnerships approved by the Board of Directors of the Corporation, including the Series B Director if then in office.

4.4.2    No Adjustment of Applicable Conversion Price of the Preferred Stock. No adjustment in the Applicable Conversion Price of a series of Preferred Stock shall be made as the result of the issuance or deemed issuance of Additional Shares of Common Stock if the Corporation receives written notice from the holders of at least a majority of the outstanding shares of such series of Preferred Stock agreeing that no such adjustment shall be made as the result of the issuance or deemed issuance of such Additional Shares of Common Stock.

4.4.3    Deemed Issue of Additional Shares of Common Stock.

(a)    If the Corporation at any time or from time to time after the Series B Original Issue Date shall issue any Options or Convertible Securities (excluding Options or Convertible Securities which are themselves Exempted Securities) or shall fix a record

14

date for the determination of holders of any class of securities entitled to receive any such Options or Convertible Securities, then the maximum number of shares of Common Stock (as set forth in the instrument relating thereto, assuming the satisfaction of any conditions to exercisability, convertibility or exchangeability but without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or, in the case of Convertible Securities and Options therefor, the conversion or exchange of such Convertible Securities, shall be deemed to be Additional Shares of Common Stock issued as of the time of such issue or, in case such a record date shall have been fixed, as of the close of business on such record date.

(b)     If the terms of any Option or Convertible Security, the issuance of which resulted in an adjustment to the Applicable Conversion Price of the Preferred Stock pursuant to the terms of <u>Subsection 4.4.4</u>, are revised as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (1) any increase or decrease in the number of shares of Common Stock issuable upon the exercise, conversion and/or exchange of any such Option or Convertible Security or (2) any increase or decrease in the consideration payable to the Corporation upon such exercise, conversion and/or exchange, then, effective upon such increase or decrease becoming effective, the Applicable Conversion Price of the Preferred Stock computed upon the original issue of such Option or Convertible Security (or upon the occurrence of a record date with respect thereto) shall be readjusted to such Applicable Conversion Price of the Preferred Stock as would have obtained had such revised terms been in effect upon the original date of issuance of such Option or Convertible Security.    Notwithstanding the foregoing, no readjustment pursuant to this clause (b) shall have the effect of increasing the Applicable Conversion Price of the Preferred Stock to an amount which exceeds the lower of (i) the Applicable Conversion Price of the Preferred Stock in effect immediately prior to the original adjustment made as a result of the issuance of such Option or Convertible Security, or (ii) the Applicable Conversion Price of the Preferred Stock that would have resulted from any issuances of Additional Shares of Common Stock (other than deemed issuances of Additional Shares of Common Stock as a result of the issuance of such Option or Convertible Security) between the original adjustment date and such readjustment date.

(c)     If the terms of any Option or Convertible Security (excluding Options or Convertible Securities which are themselves Exempted Securities), the issuance of which did not result in an adjustment to the Applicable Conversion Price of the Preferred Stock pursuant to the terms of <u>Subsection 4.4.4</u> (either because the consideration per share (determined pursuant to <u>Subsection 4.4.5</u>) of the Additional Shares of Common Stock subject thereto was equal to or greater than the Applicable Conversion Price of the Preferred Stock then in effect, or because such Option or Convertible Security was issued before the Series B Original Issue Date), are revised after the Series B Original Issue Date as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (1) any increase in the number of shares of Common Stock issuable upon the exercise, conversion or exchange of any such Option or Convertible Security or (2) any decrease in the consideration payable to the Corporation upon such exercise, conversion or exchange, then such Option or Convertible

15

Security, as so amended or adjusted, and the Additional Shares of Common Stock subject thereto (determined in the manner provided in Subsection 4.4.3(a) shall be deemed to have been issued effective upon such increase or decrease becoming effective.

(d)     Upon the expiration or termination of any unexercised Option or unconverted or unexchanged Convertible Security (or portion thereof) which resulted (either upon its original issuance or upon a revision of its terms) in an adjustment to the Applicable Conversion Price of the Preferred Stock pursuant to the terms of Subsection 4.4.4, the Applicable Conversion Price of the Preferred Stock shall be readjusted to such Applicable Conversion Price of the Preferred Stock as would have obtained had such Option or Convertible Security (or portion thereof) never been issued.

(e)     If the number of shares of Common Stock issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Corporation upon such exercise, conversion and/or exchange, is calculable at the time such Option or Convertible Security is issued or amended but is subject to adjustment based upon subsequent events, any adjustment to the Applicable Conversion Price of the Preferred Stock provided for in this Subsection 4.4.3 shall be effected at the time of such issuance or amendment based on such number of shares or amount of consideration without regard to any provisions for subsequent adjustments (and any subsequent adjustments shall be treated as provided in clauses (b) and (c) of this Subsection 4.4.3). If the number of shares of Common Stock issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Corporation upon such exercise, conversion and/or exchange, cannot be calculated at all at the time such Option or Convertible Security is issued or amended, any adjustment to the Applicable Conversion Price of the Preferred Stock that would result under the terms of this Subsection 4.4.3 at the time of such issuance or amendment shall instead be effected at the time such number of shares and/or amount of consideration is first calculable (even if subject to subsequent adjustments), assuming for purposes of calculating such adjustment to the Applicable Conversion Price of the Preferred Stock that such issuance or amendment took place at the time such calculation can first be made.

4.4.4     Adjustment of Applicable Conversion Price of the Preferred Stock Upon Issuance of Additional Shares of Common Stock. In the event the Corporation shall at any time after the Series B Original Issue Date issue Additional Shares of Common Stock (including Additional Shares of Common Stock deemed to be issued pursuant to Subsection 4.4.3), without consideration or for a consideration per share less than the Applicable Conversion Price of the Preferred Stock in effect immediately prior to such issuance or deemed issuance, then the Applicable Conversion Price of the Preferred Stock shall be reduced, concurrently with such issue, to a price (calculated to the nearest one-hundredth of a cent) determined in accordance with the following formula:

$$CP_2 = CP_1 * (A + B) + (A + C).$$

For purposes of the foregoing formula, the following definitions shall apply:

4135-6350-6214.8

(a)     "$CP_2$" shall mean the Applicable Conversion Price of the Preferred Stock in effect immediately after such issuance or deemed issuance of Additional Shares of Common Stock

(b)     "$CP_1$" shall mean the Applicable Conversion Price of the Preferred Stock in effect immediately prior to such issuance or deemed issuance of Additional Shares of Common Stock;

(c)     "A" shall mean the number of shares of Common Stock outstanding immediately prior to such issuance or deemed issuance of Additional Shares of Common Stock (treating for this purpose as outstanding all shares of Common Stock issuable upon exercise of Options outstanding immediately prior to such issuance or deemed issuance or upon conversion or exchange of Convertible Securities (including the Preferred Stock) outstanding (assuming exercise of any outstanding Options therefor) immediately prior to such issue);

(d)     "B" shall mean the number of shares of Common Stock that would have been issued if such Additional Shares of Common Stock had been issued or deemed issued at a price per share equal to $CP_1$ (determined by dividing the aggregate consideration received by the Corporation in respect of such issue by $CP_1$); and

(e)     "C" shall mean the number of such Additional Shares of Common Stock issued in such transaction.

4.4.5   Determination of Consideration.   For purposes of this Subsection 4.4, the consideration received by the Corporation for the issuance or deemed issuance of any Additional Shares of Common Stock shall be computed as follows:

(a)     Cash and Property: Such consideration shall:

(i)     insofar as it consists of cash, be computed at the aggregate amount of cash received by the Corporation, excluding amounts paid or payable for accrued interest;

(ii)    insofar as it consists of property other than cash, be computed at the fair market value thereof at the time of such issue, as determined in good faith by the Board of Directors of the Corporation; and

(iii)   in the event Additional Shares of Common Stock are issued together with other shares or securities or other assets of the Corporation for consideration which covers both, be the proportion of such consideration so received, computed as provided in clauses (i) and (ii) above, as determined in good faith by the Board of Directors of the Corporation.

17

4135-6350-6214.8

(b)    Options and Convertible Securities.    The consideration per share received by the Corporation for Additional Shares of Common Stock deemed to have been issued pursuant to Subsection 4.4.3, relating to Options and Convertible Securities, shall be determined by dividing:

(i)    The total amount, if any, received or receivable by the Corporation as consideration for the issue of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such consideration) payable to the Corporation upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities, by

(ii)    the maximum number of shares of Common Stock (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities.

4.4.6    Multiple Closing Dates.    In the event the Corporation shall issue on more than one date Additional Shares of Common Stock that are a part of one transaction or a series of related transactions and that would result in an adjustment to the Applicable Conversion Price of the Preferred Stock pursuant to the terms of Subsection 4.4.4 then, upon the final such issuance, the Applicable Conversion Price of the Preferred Stock shall be readjusted to give effect to all such issuances as if they occurred on the date of the first such issuance (and without giving effect to any additional adjustments as a result of any such subsequent issuances within such period).

