ORIGINAL

AGC

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL NO. 4:23-CR-127-P |
| CHRISTOPHER KIRCHNER | Supersedes indictment returned on May 2, 2023 |

### SUPERSEDING INDICTMENT

At all times material to this Indictment:

Overview

1.   In or about 2017, defendant **Christopher Kirchner** founded Slync.io ("Slync") with several other people. Slync was a supply-chain management software company. **Kirchner** acted as Slync's CEO from approximately 2017 until July 2022, when he was suspended by Slync's Board of Directors. **Kirchner** was terminated from Slync in or about August 2022.

2.   Slync was funded in part by private equity investors, both individuals and venture capital groups. This funding came largely from two primary fundraising campaigns: a Series A offering and a Series B offering. From in or about March 2020 to May 2020, Slync raised approximately $7.2 million in the Series A preferred stock offering. Then, from in or about December 2020 to May 2021, Slync raised approximately $50 million in the Series B preferred stock offering. Both offerings were designed to raise money for Slync's business operations so that the company could grow.

3. During his time as CEO, **Kirchner** maintained close control over Slync's operations, sales, and recordkeeping. **Kirchner** maintained exclusive access to information about the company's finances and was the primary decisionmaker regarding when, how, and whether the company would record revenue. **Kirchner** limited the access that other employees had to company records.

4. From at least in or about 2020, through in or about August 2022, **Kirchner** perpetrated a scheme to defraud Slync and Slync investors out of at least $25,000,000 by making false representations and promises about Slync's business operations and **Kirchner's** use of investor funds. For example, **Kirchner** created false documents to deceive investors about the amount of cash in Slync bank accounts. **Kirchner** also signed agreements promising that investor funds would be used for Slync business operations, but then spent Slync investors' money on a personal private jet, his residence in Westlake, Texas, and personal items such as credit card bills, jewelry, automobiles, and daily living expenses. And **Kirchner** took steps to conceal his fraud from investors, directors, and other employees by creating false documents and structuring transactions to evade approval requirements.

5. In or about July 2017, **Kirchner** opened a bank account ending in 0392 on behalf of Slync at JPMorgan Chase Bank ("Slync Chase account"). **Kirchner** had sole signatory authority on the Slync Chase account.

6. In or about October 2019, **Kirchner** opened a bank account ending in 6437 on behalf of Slync at Silicon Valley Bank ("Slync SVB account"). Both **Kirchner** and another Slync employee known to the Grand Jury as Individual 1 had signatory authority

on the Slync SVB account. Whenever **Kirchner** initiated a wire or transfer of more than $100,000 from the Slync SVB account, Individual 1's approval was required to complete the transfer. Similarly, whenever Individual 1 initiated a wire or transfer of more than $100,000 from the account, **Kirchner's** approval was required to complete the transfer.

The Scheme to Defraud

Series A Investment and Misappropriation

7.   Between on or about March 30, 2020, and on or about May 14, 2020, Slync and persons and entities known to the Grand Jury as Investors 1, 2, 3, 4, 5, and 6 entered into Series A Preferred Stock Purchase Agreements ("Series A Purchase Agreements") to raise money for Slync's business operations. The Series A Purchase Agreements explicitly required that the proceeds received from the Series A investors would be used "for product development and other general corporate purposes."

8.   Slync raised approximately $7.2 million in financing through the Series A fundraising, which included the following investments:

| Date | Payer | Amount |
|---|---|---|
| 3/30/2020 | Investor 1 | $3,999,998.85 |
| 3/31/2020 | Investor 2 | $2,789,026.25 |
| 3/31/2020 | Investor 3 | $24,999.34 |
| 5/13/2020 | Investor 4 | $100,000.00 |
| 5/13/2020 | Investor 5 | $92,820.00 |
| 5/14/2020 | Investor 6 | $207,180.00 |
| | Total | $7,214,024.44 |

9. Slync received these investments via electronic wire transfers from the Series A investors into the Slync SVB bank account.

10. Prior to Investor 1's wire transfer, which was the first that Slync received from its Series A investors, the Slync SVB account was overdrawn by approximately $693.21.

11. As part of the scheme, **Kirchner** made materially false and fraudulent statements and representations to Slync investors in connection with the Series A fundraising. When raising capital from investors in Slync, **Kirchner** deceived those investors about the company's revenue and how the investments would be used.