4.5.    Adjustment for Stock Splits and Combinations.    If the Corporation shall at any time or from time to time after the Series B Original Issue Date effect a subdivision of the outstanding Common Stock, the Applicable Conversion Price in effect immediately before that

18

subdivision shall be proportionately decreased so that the number of shares of Common Stock issuable on conversion of each share of such series shall be increased in proportion to such increase in the aggregate number of shares of Common Stock outstanding. If the Corporation shall at any time or from time to time after the Series B Original Issue Date combine the outstanding shares of Common Stock, the Applicable Conversion Price in effect immediately before the combination shall be proportionately increased so that the number of shares of Common Stock issuable on conversion of each share of such series shall be decreased in proportion to such decrease in the aggregate number of shares of Common Stock outstanding. Any adjustment under this subsection shall become effective at the close of business on the date the subdivision or combination becomes effective.

        4.6.    <u>Adjustment for Certain Dividends and Distributions</u>. In the event the Corporation at any time or from time to time after the Series B Original Issue Date shall make or issue, or fix a record date for the determination of holders of Common Stock entitled to receive, a dividend or other distribution payable on the Common Stock in additional shares of Common Stock, then and in each such event the Applicable Conversion Price in effect immediately before such event shall be decreased as of the time of such issuance or, in the event such a record date shall have been fixed, as of the close of business on such record date, by multiplying the Applicable Conversion Price then in effect by a fraction:

        (1)    the numerator of which shall be the total number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance or the close of business on such record date, and

        (2)    the denominator of which shall be the total number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance or the close of business on such record date plus the number of shares of Common Stock issuable in payment of such dividend or distribution.

Notwithstanding the foregoing (a) if such record date shall have been fixed and such dividend is not fully paid or if such distribution is not fully made on the date fixed therefor, the Applicable Conversion Price shall be recomputed accordingly as of the close of business on such record date and thereafter the Applicable Conversion Price shall be adjusted pursuant to this subsection as of the time of actual payment of such dividends or distributions; and (b) that no such adjustment shall be made if the holders of Preferred Stock simultaneously receive a dividend or other distribution of shares of Common Stock in a number equal to the number of shares of Common Stock as they would have received if all outstanding shares of Preferred Stock had been converted into Common Stock on the date of such event.

        4.7.    <u>Adjustments for Other Dividends and Distributions</u>. In the event the Corporation at any time or from time to time after the Series B Original Issue Date shall make or issue, or fix a record date for the determination of holders of Common Stock entitled to receive, a dividend or other distribution payable in securities of the Corporation (other than a distribution of shares of Common Stock in respect of outstanding shares of Common Stock) or in other property and the provisions of <u>Section 1</u> do not apply to such dividend or distribution, then and in each such event the holders of Preferred Stock shall receive, simultaneously with the distribution to the holders of Common Stock, a dividend or other distribution of such securities or other property in

19

an amount equal to the amount of such securities or other property as they would have received if all outstanding shares of Preferred Stock had been converted into Common Stock on the date of such event.

4.8.    Adjustment for Merger or Reorganization, etc.    Subject to the provisions of Subsection 2.3, if there shall occur any reorganization, recapitalization, reclassification, consolidation or merger involving the Corporation in which the Common Stock (but not the Preferred Stock) is converted into or exchanged for securities, cash or other property (other than a transaction covered by Subsections 4.4, 4.6 or 4.7), then, following any such reorganization, recapitalization, reclassification, consolidation or merger, each share of each series of Preferred Stock shall thereafter be convertible in lieu of the Common Stock into which it was convertible prior to such event into the kind and amount of securities, cash or other property which a holder of the number of shares of Common Stock of the Corporation issuable upon conversion of one share of such series of Preferred Stock immediately prior to such reorganization, recapitalization, reclassification, consolidation or merger would have been entitled to receive pursuant to such transaction; and, in such case, appropriate adjustment (as determined in good faith by the Board of Directors of the Corporation) shall be made in the application of the provisions in this Section 4 with respect to the rights and interests thereafter of the holders of the Preferred Stock, to the end that the provisions set forth in this Section 4 (including provisions with respect to changes in and other adjustments of the Applicable Conversion Price) shall thereafter be applicable, as nearly as reasonably may be, in relation to any securities or other property thereafter deliverable upon the conversion of the Preferred Stock.

4.9.    Certificate as to Adjustments.    Upon the occurrence of each adjustment or readjustment of the Applicable Conversion Price pursuant to this Section 4, the Corporation at its expense shall, as promptly as reasonably practicable but in any event not later than ten (10) days thereafter, compute such adjustment or readjustment in accordance with the terms hereof and furnish to each holder of Preferred Stock a certificate setting forth such adjustment or readjustment (including the kind and amount of securities, cash or other property into which the Preferred Stock is convertible) and showing in detail the facts upon which such adjustment or readjustment is based. The Corporation shall, as promptly as reasonably practicable after the written request at any time of any holder of Preferred Stock (but in any event not later than ten (10) days thereafter), furnish or cause to be furnished to such holder a certificate setting forth (i) the Applicable Conversion Price then in effect, and (ii) the number of shares of Common Stock and the amount, if any, of other securities, cash or property which then would be received upon the conversion of Preferred Stock.

4.10.   Notice of Record Date.    In the event:

(a)    the Corporation shall take a record of the holders of its Common Stock (or other capital stock or securities at the time issuable upon conversion of the Preferred Stock) for the purpose of entitling or enabling them to receive any dividend or other distribution, or to receive any right to subscribe for or purchase any shares of capital stock of any class or any other securities, or to receive any other security;

(b)    of any capital reorganization of the Corporation, any reclassification of the Common Stock of the Corporation, or any Deemed Liquidation Event; or

20

(c) of the voluntary or involuntary dissolution, liquidation or winding-up of the Corporation,

then, and in each such case, the Corporation will send or cause to be sent to the holders of the Preferred Stock a notice specifying, as the case may be, (i) the record date for such dividend, distribution or right, and the amount and character of such dividend, distribution or right, or (ii) the effective date on which such reorganization, reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up is proposed to take place, and the time, if any is to be fixed, as of which the holders of record of Common Stock (or such other capital stock or securities at the time issuable upon the conversion of the Preferred Stock) shall be entitled to exchange their shares of Common Stock (or such other capital stock or securities) for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up, and the amount per share and character of such exchange applicable to the Preferred Stock and the Common Stock. Such notice shall be sent at least ten (10) days prior to the record date or effective date for the event specified in such notice.

5. <u>Mandatory Conversion</u>.

5.1. <u>Trigger Events</u>. Upon either (a) the closing of the sale of shares of Common Stock to the public at a price of at least $9.57 per share (subject to adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Common Stock), in a firm-commitment underwritten public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended, resulting in at least $75,000,000 of gross proceeds, before deduction of the underwriting discount and commissions, to the Corporation and in connection with such offering the Common Stock is listed for trading on the Nasdaq Stock Market's National Market, the New York Stock Exchange or another exchange or marketplace approved the Board of Directors (a "**Qualified IPO**") or (b) the date and time, or the occurrence of an event, specified by vote or written consent of the Requisite Holders (the time of such closing or the date and time specified or the time of the event specified in such vote or written consent is referred to herein as the "**Mandatory Conversion Time**"), then (i) all outstanding shares of Preferred Stock shall automatically be converted into shares of Common Stock, at the then effective conversion rate as calculated pursuant to <u>Subsection 4.1.1</u> and (ii) such shares may not be reissued by the Corporation.

5.2. <u>Procedural Requirements</u>. All holders of record of shares of Preferred Stock shall be sent written notice of the Mandatory Conversion Time and the place designated for mandatory conversion of all such shares of Preferred Stock pursuant to this <u>Section 5</u>. Such notice need not be sent in advance of the occurrence of the Mandatory Conversion Time. Upon receipt of such notice, each holder of shares of Preferred Stock in certificated form shall surrender his, her or its certificate or certificates for all such shares (or, if such holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate) to the Corporation at the place designated in such notice. If so required by the Corporation, any certificates surrendered for conversion shall be endorsed or accompanied by written instrument or instruments of transfer, in form satisfactory to the Corporation, duly executed by the registered holder or by his, her or its attorney duly authorized in writing. All rights with

21

respect to the Preferred Stock converted pursuant to Subsection 5.1, including the rights, if any, to receive notices and vote (other than as a holder of Common Stock), will terminate at the Mandatory Conversion Time (notwithstanding the failure of the holder or holders thereof to surrender any certificates at or prior to such time), except only the rights of the holders thereof, upon surrender of any certificate or certificates of such holders (or lost certificate affidavit and agreement) therefor, to receive the items provided for in the next sentence of this Subsection 5.2. As soon as practicable after the Mandatory Conversion Time and, if applicable, the surrender of any certificate or certificates (or lost certificate affidavit and agreement) for Preferred Stock, the Corporation shall (a) issue and deliver to such holder, or to his, her or its nominees, a certificate or certificates for the number of full shares of Common Stock issuable on such conversion in accordance with the provisions hereof and (b) pay cash as provided in Subsection 4.2 in lieu of any fraction of a share of Common Stock otherwise issuable upon such conversion and the payment of any declared but unpaid dividends on the shares of Preferred Stock converted. Such converted Preferred Stock shall be retired and cancelled and may not be reissued as shares of such series, and the Corporation may thereafter take such appropriate action (without the need for stockholder action) as may be necessary to reduce the authorized number of shares of Preferred Stock accordingly.