12. **Kirchner** began taking Series A investor funds for his personal use shortly after they were transferred into Slync's account. Between on or about April 6, 2020, and on or about November 23, 2020, **Kirchner** initiated a series of approximately 27 wire transfers totaling approximately $2,174,000 from the Slync SVB account to the Slync Chase account. Prior to these 27 wire transfers from the Slync SVB account to the Slync Chase account, the Slync Chase account had a balance of approximately $5,900.

13. **Kirchner's** 27 transfers ranged in amount from $22,500 to $99,750. **Kirchner** structured the transfers out of the Slync SVB account so that each fell below the $100,000 threshold requiring Individual 1's approval. Once the money was transferred into the Slync Chase account, **Kirchner** was able to make further transfers in any amount without approval. **Kirchner** was the only signatory on the Slync Chase

account and was therefore able to transfer money out of that account and into his own personal accounts without Individual 1's approval.

14. In many instances, after **Kirchner** caused the transfer to the Slync Chase account, he either spent the money for his own personal use, or moved the money to his own personal bank accounts and used it to make purchases for his personal benefit.

15. **Kirchner** transferred approximately $1,311,400 of Series A investor funds from the Slync Chase account to personal bank accounts that he controlled as follows:

   a. $1,145,900 to **Kirchner's** personal bank account ending in 2337 at JPMorgan Chase Bank;

   b. $153,000 to **Kirchner's** personal bank account ending in 8697 at JPMorgan Chase Bank; and

   c. $12,500 to **Kirchner's** personal bank account ending in 0219 at Silicon Valley Bank.

16. These funds were then used towards a payment of approximately $670,000 towards **Kirchner's** personal residence in Westlake, Texas, payments on luxury automobiles purchased or leased by **Kirchner**, payments to a country club, and other personal living expenses.

17. **Kirchner** also spent Series A investor funds directly from the Slync Chase account for his own personal benefit, including but not limited to payments to private jet charter companies, the purchase of wine from a vineyard in Napa Valley, California, payments to golf clubs, payments on his personal credit cards, and other personal living expenses.

Series B Investment and Misappropriation

18.  Following the Series A funding round, between on or about December 11, 2020, and on or about May 7, 2021, Slync and persons and entities known to the Grand Jury as Investors 1, 7, 8, 9, 10, 11, and 12 entered into Series B Preferred Stock Purchase Agreements ("Series B Purchase Agreements") to raise additional funds for Slync's business operations. The Series B Purchase Agreements stipulated that Slync would use the proceeds received from the Series B investors to repay an outstanding loan to Slync and "for product development and other general corporate purposes."

19.  **Kirchner** made materially false and fraudulent statements and representations to Slync investors in connection with the Series B fundraising. **Kirchner** deceived investors about the company's revenue and how the investment funds would be used. **Kirchner** also concealed from the Series B investors that he had used a significant portion of the Series A funds for his own personal benefit.

20.  Additionally, in the course of due diligence of Slync's financial statements, **Kirchner** omitted material information about Slync customers and created a false bank statement to convince investors that Slync had significantly more cash on hand than it did. Because of those fraudulent statements and omissions, investors received false and inaccurate financial information.

21.  Slync raised approximately $50 million in financing through the Series B fundraising, which included the following investments:

| Date | Payer | Amount |
| --- | --- | --- |
| 12/11/2020 | Investor 7 | $34,999,997.45 |
| 12/11/2020 | Investor 8 | $9,997.98 |
| 12/15/2020 | Investor 1 | $499,999.08 |
| 12/28/2020 | Investor 9 | $7,499,995.70 |
| 12/28/2020 | Investor 10 | $199,997.72 |
| 3/3/2021 | Investor 11 | $1,130,235.13 |
| 3/3/2021 | Investor 12 | $420,000.00 |
| 5/7/2021 | Investor 9 | $5,000,009.90 |
| 5/7/2021 | Investor 9 | $239,764.55 |
| | Total | $49,999,997.51 |

22. Slync received the majority of these investments via electronic wire transfers from the Series B investors into the Slync SVB bank account.

23. Prior to the payments received from Investors 7 and 8, which were the first that Slync received from its Series B investors, the Slync SVB account was overdrawn by approximately $232,423.