6. Redemption.

6.1. General. Unless prohibited by Delaware law governing distributions to stockholders, shares of Series B Preferred Stock shall be redeemed by the Corporation at a price equal to the Series B Original Issue Price per share, plus all declared but unpaid dividends thereon (the "**Redemption Price**"), in one (1) installment commencing not more than sixty (60) days after receipt by the Corporation, at any time on or after the tenth (10th) anniversary of the Series B Original Issue Date, of written notice requesting redemption of shares of Series B Preferred Stock from the holder or holders, as applicable, of a majority of the shares of Series B Preferred Stock then outstanding (the "**Redemption Request**"). The date of each such installment provided in the Redemption Notice (as defined below) shall be referred to as a "**Redemption Date**." On each Redemption Date, the Corporation shall redeem, on a pro rata basis in accordance with the number of shares of Series B Preferred Stock owned by each holder, that number of outstanding shares of Series B Preferred Stock; provided, however, that Excluded Shares (as such term is defined in Section **Error! Reference source not found.**) shall not be redeemed. If on any Redemption Date Delaware law governing distributions to stockholders prevents the Corporation from redeeming all shares of Series B Preferred Stock to be redeemed, the Corporation shall ratably redeem the maximum number of shares that it may redeem consistent with such law, and shall redeem the remaining shares as soon as it may lawfully do so under such law.

6.2. Redemption Notice. The Corporation shall send written notice of the Redemption Request (a "**Redemption Notice**") to each holder of record of Series B Preferred Stock not less than forty (40) days prior to each Redemption Date. Each Redemption Notice shall state:

(a) the number of shares of Series B Preferred Stock held by the holder that the Corporation shall redeem on the Redemption Date specified in the Redemption Notice;

4135-6350-6214.8

(b)    the Redemption Date and the Redemption Price;

(c)    the date upon which the holder's right to convert such shares terminates (as determined in accordance with Section **Error! Reference source not found.**); and

(d)    for holders of shares in certificated form, that the holder is to surrender to the Corporation, in the manner and at the place designated, his, her or its certificate or certificates representing the shares of Series B Preferred Stock to be redeemed.

If the Corporation receives, on or prior to the twentieth (20th) day after the date of delivery of a Redemption Notice to a holder of Series B Preferred Stock, written notice from such holder that such holder elects to be excluded from such redemption, then the shares of Series B Preferred Stock registered on the books of the Corporation in the name of such holder at the time of the Corporation's receipt of such notice shall thereafter be "**Excluded Shares**" with respect to such redemption and shall not be redeemed or redeemable in connection with such redemption.

6.3.    <u>Surrender of Certificates; Payment</u>.    On or before the applicable Redemption Date, a holder of Series B Preferred Stock shall, with respect to the shares of Series B Preferred Stock to be redeemed on such Redemption Date, surrender the certificate or certificates representing such shares (or, if such holder alleges that any such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate) to the Corporation, in the manner and at the place designated by the Corporation, and thereupon the Redemption Price for such shares shall be payable to the order of the person whose name appears on such certificate or certificates as the owner thereof.    In the event that less than all of the shares of Series B Preferred Stock represented by a certificate are redeemed, a new certificate, instrument, or book entry representing the unredeemed shares of Series B Preferred Stock shall promptly be issued to such holder.

6.4.    <u>Rights Subsequent to Redemption</u>.    If on the applicable Redemption Date the Redemption Price payable upon redemption of shares of Series B Preferred Stock to be redeemed on such Redemption Date is paid or tendered for payment or deposited with an independent payment agent so as to be available therefor in a timely manner, then notwithstanding that any certificates evidencing any of the shares of Series B Preferred Stock so called for redemption shall not have been surrendered, dividends with respect to such shares of Series B Preferred Stock shall cease to accrue after such Redemption Date and all rights with respect to such shares shall forthwith after such Redemption Date terminate, except only the right of the holders to receive the Redemption Price without interest upon surrender of any such certificate or certificates therefor.

6.5.    <u>Term</u>.    The redemption rights set forth in this <u>Section 6</u> shall terminate and be of no further force and effect immediately prior to the closing of a Qualified IPO.

7.    <u>Redeemed or Otherwise Acquired Shares</u>.    Any shares of Preferred Stock that are redeemed or otherwise acquired by the Corporation or any of its subsidiaries shall be automatically and immediately cancelled and retired and shall not be reissued, sold or transferred.

Neither the Corporation nor any of its subsidiaries may exercise any voting or other rights granted to the holders of Preferred Stock following redemption.

8. <u>Waiver</u>. Except as otherwise set forth herein, (i) any of the rights, powers, preferences and other terms of the Preferred Stock set forth herein (excluding any rights, powers, preferences and other terms that apply solely to a series of Preferred Stock, but not the Preferred Stock generally) may be waived on behalf of all holders of Preferred Stock by the affirmative written consent or vote of the Requisite Holders, (ii) any of the rights, powers, preferences and other terms of the holders of Series B Preferred Stock set forth herein may be waived on behalf of all holders of Series B Preferred Stock by the affirmative written consent or vote of the of a majority of the shares of Series B Preferred Stock then outstanding, (iii) any of the rights, powers, preferences and other terms of the holders of Series A Preferred Stock set forth herein may be waived on behalf of all holders of Series A Preferred Stock by the affirmative written consent or vote of the holders of a majority of the shares of Series A Preferred Stock then outstanding and (iv) any of the rights, powers, preferences and other terms of the holders of the Series Seed Preferred Stock set forth herein may be waived on behalf of all holders of Series Seed Preferred Stock by the affirmative written consent or vote of a majority of the shares of Series Seed Preferred Stock then outstanding.

9. <u>Notices</u>. Any notice required or permitted by the provisions of this Article Fourth to be given to a holder of shares of Preferred Stock shall be mailed, postage prepaid, to the post office address last shown on the records of the Corporation, or given by electronic communication in compliance with the provisions of the General Corporation Law, and shall be deemed sent upon such mailing or electronic transmission.

**FIFTH**:  Subject to any additional vote required by this Amended and Restated Certificate of Incorporation or Bylaws, in furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind any or all of the Bylaws of the Corporation.

**SIXTH**:  Subject to any additional vote required by this Amended and Restated Certificate of Incorporation, the number of directors of the Corporation shall be determined in the manner set forth in the Bylaws of the Corporation.  Each director shall be entitled to one vote on each matter presented to the Board of Directors.

**SEVENTH**:  Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

**EIGHTH**:  Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws of the Corporation may provide.  The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

**NINTH**:  To the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.  If the General Corporation Law or any other law of the State of Delaware is amended after approval by the stockholders of this Article Ninth to authorize

24

corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law as so amended.

Any repeal or modification of the foregoing provisions of this Article Ninth by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director occurring prior to, such repeal or modification.

**TENTH**:  To the fullest extent permitted by applicable law, the Corporation is authorized to provide indemnification of (and advancement of expenses to) directors, officers and agents of the Corporation (and any other persons to which General Corporation Law permits the Corporation to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the General Corporation Law.

Any amendment, repeal or modification of the foregoing provisions of this Article Tenth shall not (a) adversely affect any right or protection of any director, officer or other agent of the Corporation existing at the time of such amendment, repeal or modification or (b) increase the liability of any director of the Corporation with respect to any acts or omissions of such director, officer or agent occurring prior to, such amendment, repeal or modification.

**ELEVENTH**:  The Corporation renounces, to the fullest extent permitted by law, any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, any Excluded Opportunity.  An "**Excluded Opportunity**" is any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of (i) any director of the Corporation who is not an employee of the Corporation or any of its subsidiaries, or (ii) any holder of Preferred Stock or any partner, member, director, stockholder, employee, affiliate or agent of any such holder, other than someone who is an employee of the Corporation or any of its subsidiaries (collectively, the persons referred to in clauses (i) and (ii) are "**Covered Persons**"), unless such matter, transaction or interest is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Covered Person expressly and solely in such Covered Person's capacity as a director of the Corporation while such Covered Person is performing services in such capacity.  Any repeal or modification of this Article Eleventh will only be prospective and will not affect the rights under this Article Eleventh in effect at the time of the occurrence of any actions or omissions to act giving rise to liability.  Notwithstanding anything to the contrary contained elsewhere in this Amended and Restated Certificate of Incorporation, the affirmative vote of the holders of at least a majority of the shares of Preferred Stock the outstanding, will be required to amend or repeal, or to adopt any provisions inconsistent with this Article Eleventh.