24. On or about December 13, 2020, after funds from Investors 7 and 8 were transferred into the Slync SVB account, **Kirchner** told Individual 1 that **Kirchner** wanted to move the majority of the newly acquired funds from the Slync SVB account to a Slync investment account. As a result of these false representations, **Kirchner** obtained approval from Individual 1 to transfer the money, which caused a transfer of $20,000,000

from the Slync SVB account to **Kirchner's** personal bank account ending in 0637 at Silicon Valley Bank. Individual 1 would not have approved the transfer had Individual 1 known the money was going to be used for **Kirchner's** personal benefit.

25. Despite promising to use the funds for Slync business operations, **Kirchner** used the $20 million for personal purposes, including, but not limited to, the following:

    a. **Kirchner** paid approximately $16,000,000 for the purchase of a Gulfstream GV-SP (G550) private jet which he bought in his personal capacity.

    b. **Kirchner** transferred approximately $800,000 to his personal bank account ending in 5469 at Bank of America.

    c. **Kirchner** paid approximately $495,000 to secure a private luxury suite at the stadium of a Dallas-area professional sports team which he held in his personal capacity.

    d. **Kirchner** paid approximately $22,000 in fees for a personal membership and other personal purchases at a private golf and social club located in Westlake, Texas.

26. In addition, between on or about January 15, 2021, and on or about March 22, 2022, **Kirchner** initiated a series of approximately 70 wire transfers totaling approximately $6,814,016 from the Slync SVB account to the Slync Chase account. The amount of these transfers varied from $35,000 to $99,987. **Kirchner** structured these transfers to fall below the $100,000 threshold that would have required Individual 1's approval.

27. **Kirchner** then moved a large portion of the money from the Slync Chase account to his personal bank accounts and used the money for his personal benefit. **Kirchner** transferred approximately $5,931,100 of Series B investor funds from the Slync Chase account to personal bank accounts that he controlled as follows:

  a. $5,167,250 to a bank account ending in 3574 in the name of KFIM—a limited liability company which **Kirchner** controlled—at Bank of America; and

  b. $763,850 to **Kirchner's** bank account ending in 2337 at JPMorgan Chase.

28. These funds were then used towards the purchase of a residential lot adjacent to **Kirchner**'s personal residence, payments on luxury automobiles purchased or leased by **Kirchner**, jewelry, wine, art, and other living expenses.

29. **Kirchner** also spent Series B investor funds directly from the Slync Chase account for his own personal benefit, including but not limited to paying at least approximately $902,990 on his personal credit cards that were used to purchase wine and jewelry, including the payment of $390,000 towards the purchase of a Richard Mille watch costing approximately $570,330 in total.

Kirchner's Acts of Concealment

30. After **Kirchner** had transferred so much money out of Slync's accounts for his personal benefit, Slync often had insufficient funds to pay its employees. On multiple occasions in or about April, May, June, and July 2022, Slync paid employees late or missed payroll.

31. As Slync struggled to pay its employees, **Kirchner** took steps to conceal his embezzlement by misleading investors, board members, and employees about the cause of Slync's payroll issues. **Kirchner** falsely claimed that the company's cash was invested in illiquid assets and that Slync was having difficulty making payroll because it could not sell those assets quickly enough. Later, **Kirchner** falsely claimed that the United States government had frozen Slync's accounts because **Kirchner** had done business with sanctioned entities in Russia. **Kirchner** knew these explanations were false and made them to conceal his misappropriation of Slync's funds.

32. In another attempt to conceal his theft, **Kirchner** convinced personal acquaintances of his that Slync was raising money for a Series C investment offering, even though Slync's Board of Directors had not approved such an offering. **Kirchner** mislead his personal acquaintances by telling them that they would get shares of Slync in return for making investments in the company. By making these false representations, **Kirchner** was able to obtain approximately $850,000, which he used to temporarily conceal his earlier misappropriation of funds.

33. To further conceal his theft, **Kirchner** provided false documents to Slync's payroll management provider and Slync Board Members.

34. **Kirchner** also fired Slync employees who raised concerns about his use of company funds.

35. On or about July 24, 2022, Slync's Board of Directors suspended **Kirchner**. Shortly thereafter, **Kirchner** accessed Slync's computer database and removed certain information technology administrator privileges from key Slync

employees, preventing the employees from accessing portions of Slync's computer systems. **Kirchner** then attempted to delete approximately 18 gigabytes of Slync data, including emails.