**TWELFTH**:  Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery in the State of Delaware shall be the sole and exclusive forum for any stockholder (including a beneficial owner) to bring (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of

fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation, its directors, officers or employees arising pursuant to any provision of the Delaware General Corporation Law or the Corporation's certificate of incorporation or bylaws or (iv) any action asserting a claim against the Corporation, its directors, officers or employees governed by the internal affairs doctrine, except for, as to each of (i) through (iv) above, any claim as to which the Court of Chancery determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, or for which the Court of Chancery does not have subject matter jurisdiction.  If any provision or provisions of this Article Twelfth shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Article Twelfth (including, without limitation, each portion of any sentence of this Article Twelfth containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby.

THIRTEENTH:  For purposes of Section 500 of the California Corporations Code (to the extent applicable), in connection with any repurchase of shares of Common Stock permitted under this Amended and Restated Certificate of Incorporation from employees, officers, directors or consultants of the Corporation in connection with a termination of employment or services pursuant to agreements or arrangements approved by the Board of Directors (in addition to any other consent required under this Amended and Restated Certificate of Incorporation), such repurchase may be made without regard to any "preferential dividends arrears amount" or "preferential rights amount" (as those terms are defined in Section 500 of the California Corporations Code).  Accordingly, for purposes of making any calculation under California Corporations Code Section 500 in connection with such repurchase, the amount of any "preferential dividends arrears amount" or "preferential rights amount" (as those terms are defined therein) shall be deemed to be zero (0).

* * *

3.    That the foregoing amendment and restatement was approved by the holders of the requisite number of shares of this corporation in accordance with Section 228 of the General Corporation Law.

4.    That this Certificate of Incorporation, which restates and integrates and further amends the provisions of this Corporation's Certificate of Incorporation and any Certificates of Designation, has been duly adopted in accordance with Sections 242 and 245 of the General Corporation Law.

4135-6350-6214.8

**IN WITNESS WHEREOF**, this Amended and Restated Certificate of Incorporation has been executed by a duly authorized officer of this corporation on December 7, 2020.

By: /s/ Christopher S. Kirchner

Christopher S. Kirchner, President

4135-6350-6214.8

# EXHIBIT C

# AMENDED AND RESTATED BYLAWS

## OF

## SLYNC, INC.

## ARTICLE I

## CORPORATE OFFICES

1.1 **Offices**

In addition to the corporation's registered office set forth in the certificate of incorporation, the Board of Directors may at any time establish other offices at any place or places where the corporation is qualified to do business.

## ARTICLE II

## MEETINGS OF STOCKHOLDERS

2.1 **Place Of Meetings**

Meetings of stockholders shall be held at any place, within or outside the state of Delaware, designated by the Board of Directors. The Board of Directors may, in its sole discretion, determine that a meeting of stockholders shall not be held at any place, but may instead be held solely by means of remote communication as authorized by Section 211(a)(2) of the Delaware General Corporation Law. In the absence of any such designation or determination, stockholders' meetings shall be held at the principal place of business of the corporation.

2.2 **Annual Meeting**

Unless directors are elected by written consent in lieu of an annual meeting as permitted by Section 211(b) of the Delaware General Corporation Law, an annual meeting of stockholders shall be held for the election of directors at such date and time as may be designated by resolution of the Board from time to time. Stockholders may, unless the certificate of incorporation otherwise provides, act by written consent to elect directors; *provided, however,* that, if such consent is less than unanimous, such action by written consent may be in lieu of holding an annual meeting only if all of the directorships to which directors could be elected at an annual meeting held at the effective time of such action are vacant and are filled by such action. Any other proper business may be transacted at the annual meeting.

2.3   **Special Meeting**

A special meeting of the stockholders may be called at any time by the Board of Directors, the chairperson of the board, the chief executive officer, the president or shall be called by the president upon the written request of one or more stockholders holding shares in the aggregate entitled to cast not less than 10% of the votes at that meeting.

If a special meeting is called by any person or persons other than the Board of Directors, the chairperson of the board, the chief executive officer or the president, the request shall be in writing, specifying the time of such meeting and the general nature of the business proposed to be transacted, and shall be delivered personally or sent by registered mail or by electronic mail, or other facsimile or electronic transmission to the chairperson of the board, the chief executive officer, the president or the secretary of the corporation.  No business may be transacted at such special meeting otherwise than specified in such notice.  The officer receiving the request shall cause notice to be promptly given to the stockholders entitled to vote, in accordance with the provisions of Sections 2.4 and 2.5 of this Article II, that a meeting will be held at the time requested by the person or persons calling the meeting, not less than 35 nor more than 60 days after the receipt of the request.  If the notice is not given within 20 days after the receipt of the request, the person or persons requesting the meeting may give the notice.  Nothing contained in this paragraph of this Section 2.3 shall be construed as limiting, fixing, or affecting the time when a meeting of stockholders called by action of the Board of Directors may be held.

2.4   **Notice Of Stockholders' Meetings**

Unless otherwise provided by law, all notices of meetings with stockholders shall be in writing and shall be sent or otherwise given in accordance with Section 2.5 of these bylaws not less than 10 nor more than 60 days before the date of the meeting to each stockholder entitled to vote at such meeting, as of the record date for determining the stockholders entitled to notice of the meeting.  The notice shall specify the place (if any), date and hour of the meeting, and in the case of a special meeting, the purpose or purposes for which the meeting is called.

2.5   **Manner Of Giving Notice; Affidavit Of Notice**

Written notice of any meeting of stockholders, if mailed, is given when deposited in the United States mail, postage prepaid, directed to the stockholder at his address as it appears on the records of the corporation.  Without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders may be given by electronic mail or other electronic transmission, in the manner provided in Section 232 of the Delaware General Corporation Law.  An affidavit of the secretary or an assistant secretary or of the transfer agent of the corporation that the notice has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

2.6   **Quorum**

The holders of a majority of the shares of stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business except as otherwise provided by statute or by the certificate of incorporation.  If, however, such quorum is not present or

2

represented at any meeting of the stockholders, then either (a) the chairperson of the meeting or (b) holders of a majority of the shares of stock entitled to vote who are present, in person or by proxy, shall have power to adjourn the meeting to another place (if any), date or time.

2.7     **Adjourned Meeting; Notice**

When a meeting is adjourned to another place (if any), date or time, unless these bylaws otherwise require, notice need not be given of the adjourned meeting if the time and place (if any), thereof and the means of remote communications (if any) by which stockholders and proxyholders may be deemed to be present and vote at such adjourned meeting, are announced at the meeting at which the adjournment is taken.  At the adjourned meeting the corporation may transact any business that might have been transacted at the original meeting.  If the adjournment is for more than 30 days, or if after the adjournment a new record date is fixed for the adjourned meeting, notice of the place (if any), date and time of the adjourned meeting and the means of remote communications (if any) by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

2.8     **Organization; Conduct of Business**

Such person as the Board of Directors may have designated or, in the absence of such a person, the chief executive officer, or in his or her absence, the president or, in his or her absence, such person as may be chosen by the holders of a majority of the shares entitled to vote who are present, in person or by proxy, shall call to order any meeting of the stockholders and act as chairperson of the meeting.  In the absence of the secretary of the corporation, the secretary of the meeting shall be such person as the chairperson of the meeting appoints.

The chairperson of any meeting of stockholders shall determine the order of business and the procedure at the meeting, including the manner of voting and the conduct of business.  The date and time of opening and closing of the polls for each matter upon which the stockholders will vote at the meeting shall be announced at the meeting.

2.9     **Voting**

The stockholders entitled to vote at any meeting of stockholders shall be determined in accordance with the provisions of Section 2.12 of these bylaws, subject to the provisions of Sections 217 and 218 of the Delaware General Corporation Law (relating to voting rights of fiduciaries, pledgors and joint owners of stock and to voting trusts and other voting agreements).

Except as may be otherwise provided in the certificate of incorporation, each stockholder shall be entitled to one vote for each share of capital stock held by such stockholder.  All elections shall be determined by a plurality of the votes cast, and except as otherwise required by law, all other matters shall be determined by a majority of the votes cast affirmatively or negatively.  At any time that, pursuant to the then-effective certificate of incorporation, any shares of stock have more or less than one (1) vote per share on any matter, every reference in these bylaws to a majority or other proportion of the shares shall refer to a majority or other proportion of the votes of the shares.