    36.    In or about August 2022, Slync terminated **Kirchner**.

Counts One through Four
Wire Fraud
[Violation of 18 U.S.C. § 1343]

37. The allegations contained in paragraphs 1 through 36 of this Indictment are repeated and realleged as if fully set forth herein.

38. From at least in or about March 2020, through in or about August 2022, in the Northern District of Texas and elsewhere, defendant **Christopher Kirchner**, devised and intended to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises as further described in paragraphs 1 to 36 above. For the purpose of executing the scheme described above, defendant **Christopher Kirchner** transmitted and caused to be transmitted by means of wire communication in interstate commerce the writings, signs, signals, pictures, and sounds described below for each count, each transmission constituting a separate count:

| Count | Date | Description of Wire Transmission |
|---|---|---|
| 1 | 10/15/2020 | Transfer of approximately $60,000 from Slync Chase account ending in 0392 to **Kirchner's** Chase account ending in 2337. |
| 2 | 12/14/2020 | Transfer of approximately $20,000,000 from Slync SVB account ending in 6347 to **Kirchner's** SVB account ending in 0637. |
| 3 | 3/2/2021 | Transfer of approximately $99,950 from Slync SVB account ending in 6347 to Slync Chase account ending in 0392. |
| 4 | 3/4/2021 | Transfer of approximately $500,000 from Slync Chase bank account ending in 0392 to KFIM Bank of America Account ending in 3574. |

Each in violation of 18 U.S.C. § 1343.

Counts Five through Eleven
Engaging in Monetary Transactions in Property
Derived from Specified Unlawful Activity
[Violation of 18 U.S.C. § 1957]

39. The allegations contained in paragraphs 1 through 38 of this Indictment are repeated and realleged as if fully set forth herein.

40. On or about the dates set forth below, in the Northern District of Texas and elsewhere, **Christopher Kirchner**, the defendant, did knowingly engage in monetary transactions, affecting interstate commerce, in criminally derived property of a value greater than $10,000.00, that is, numerous purchases, including vehicles, an airplane, and real and personal property, with checks and wire transfers drawn on accounts at financial institutions engaged in interstate commerce, the funds used to purchase such property having been derived from wire fraud, a criminal offense under 18 U.S.C. § 1343, a specified unlawful activity.

| Count | Date | Description of Monetary Transaction | Amount |
|---|---|---|---|
| 5 | 6/17/2020 | Wire transfer from **Kirchner's** SVB account ending in 0637 for down payment for residence in Westlake, Texas. | $669,453.05 |
| 6 | 12/14/2020 | Wire transfer from **Kirchner's** SVB account ending in 0637 for deposit for Gulfstream GV-SP (G550) private jet aircraft. | $5,000,000.00 |
| 7 | 12/14/2020 | Wire transfer from **Kirchner's** SVB account ending in 0637 for lease payment for luxury suite at the stadium of a local professional sports team. | $495,000.00 |
| 8 | 12/22/2020 | Wire transfer from **Kirchner's** SVB account ending in 0219 to pay the remaining balance for the purchase of Gulfstream GV-SP (G550) private jet aircraft. | $11,131,500.00 |

| Count | Date | Description of Monetary Transaction | Amount |
|---|---|---|---|
| 9 | 3/5/2021 | Wire transfer from **Kirchner's** Bank of America account ending in 3574 for purchase of residential lot in Westlake, Texas. | $1,411,470.07 |
| 10 | 6/9/2021 | Personal check drawn on **Kirchner's** Bank of America account ending in 5469 for purchase of 2021 Porsche 911 Turbo S Cabriolet, VIN WP0CD2A90MS263853. | $287,106.72 |
| 11 | 8/16/2021 | Cashier's check drawn on **Kirchner's** Bank of America account ending in 5469 for purchase of 2021 Mercedes-Benz AMG G63, VIN W1NYC7HJ9MX401228. | $283,261.12 |
| | | Total | $19,277,790.96 |

Each in violation of 18 U.S.C. § 1957.