3

2.10   **Waiver Of Notice**

Whenever notice is required to be given under any provision of the Delaware General Corporation Law or of the certificate of incorporation or these bylaws, a written waiver thereof, signed by the person entitled to notice, or waiver by electronic mail or other electronic transmission by such person, whether before or after the time stated therein, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders need be specified in any written waiver of notice, or any waiver of notice by electronic transmission, unless so required by the certificate of incorporation or these bylaws.

2.11   **Stockholder Action By Written Consent Without A Meeting**

Unless otherwise provided in the certificate of incorporation, any action required to be taken at any annual or special meeting of stockholders of the corporation, or any action that may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice, and without a vote if a consent in writing, setting forth the action so taken, is (a) signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted, and (b) delivered to the corporation in accordance with Section 228 of the Delaware General Corporation Law.

No written consent shall be effective to take the corporate action referred to therein unless, within 60 days of the first date a written consent is delivered to the corporation, a written consent or consents signed by a sufficient number of holders to take action are delivered to the corporation in the manner prescribed in this Section.  A facsimile, electronic mail or other electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxyholder, or by a person or persons authorized to act for a stockholder or proxyholder, shall be deemed to be written and signed for purposes of this Section to the extent permitted by law.  Any such consent shall be delivered in accordance with Section 228 of the Delaware General Corporation Law.

Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing.

Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing (including by electronic mail or other electronic transmission as permitted by law).  If the action which is consented to is such as would have required the filing of a certificate under any section of the Delaware General Corporation Law if such action had been voted on by stockholders at a meeting thereof, then the certificate filed under such section shall state, in lieu

4

of any statement required by such section concerning any vote of stockholders, that written consent has been given as provided in Section 228 of the Delaware General Corporation Law.

2.12 **Record Date For Stockholder Notice; Voting; Giving Consents**

(a)    In order that the corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, or to express consent to corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date: (1) in the case of determination of stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, shall, unless otherwise required by law, not be more than 60 nor less than 10 days before the date of such meeting and, unless the Board of Directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for determining the stockholders entitled to vote at such meeting, the record date for determining the stockholders entitled to notice of such meeting shall also be the record date for determining the stockholders entitled to vote at such meeting; (2) in the case of determination of stockholders entitled to express consent to corporate action in writing without a meeting, shall not be more than 10 days from the date upon which the resolution fixing the record date is adopted by the Board of Directors; and (3) in the case of any other action, shall not be more than 60 days prior to such other action.

(b)    If the Board of Directors does not so fix a record date:  (1) the record date for determining stockholders entitled to notice of and to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held; (2) the record date for determining stockholders entitled to express consent to corporate action in writing without a meeting, when no prior action of the Board of Directors is required by law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the corporation in accordance with applicable law, or, if prior action by the Board of Directors is required by law, shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action; and (3) the record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

(c)    A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the determination of stockholders entitled to vote at the adjourned meeting, and in such case shall also fix as the record date for the stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for the determination of stockholders entitled to vote in accordance with the foregoing provisions of this Section 2.12 at the adjourned meeting.

2.13   **Proxies**

Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by an instrument in writing or by an electronic transmission permitted by law filed with the secretary of the corporation, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.  A proxy shall be deemed signed if the stockholder's name is placed on the proxy (whether by manual signature, typewriting, facsimile, electronic transmission or otherwise) by the stockholder or the stockholder's attorney-in-fact.  The revocability of a proxy that states on its face that it is irrevocable shall be governed by the provisions of Section 212(e) of the Delaware General Corporation Law.

## ARTICLE III

## DIRECTORS

3.1   **Powers**

Subject to the provisions of the Delaware General Corporation Law and any limitations in the certificate of incorporation or these bylaws relating to action required to be approved by the stockholders, the business and affairs of the corporation shall be managed and all corporate powers shall be exercised by or under the direction of the Board of Directors.  At any time that, pursuant to the then-effective certificate of incorporation, any director or directors have more or less than one (1) vote per director on any matter, every reference in these bylaws to a majority or other proportion of the directors shall refer to a majority or other proportion of the votes of the directors.

3.2   **Number Of Directors**

The number of directors constituting the entire Board of Directors is five.  This number may be changed by a resolution of the Board of Directors or of the stockholders, subject to Section 3.4 of these bylaws.  No reduction of the authorized number of directors shall have the effect of removing any director before such director's term of office expires.

3.3   **Election, Qualification And Term Of Office Of Directors**

Except as provided in Section 3.4 of these bylaws, and unless otherwise provided in the certificate of incorporation, directors shall be elected at each annual meeting of stockholders to hold office until the next annual meeting.  Directors need not be stockholders unless so required by the certificate of incorporation or these bylaws, wherein other qualifications for directors may be prescribed.  Each director, including a director elected to fill a vacancy, shall hold office until his or her successor is elected and qualified or until his or her earlier resignation or removal.

Unless otherwise specified in the certificate of incorporation, elections of directors need not be by written ballot.

3.4     **Resignation And Vacancies**

Any director may resign at any time upon written notice to the attention of the Secretary of the corporation.  Notwithstanding the provisions of Section 223(a)(1) and 223(a)(2) of the Delaware General Corporation Law, any vacancy or newly created directorship may be filled by a majority of the directors then in office (including any directors that have tendered a resignation effective at a future date), though less than a quorum, or by a sole remaining director, and the directors so chosen shall hold office until the next annual election and until their successors are duly elected and shall qualify, unless sooner displaced; provided, however, that where such vacancy or newly created directorship occurs among the directors elected by the holders of a class or series of stock, the holders of shares of such class or series may override the Board of Directors' action to fill such vacancy or newly created directorship by (i) voting for their own designee to fill such vacancy or newly created directorship at a meeting of the corporation's stockholders or (ii) written consent, if the consenting stockholders hold a sufficient number of shares to elect their designee at a meeting of the stockholders.

If at any time, by reason of death or resignation or other cause, the corporation should have no directors in office, then any officer or any stockholder or an executor, administrator, trustee or guardian of a stockholder, or other fiduciary entrusted with like responsibility for the person or estate of a stockholder, may call a special meeting of stockholders in accordance with the provisions of the certificate of incorporation or these bylaws, or may apply to the Court of Chancery for a decree summarily ordering an election as provided in Section 211 of the Delaware General Corporation Law.

If, at the time of filling any vacancy or any newly created directorship, the directors then in office constitute less than a majority of the whole board (as constituted immediately prior to any such increase), then the Court of Chancery may, upon application of any stockholder or stockholders holding at least 10% of the total number of the shares at the time outstanding having the right to vote for such directors, summarily order an election to be held to fill any such vacancies or newly created directorships, or to replace the directors chosen by the directors then in office as aforesaid, which election shall be governed by the provisions of Section 211 of the Delaware General Corporation Law as far as applicable.

3.5     **Place Of Meetings; Meetings By Telephone**

The Board of Directors of the corporation may hold meetings, both regular and special, either within or outside the state of Delaware.

Unless otherwise restricted by the certificate of incorporation or these bylaws, members of the Board of Directors, or any committee designated by the Board of Directors, may participate in a meeting of the Board of Directors, or any committee, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

3.6     **Regular Meetings**

Regular meetings of the Board of Directors may be held without notice at such time and at such place as shall from time to time be determined by the board.

3.7     **Special Meetings; Notice**

Special meetings of the Board of Directors for any purpose or purposes may be called at any time by the chairperson of the board, the chief executive officer, the president, the secretary or any two directors.

Notice of the time and place of special meetings shall be delivered personally or by telephone to each director or sent by first-class mail, facsimile, electronic mail or other electronic transmission, charges prepaid, addressed to each director at that director's address as it is shown on the records of the corporation.  If the notice is mailed, it shall be deposited in the United States mail at least 4 days before the time of the holding of the meeting.  If the notice is delivered personally or by facsimile, electronic mail or other electronic transmission, or telephone, it shall be delivered at least 24 hours before the time of the holding of the meeting. Any oral notice given personally or by telephone may be communicated either to the director or to a person at the office of the director who the person giving the notice has reason to believe will promptly communicate it to the director.  The notice need not specify the purpose of the meeting.  The notice need not specify the place of the meeting, if the meeting is to be held at the principal executive office of the corporation. Unless otherwise indicated in the notice thereof, any and all business may be transacted at a special meeting.

3.8     **Quorum**

At all meetings of the Board of Directors, a majority of the total number of duly elected directors then in office (but in no case less than 1/3 of the total number of authorized directors) shall constitute a quorum for the transaction of business and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board of Directors, except as may be otherwise specifically provided by statute or by the certificate of incorporation.  If a quorum is not present at any meeting of the Board of Directors, then the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present.

3.9     **Waiver Of Notice**

Whenever notice is required to be given under any provision of the Delaware General Corporation Law or of the certificate of incorporation or these bylaws, a written waiver thereof, signed by the person entitled to notice, or waiver by electronic mail or other electronic transmission by such person, whether before or after the time stated therein, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the directors, or members of a committee of directors, need be

8

specified in any written waiver of notice unless so required by the certificate of incorporation or these bylaws.