Notice of Forfeiture
[18 U.S.C § 981(a)(1)(C) and 28 U.S.C. § 2461(c); 18 U.S.C. § 982(a)(2)(A); 18 U.S.C. § 982(a)(1)]

41. Upon conviction for any offense charged in Counts One through Four of this Indictment, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and 18 U.S.C. § 982(a)(2)(A), the defendant, **Christopher Kirchner**, shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the respective offense.

42. Upon conviction for any offense charged in Counts Five through Eleven of this Indictment, pursuant to 18 U.S.C. § 982(a)(1), the defendant, **Christopher Kirchner**, shall forfeit to the United States any property, real or personal, involved in, or traceable to property involved in, the respective offense.

43. The property subject to forfeiture includes, but is not limited to, the following:

   a. The proceeds traceable to each of Counts One through Four, as well as the scheme to defraud underlying those Counts, in the form of a "money judgment" in the amount of at least $25,000,000.
   b. The value of the property involved in each of Counts Five through Eleven, in the form of a "money judgment" in the amount of the respective laundering transaction.
   c. 2021 Mercedes Benz AMG G63, VIN W1NYC7HJ9MX401228.
   d. 2022 Rolls Royce Cullinan, VIN SLATV4C05NU211445.
   e. Richard Mille 95% Platinum Watch with Sports Rubber Bracelet, Model RM008/AFPT/27, Serial No. PT950.
   f. Men's Rolex Oyster Cosmograph Dayton Watch, 18K Yellow Gold, Model 116508, Serial No. 124741T1.
   g. Men's Rolex Oyster Perpetual Cosmograph Daytona Watch in 18K White Gold, Model 116509, Serial No. Z071060.
   h. Ladies' Rolex Oyster Perpetual Date Just Watch in 18K Rose Gold, Model 81285, Serial No. J0560855.

i. Cartier Panther-Style Pendant Necklace in 18K Yellow Gold, seized on February 14, 2023.
j. *Round Monette with Pink Roses* Painting by Sarah Ashley Longshore.
k. 57 bottles of wine (formerly described as Eleven cases of wine, including bottles of wine from the Lokoya winery), seized from defendant Christopher Kirchner's residence on or about February 14, 2023, as follows:
Four (4) bottles of Hundred Acre Ark Wine;
Thirty-three (33) bottles of Lokoya 2018 Cabernet Sauvignon;
Two (2) bottles of Vineyard 7 and 8 Estate 2018 Cabernet Sauvignon; and
Eighteen (18) bottles of Lokoya 2016 Cabernet Sauvignon.
l. The real property located at 1209 Perdenalas Trail, Westlake, Tarrant County, Texas, a 2.313 acre tract of land situated in the Josiah Walker Survey, Abstract No. 1604, Town of Westlake, Tarrant County, Texas, and being all of Lots 19 and 20, Block L of the Vaquero ~ Arthur Addition, Phase 3 according to the Plat thereof recorded in Instrument No. D203426028 of said Map or Plat Records of Tarrant County, Texas, said 2.313 acre tract of land being more particularly described by metes and bounds as follows:

> BEGINNING at a ½" iron rod found for corner in the South line of Perdenalas Trail (35 foot wide Right-of-Way), at the Northwest corner of said Lot 20, same being the Southwest corner of Lot 21, Block L;
> THENCE South 64°32'49" East with the North line of said Lot 20, same being the south line of Lot 21 a distance of 284.19 feet to ½" iron rod found at the Northeast corner of said Lot 20, same being the Southeast corner of said Lot 21, and being in the West line of Lot 23, Block L;
> THENCE South 00°33'08" East with the West line of said Lot 20, same being the East line of said Lot 23 a distance of 233.51 feet to a point for corner at the Southeast corner of said Lot 20, same being the Southwest corner of said Lot 23, and being in the South line of said Block L of the above referenced Phase 3;
> THENCE South 89°47'42" West with the South line of said Lot 20, Block L at a distance of 172.19 feet passing a point for corner at the Southwest corner of said Lot 20, same being the Southeast corner of said Lot 19 and continuing a total distance of 362.80 feet to a point for corner in the South line of said Block L, and being at the Southwest corner of said Lot 19, same being the Southeast corner of Lot 18, Block L of said Vaquero – Arthur Addition Phase 3;
> THENCE North 00°37'05" West with the common line between said Lots 18 and 19 distance of 243.55 feet to a ½" iron rod found in the South line of Perdenalas Trail, at the Northwest corner of said Lot 19, same being the Northeast corner of Lot 18, and being at the beginning of a non-tangent curve to the left;