### 3.10    Board Action By Written Consent Without A Meeting

Unless otherwise restricted by the certificate of incorporation or these bylaws, any action required or permitted to be taken at any meeting of the Board of Directors, or of any committee thereof, may be taken without a meeting if all members of the board or committee, as the case may be, consent thereto in writing or by electronic transmission.  After an action is taken, the consent or consents relating thereto shall be filed with the minutes of the proceedings of the Board of Directors, or the committee thereof, in the same paper or electronic form as the minutes are maintained.

Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing.

### 3.11    Fees And Compensation Of Directors

Unless otherwise restricted by the certificate of incorporation or these bylaws, the Board of Directors shall have the authority to fix the compensation of directors.  No such compensation shall preclude any director from serving the corporation in any other capacity and receiving compensation therefor.

### 3.12    Approval Of Loans To Officers

The corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the corporation or of its subsidiary, including any officer or employee who is a director of the corporation or its subsidiary, whenever, in the judgment of the directors, such loan, guaranty or assistance may reasonably be expected to benefit the corporation.  The loan, guaranty or other assistance may be with or without interest and may be unsecured, or secured in such manner as the Board of Directors shall approve, including, without limitation, a pledge of shares of stock of the corporation.  Nothing in this section shall be deemed to deny, limit or restrict the powers of guaranty or warranty of the corporation at common law or under any statute.

### 3.13    Removal Of Directors

Unless otherwise restricted by statute, by the certificate of incorporation or by these bylaws, any director or the entire Board of Directors may be removed, with or without cause, by, and only by, the affirmative vote of the holders of the shares of the class or series of stock entitled to elect such director or directors, given either at a special meeting of such stockholders duly called for that purpose or pursuant to a written consent of stockholders, and any vacancy thereby created may be filled by the holders of that class or series of stock represented at the meeting or pursuant to written consent; provided, however, that if the stockholders of the corporation are entitled to cumulative voting, if less than the entire Board of Directors is to be removed, no director may be removed without cause if the votes cast against

his removal would be sufficient to elect him if then cumulatively voted at an election of the entire Board of Directors.

No reduction of the authorized number of directors shall have the effect of removing any director prior to the expiration of such director's term of office.

### 3.14   **Chairperson Of The Board Of Directors**

The corporation may also have, at the discretion of the Board of Directors, a chairperson of the Board of Directors who shall not be considered an officer of the corporation.

## ARTICLE IV

## COMMITTEES

### 4.1   **Committees Of Directors**

The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the corporation.  The Board may designate 1 or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.  In the absence or disqualification of a member of a committee, the member or members present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.  Any such committee, to the extent provided in the resolution of the Board of Directors, or in these bylaws, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the corporation, and may authorize the seal of the corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to the following matters:  (i) approving or adopting, or recommending to the stockholders, any action or matter expressly required by the General Corporate Law of Delaware to be submitted to stockholders for approval or (ii) adopting, amending or repealing any Bylaw of the corporation.

### 4.2   **Committee Minutes**

Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

### 4.3   **Meetings And Action Of Committees**

Meetings and actions of committees shall be governed by, and held and taken in accordance with, the provisions of Section 3.5 (place of meetings and meetings by telephone), Section 3.6 (regular meetings), Section 3.7 (special meetings and notice), Section 3.8 (quorum), Section 3.9 (waiver of notice), and Section 3.10 (action without a meeting) of these bylaws, with such changes in the context of such provisions as are necessary to substitute the committee and its members for the Board of Directors and its members; provided, however, that the time of regular meetings of committees may be determined either by resolution of the Board of Directors or by resolution of the committee, that special meetings of committees may also be called by

resolution of the Board of Directors and that notice of special meetings of committees shall also be given to all alternate members, who shall have the right to attend all meetings of the committee.  The Board of Directors may adopt rules for the government of any committee not inconsistent with the provisions of these bylaws.

## ARTICLE V

## OFFICERS

### 5.1     Officers

The officers of the corporation shall be a president and a secretary.  The corporation may also have, at the discretion of the Board of Directors, a chief executive officer, a chief financial officer, a treasurer, one or more vice presidents, one or more assistant secretaries, one or more assistant treasurers, and any such other officers as may be appointed in accordance with the provisions of Section 5.3 of these bylaws.  Any number of offices may be held by the same person.

### 5.2     Appointment Of Officers

The officers of the corporation, except such officers as may be appointed in accordance with the provisions of Sections 5.3 or 5.5 of these bylaws, shall be appointed by the Board of Directors, subject to the rights (if any) of an officer under any contract of employment.

### 5.3     Subordinate Officers

The Board of Directors may appoint, or empower the chief executive officer or the president to appoint, such other officers and agents as the business of the corporation may require, each of whom shall hold office for such period, have such authority, and perform such duties as are provided in these bylaws or as the Board of Directors may from time to time determine.

### 5.4     Removal And Resignation Of Officers

Subject to the rights (if any) of an officer under any contract of employment, any officer may be removed, either with or without cause, by an affirmative vote of the majority of the Board of Directors at any regular or special meeting of the board or, except in the case of an officer chosen by the Board of Directors, by any officer upon whom the power of removal is conferred by the Board of Directors.

Any officer may resign at any time by giving written notice to the corporation (including written notice by electronic mail, or other facsimile or electronic transmission).  Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective.  Any resignation is without prejudice to the rights (if any) of the corporation under any contract to which the officer is a party.

11

5.5 **Vacancies In Offices**

Any vacancy occurring in any office of the corporation shall be filled by the Board of Directors.

5.6 **Chief Executive Officer**

Subject to such supervisory powers (if any) as may be given by the Board of Directors to the chairperson of the board (if any), the chief executive officer of the corporation (if such an officer is appointed) shall, subject to the control of the Board of Directors, have general supervision, direction, and control of the business and the officers of the corporation and shall have the general powers and duties of management usually vested in the office of chief executive officer of a corporation and shall have such other powers and duties as may be prescribed by the Board of Directors or these bylaws.

The person serving as chief executive officer shall also be the acting president of the corporation whenever no other person is then serving in such capacity.

5.7 **President**

Subject to such supervisory powers (if any) as may be given by the Board of Directors to the chairperson of the board (if any) or the chief executive officer, the president shall have general supervision, direction, and control of the business and other officers of the corporation.  He or she shall have the general powers and duties of management usually vested in the office of president of a corporation and such other powers and duties as may be prescribed by the Board of Directors or these bylaws.

The person serving as president shall also be the acting chief executive officer, secretary or treasurer of the corporation, as applicable, whenever no other person is then serving in such capacity.

5.8 **Vice Presidents**

In the absence or disability of the chief executive officer and president, the vice presidents (if any) in order of their rank as fixed by the Board of Directors or, if not ranked, a vice president designated by the Board of Directors, shall perform all the duties of the president and when so acting shall have all the powers of, and be subject to all the restrictions upon, the president.  The vice presidents shall have such other powers and perform such other duties as from time to time may be prescribed for them respectively by the Board of Directors, these bylaws, the president or the chairperson of the board.

5.9 **Secretary**

The secretary shall keep or cause to be kept, at the principal executive office of the corporation or such other place as the Board of Directors may direct, a book of minutes of all meetings and actions of directors, committees of directors, and stockholders.  The minutes shall show the time and place of each meeting, the names of those present at directors' meetings or

12

committee meetings, the number of shares present or represented at stockholders' meetings, and the proceedings thereof.

The secretary shall keep, or cause to be kept, at the principal executive office of the corporation or at the office of the corporation's transfer agent or registrar, as determined by resolution of the Board of Directors, a share register, or a duplicate share register, showing the names of all stockholders and their addresses, the number and classes of shares held by each, the number and date of certificates (if any) evidencing such shares, and the number and date of cancellation of every certificate (if any) surrendered for cancellation.

The secretary shall give, or cause to be given, notice of all meetings of the stockholders and of the Board of Directors required to be given by law or by these bylaws.  He or she shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or by these bylaws.

### 5.10    **Chief Financial Officer**

The chief financial officer (if such an officer is appointed) shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of accounts of the properties and business transactions of the corporation, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, retained earnings and shares. The books of account shall at all reasonable times be open to inspection by any member of the Board of Directors.

The chief financial officer shall render to the chief executive officer, the president, or the Board of Directors, upon request, an account of all his or her transactions as chief financial officer and of the financial condition of the corporation.  He or she shall have the general powers and duties usually vested in the office of chief financial officer of a corporation and shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or these bylaws.

The person serving as the chief financial officer shall also be the acting treasurer of the corporation whenever no other person is then serving in such capacity.  Subject to such supervisory powers (if any) as may be given by the Board of Directors to another officer of the corporation, the chief financial officer shall supervise and direct the responsibilities of the treasurer whenever someone other than the chief financial officer is serving as treasurer of the corporation.