16

THENCE in a Northeasterly direction with the South line of said Perdenalas Trail, the North line of said Lot 19, and with said curve to the left having a radius of 129.50 feet, whose chord bears North 79°03'05" East, a distance of 2.59 feet, for an arc length of 2.59 feet at the beginning of a reverse curve to the right;

THENCE in a Southeasterly direction with the Said North and South lines and with said reverse curve to the right having a radius of 14.00 feet, whose chord bears South 69°39'36" East, a distance of 14.78 feet, for an arc length of 15.57 feet at the beginning of a reverse curve to the left;

THENCE in a Northeasterly direction continuing with the said South line of Perdenalas with said reverse curve to the left having a radius of 50.00 feet, whose chord bears North 53°11'56" East, a distance of 99.98 feet, at an arc length of 128.85 feet passing a point for corner at the Northeast corner of Lot 19, same being an angle corner in the West line of Lot 20, and continuing with said curve to the left a total length of 155.08 feet to a point for corner at the beginning of a reverse curve to the right;

THENCE in the Northwesterly direction with the common line of Perdenalas Trail and said Lot 20 and with said reverse curve to the right having a radius of 14.00 feet, whose chord bears North 10°06'14" West, a distance of 12.14 feet, for an arc length of 12.56 feet to a point for corner in said common line;

THENCE North 15°35'44" East continuing with said common line a distance of 26.33 feet to ½" iron rod found at the beginning of a curve to the left;

THENCE in the Northeasterly direction with said common line and with said curve to the left having a radius of 367.50 feet, whose chord bears North 13°55'20" East, a distance of 21.47 feet, for an arc length of 21.47 feet;

Back to the POINT OF BEGINNING and CONTAINING 100,740 square feet or 2313 acres of land, more or less.

m. Approximately $3,508.99 seized from Bank of America Account No. XXXXXXXX3574, in the name of KFIM, LLC.
n. Approximately $500,000.00 of $500,000.82 seized from Bank of America Account No. XXXXXXXX1186, in the name of Alyssa Kirchner.
o. Approximately $39,501.76 seized from Bank of America Account No. XXXXXXXX5469, in the name of Christopher Kirchner and/or Alyssa Kirchner.
p. Approximately $32,292.90 seized from Bank of America Account No. XXXXXXXX5472, in the name of Christopher Kirchner and/or Alyssa Kirchner.

44. Pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b), if any of the above property subject to forfeiture, as a result of any act or omission of the defendant, cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third person; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be subdivided without difficulty, it is the intent of the United States of America to seek forfeiture of any other property of the defendant up to the value of the above-described property subject to forfeiture.

A TRUE BILL

_____
FOREPERSON

LEIGHA SIMONTON
UNITED STATES ATTORNEY

_____
JOSHUA D. DETZKY
Assistant United States Attorney
New Jersey No. 037172011
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8600; Fax: 214-659-8805
Email: joshua.detzky@usdoj.gov

*Nashonme Johnson*
NASHONME JOHNSON
Assistant United States Attorney
New York No. 4952248
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8600; Fax: 214-659-8805
Email:nashonme.johnson@usdoj.gov

_____
JAY WEIMER
Assistant United States Attorney
Texas State Bar No. 24013727
801 Cherry Street, Suite 1700
Fort Worth, Texas
Telephone: (817) 252-5200
Facsimile: 817-252-5455
Email: jay.weimer@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

THE UNITED STATES OF AMERICA

v.

CHRISTOPHER KIRCHNER

SUPERSEDING INDICTMENT

18 U.S.C. § 1343
Wire Fraud
(Counts 1-4)

18 U.S.C. § 1957
Engaging in Monetary Transactions in Property
Derived from Specified Unlawful Activity
(Counts 5-11)

18 U.S.C § 981(a)(1)(C) and 28 U.S.C. § 2461(c);
18 U.S.C. § 982(a)(2)(A); 18 U.S.C. § 982(a)(1)
Forfeiture Notice

11 Counts

A true bill rendered

DALLAS                                                          FOREPERSON

Filed in open court this __19__ day of December, 2023.

Voluntary Appearance

UNITED STATES MAGISTRATE JUDGE
Criminal Case Pending: 4:23-CR-127-P