### 5.11    **Treasurer**

The treasurer (if such an officer is appointed) shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records with respect to all bank accounts, deposit accounts, cash management accounts and other investment accounts of the corporation.  The books of account shall at all reasonable times be open to inspection by any member of the Board of Directors.

The treasurer shall deposit, or cause to be deposited, all moneys and other valuables in the name and to the credit of the corporation with such depositories as may be

13

designated by the Board of Directors.  He or she shall disburse the funds of the corporation as may be ordered by the Board of Directors and shall render to the chief financial officer, the chief executive officer, the president or the Board of Directors, upon request, an account of all his or her transactions as treasurer.  He or she shall have the general powers and duties usually vested in the office of treasurer of a corporation and shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or these bylaws.

The person serving as the treasurer shall also be the acting chief financial officer of the corporation whenever no other person is then serving in such capacity.

### 5.12   <u>Representation Of Shares Of Other Corporations</u>

The chairperson of the board, the chief executive officer, the president, any vice president, the chief financial officer, the secretary or assistant secretary of this corporation, or any other person authorized by the Board of Directors or the chief executive officer or the president or a vice president, is authorized to vote, represent, and exercise on behalf of this corporation all rights incident to any and all shares of any other corporation or corporations standing in the name of this corporation.  The authority granted herein may be exercised either by such person directly or by any other person authorized to do so by proxy or power of attorney duly executed by the person having such authority.

### 5.13   <u>Authority And Duties Of Officers</u>

In addition to the foregoing authority and duties, all officers of the corporation shall respectively have such authority and perform such duties in the management of the business of the corporation as may be designated from time to time by the Board of Directors or the stockholders.

## ARTICLE VI

## <u>INDEMNIFICATION OF DIRECTORS, OFFICERS, EMPLOYEES, AND OTHER AGENTS</u>

### 6.1   <u>Indemnification Of Directors And Officers</u>

The corporation shall, to the maximum extent and in the manner permitted by the Delaware General Corporation Law, indemnify each of its directors and officers against expenses (including attorneys' fees), judgments, fines, settlements and other amounts actually and reasonably incurred in connection with any proceeding, arising by reason of the fact that such person is or was an agent of the corporation.  For purposes of this Section 6.1, a "director" or "officer" of the corporation includes any person (a) who is or was a director or officer of the corporation, (b) who is or was serving at the request of the corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, or (c) who was a director or officer of a corporation which was a predecessor corporation of the corporation or of another enterprise at the request of such predecessor corporation.

14

6.2    **Indemnification Of Others**

The corporation shall have the power, to the maximum extent and in the manner permitted by the Delaware General Corporation Law, to indemnify each of its employees and agents (other than directors and officers) against expenses (including attorneys' fees), judgments, fines, settlements and other amounts actually and reasonably incurred in connection with any proceeding, arising by reason of the fact that such person is or was an agent of the corporation. For purposes of this Section 6.2, an "employee" or "agent" of the corporation (other than a director or officer) includes any person (a) who is or was an employee or agent of the corporation, (b) who is or was serving at the request of the corporation as an employee or agent of another corporation, partnership, joint venture, trust or other enterprise, or (c) who was an employee or agent of a corporation which was a predecessor corporation of the corporation or of another enterprise at the request of such predecessor corporation.

6.3    **Payment Of Expenses In Advance**

Expenses incurred in defending any action or proceeding for which indemnification is required pursuant to Section 6.1 or for which indemnification is permitted pursuant to Section 6.2 following authorization thereof by the Board of Directors shall be paid by the corporation in advance of the final disposition of such action or proceeding upon receipt of an undertaking by or on behalf of the indemnified party to repay such amount if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that the indemnified party is not entitled to be indemnified as authorized in this Article VI.

6.4    **Indemnity Not Exclusive**

The indemnification provided by this Article VI shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled under any Bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in an official capacity and as to action in another capacity while holding such office, to the extent that such additional rights to indemnification are authorized in the certificate of incorporation.

6.5    **Insurance**

The corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him or her and incurred by him or her in any such capacity, or arising out of his or her status as such, whether or not the corporation would have the power to indemnify him or her against such liability under the provisions of the Delaware General Corporation Law.

6.6    **Conflicts**

No indemnification or advance shall be made under this Article VI, except where such indemnification or advance is mandated by law or the order, judgment or decree of any court of competent jurisdiction, in any circumstance where it appears:

(a)     That it would be inconsistent with a provision of the certificate of incorporation, these bylaws, a resolution of the stockholders or an agreement in effect at the time of the accrual of the alleged cause of the action asserted in the proceeding in which the expenses were incurred or other amounts were paid, which prohibits or otherwise limits indemnification; or

(b)     That it would be inconsistent with any condition expressly imposed by a court in approving a settlement.

## ARTICLE VII

## RECORDS AND REPORTS

### 7.1     Maintenance And Inspection Of Records

The corporation shall, either at its principal executive offices or at such place or places as designated by the Board of Directors, keep a record of its stockholders listing their names and addresses and the number and class of shares held by each stockholder, a copy of these bylaws as amended to date, accounting books, and other records.

A complete list of stockholders entitled to vote at any meeting of stockholders, arranged in alphabetical order for each class of stock and showing the address of each such stockholder and the number of shares registered in each such stockholder's name, shall be open to the examination of any such stockholder for a period of at least 10 days prior to the meeting in the manner provided by law.  The stock list shall also be open to the examination of any stockholder during the whole time of the meeting as provided by law.  This list shall presumptively determine the identity of the stockholders entitled to vote at the meeting and the number of shares held by each of them.

If and so long as there are fewer than one hundred (100) holders of record of the corporation's shares, any state law requirement of sending of an annual report to the stockholders of the corporation is hereby expressly waived, to the extent permitted.

### 7.2     Inspection By Directors

Any director shall have the right to examine the corporation's stock ledger, a list of its stockholders, and its other books and records for a purpose reasonably related to his or her position as a director.  The Court of Chancery is hereby vested with the exclusive jurisdiction to determine whether a director is entitled to the inspection sought.  The Court may summarily order the corporation to permit the director to inspect any and all books and records, the stock ledger, and the stock list and to make copies or extracts therefrom.  The Court may, in its discretion, prescribe any limitations or conditions with reference to the inspection, or award such other and further relief as the Court may deem just and proper.

4165-9623-1719.3

# ARTICLE VIII

# GENERAL MATTERS

### 8.1    Checks

From time to time, the Board of Directors shall determine by resolution which person or persons may sign or endorse all checks, drafts, other orders for payment of money, notes or other evidences of indebtedness that are issued in the name of or payable to the corporation, and only the persons so authorized shall sign or endorse those instruments.

### 8.2    Execution Of Corporate Contracts And Instruments

The Board of Directors, except as otherwise provided in these bylaws, may authorize any officer or officers, or agent or agents, to enter into any contract or execute any instrument in the name of and on behalf of the corporation; such authority may be general or confined to specific instances.  Unless so authorized or ratified by the Board of Directors or within the agency power of an officer, no officer, agent or employee shall have any power or authority to bind the corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

### 8.3    Stock Certificates and Notices; Uncertificated Stock; Partly Paid Shares

The shares of the corporation may be certificated or uncertificated, as provided under Delaware law, and shall be entered in the books of the corporation and recorded as they are issued.  Any duly appointed officer of the corporation is authorized to sign share certificates. Any or all of the signatures on any certificate may be a facsimile or electronic signature.  In case any officer, transfer agent or registrar who has signed or whose facsimile or electronic signature has been placed upon a certificate has ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the corporation with the same effect as if he or she were such officer, transfer agent or registrar at the date of issue.

Within a reasonable time after the issuance or transfer of uncertificated stock and upon the request of a stockholder, the corporation shall send to the record owner thereof a written notice that shall set forth the name of the corporation, that the corporation is organized under the laws of Delaware, the name of the stockholder, the number and class (and the designation of the series, if any) of the shares, and any restrictions on the transfer or registration of such shares of stock imposed by the corporation's certificate of incorporation, these bylaws, any agreement among stockholders or any agreement between stockholders and the corporation.

The corporation may issue the whole or any part of its shares as partly paid and subject to call for the remainder of the consideration to be paid therefor.  Upon the face or back of each stock certificate (if any) issued to represent any such partly paid shares, or upon the books and records of the corporation in the case of uncertificated partly paid shares, the total amount of the consideration to be paid therefor and the amount paid thereon shall be stated. Upon the declaration of any dividend on fully paid shares, the corporation shall declare a dividend upon partly paid shares of the same class, but only upon the basis of the percentage of the consideration actually paid thereon.

17

8.4    **Special Designation On Certificates and Notices of Issuance**

If the corporation is authorized to issue more than one class of stock or more than one series of any class, then the powers, the designations, the preferences, and the relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate that the corporation shall issue to represent such class or series of stock or the notice of issuance to the record owner of uncertificated stock; provided, however, that, except as otherwise provided in Section 202 of the Delaware General Corporation Law, in lieu of the foregoing requirements there may be set forth on the face or back of the certificate that the corporation shall issue to represent such class or series of stock or the notice of issuance to the record owner of uncertificated stock, or the purchase agreement for such stock a statement that the corporation will furnish without charge to each stockholder who so requests the powers, the designations, the preferences, and the relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

8.5    **Lost Certificates**

Except as provided in this Section 8.5, no new certificates for shares shall be issued to replace a previously issued certificate unless the latter is surrendered to the corporation and cancelled at the same time. The corporation may issue a new certificate of stock or notice of uncertificated stock in the place of any certificate previously issued by it, alleged to have been lost, stolen or destroyed, and the corporation may require the owner of the lost, stolen or destroyed certificate, or the owner's legal representative, to give the corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate or uncertificated shares.

8.6    **Construction; Definitions**

Unless the context requires otherwise, the general provisions, rules of construction, and definitions in the Delaware General Corporation Law shall govern the construction of these bylaws. Without limiting the generality of this provision, the singular number includes the plural, the plural number includes the singular, and the term "person" includes both a corporation and a natural person.

8.7    **Dividends**

The directors of the corporation, subject to any restrictions contained in (a) the Delaware General Corporation Law or (b) the certificate of incorporation, may declare and pay dividends upon the shares of its capital stock. Dividends may be paid in cash, in property, or in shares of the corporation's capital stock.

The directors of the corporation may set apart out of any of the funds of the corporation available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve. Such purposes shall include but not be limited to equalizing dividends, repairing or maintaining any property of the corporation, and meeting contingencies.

18

8.8     **Fiscal Year**

      The fiscal year of the corporation shall be fixed by resolution of the Board of Directors and may be changed by the Board of Directors.

8.9     **Transfer Restrictions**

      Notwithstanding anything to the contrary, except as expressly permitted in this Section 8.9, a stockholder shall not transfer, whether by sale, gift or otherwise, any shares of the Corporation's Common Stock to any person unless such transfer is approved by the Board of Directors prior to such transfer, which approval may be granted or withheld in the Board of Directors' sole and absolute discretion.  Any purported transfer of any shares of the Corporation's Common Stock effected in violation of this Section 8.9 shall be null and void and shall have no force or effect and the Corporation shall not register any such purported transfer.

      Any stockholder seeking the approval of the Board of Directors of a transfer of some or all of its Common Stock shall give written notice thereof to the Secretary of the Corporation that shall include:  (a) the name of the stockholder; (b) the proposed transferee; (c) the number of shares of the transfer of which approval is thereby requested; and (d) the purchase price (if any) of the shares proposed for transfer.  The Corporation may require the stockholder to supplement its notice with such additional information as the Corporation may request.

      Certificates representing, and in the case of uncertificated securities, notices of issuance with respect to, shares of Common Stock of the Corporation shall have impressed on, printed on, written on or otherwise affixed to them the following legend:

      THE TRANSFER OF SECURITIES REFERENCED HEREIN IS SUBJECT TO RESTRICTIONS REQUIRING APPROVAL OF THE COMPANY PURSUANT TO AND IN ACCORDANCE WITH THE COMPANY'S BYLAWS AND/OR STOCK PLAN, COPIES OF WHICH MAY BE OBTAINED UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS.  THE COMPANY SHALL NOT REGISTER OR OTHERWISE RECOGNIZE OR GIVE EFFECT TO ANY PURPORTED TRANSFER OF SHARES OF STOCK THAT DOES NOT COMPLY WITH THE COMPANY'S BYLAWS.

      The Corporation shall take all such actions as are practicable to cause the certificates representing, and notices of issuance with respect to, shares that are subject to the restrictions on transfer set forth in this Section to contain the foregoing legend.

      The foregoing transfer restrictions set forth in this Section 8.9 shall not apply to any sale of shares of the Corporation's Preferred Stock (or shares of Common Stock issued upon conversion of Preferred Stock) to the extent such sale is made in accordance with the provisions set forth in the certificate of incorporation, any agreements between the Corporation and the holder of such Preferred Stock (or shares of Common Stock issued upon conversion of Preferred Stock) and applicable law.

8.10    **Transfer Of Stock**

Upon receipt by the corporation or the transfer agent of the corporation of proper transfer instructions from the record holder of uncertificated shares or upon surrender to the corporation or the transfer agent of the corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignation or authority to transfer, it shall be the duty of the corporation to issue a new certificate or, in the case of uncertificated securities and upon request, a notice of issuance of shares, to the person entitled thereto, cancel the old certificate (if any) and record the transaction in its books.

8.11    **Stock Transfer Agreements**

The corporation shall have power to enter into and perform any agreement with any number of stockholders of any one or more classes of stock of the corporation to restrict the transfer of shares of stock of the corporation of any one or more classes owned by such stockholders in any manner not prohibited by the Delaware General Corporation Law.

8.12    **Stockholders of Record**

The corporation shall be entitled to recognize the exclusive right of a person recorded on its books as the owner of shares to receive dividends and to vote as such owner, shall be entitled to hold liable for calls and assessments the person recorded on its books as the owner of shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of another person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

8.13    **Facsimile or Electronic Signature**

In addition to the provisions for use of facsimile or electronic signatures elsewhere specifically authorized in these bylaws, facsimile or electronic signatures of any stockholder, director or officer of the corporation may be used whenever and as authorized by the Board of Directors or a committee thereof.

## ARTICLE IX

## AMENDMENTS

The Bylaws of the corporation may be adopted, amended or repealed by the stockholders entitled to vote; provided, however, that the corporation may, in its certificate of incorporation, confer the power to adopt, amend or repeal Bylaws upon the directors.  The fact that such power has been so conferred upon the directors shall not divest the stockholders of the power, nor limit their power to adopt, amend or repeal Bylaws.

4165-9623-1719.3

# EXHIBIT D

| | |
|---|---|
| **From:** | Kramer, James N. |
| **To:** | Monnin, Paul |
| **Cc:** | Sullivan, Mike; Grantham, Thomas; K. Tyler O"Connell, Esq.; Samuel Bashman; John Urban |
| **Subject:** | RE: Advancement of Chris Kirchner"s Legal Expenses in Relation to Northern District of Texas Criminal and Civil Actions |
| **Date:** | Wednesday, August 30, 2023 3:21:28 PM |

**EXTERNAL SENDER – Proceed with caution**

Paul,

Apologies for the delay.  The company will agree to advance.

Please reach out to John Urban at the company regarding logistics.  Note that John is cc'd above.

Best,
Jim

**From:** Monnin, Paul <Paul.Monnin@alston.com>
**Sent:** Wednesday, August 30, 2023 11:41 AM
**To:** Kramer, James N. <jkramer@orrick.com>
**Cc:** Sullivan, Mike <msullivan@orrick.com>; Grantham, Thomas <Thomas.Grantham@alston.com>; toconnell@morrisjames.com; Samuel Bashman <SBashman@morrisjames.com>
**Subject:** RE: Advancement of Chris Kirchner's Legal Expenses in Relation to Northern District of Texas Criminal and Civil Actions

Jim,

Further to my email below, please see the attached, signed undertaking from Mr. Kirchner, which is in the same form as the undertaking I previously sent you on August 16. We plan to file this along with a complaint for advancement this afternoon.

Best regards,

Paul N. Monnin
**ALSTON & BIRD LLP**
One Atlantic Center
1201 W. Peachtree Street
Atlanta, GA 30309-3424
404.881.7394 (o)
404.428.8082 (m)
Paul.Monnin@alston.com

**From:** Monnin, Paul

**Sent:** Wednesday, August 16, 2023 3:15 PM
**To:** Kramer, James N. <jkramer@orrick.com>
**Cc:** Sullivan, Mike <msullivan@orrick.com>; Grantham, Thomas <Thomas.Grantham@alston.com>; toconnell@morrisjames.com; Samuel Bashman <SBashman@morrisjames.com>
**Subject:** Advancement of Chris Kirchner's Legal Expenses in Relation to Northern District of Texas Criminal and Civil Actions
**Importance:** High

Jim:

Please see the attached correspondence regarding Chris Kirchner's request for advancement of his legal expenses in relation to *United States v. Kirchner*, No. 4:23-cr-127-P (N.D. Tex.), and *SEC v. Kirchner, et al.*, No. 4:23-cv-147-P (N.D. Tex.).

Hope you're doing well and that we're able to work this out.

Best regards,

Paul N. Monnin
**ALSTON & BIRD LLP**
One Atlantic Center
1201 W. Peachtree Street
Atlanta, GA 30309-3424
404.881.7394 (o)
404.428.8082 (m)
Paul.Monnin@alston.com

---

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.

---

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.