## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

FILED-USDC-NDTX-DA
'24 MAY 3 ᴀᴍ11:48

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **NO. 4:23-CR-127-P** |
| | ) | |
| **CHRISTOPHER KIRCHNER** | ) | |

### PETITION IN THIRD-PARTY ANCILLARY PROCEEDING FOR ADJUDICATION OF LEGAL INTEREST

**To the United States District Court, United States Attorney Leigha Simonton et al:**

This matter is before the Court on individual third-party Alyssa Kirchner's "Valid Legal

Interest in the Forfeited Property" filed in response to the Court's Preliminary Order of

Forfeiture (included, named: Document #114). This petition concerns the Preliminary Order of

Forfeiture, and Return of Property by adjudicating a valid legal interest in the forfeited property set out

in 21 U.S.C. § 853(n)(1)(2).

You will find this petition:

i) signed by Alyssa Kirchner, under penalty of perjury,

ii) identified the particular property in which a claim a legal right, title or interest,

iii) identified the nature and extent of such right, title or interest in the forfeited property,

iv) identified the time and circumstances of the acquisition of the right, title, and interest in the
forfeited property,

v) provided any additional facts and documents supporting a claim and the relief support.

In submitting contemporaneously under filing this petition in third-party ancillary proceeding

for adjudication of legal interest to the United States District Court and U.S Attorney's Office, ATTN:

Asset Recovery Section, I am also filing a petition of remission to the Attorney General concerning

the forfeited property.  In the event any element for petition of relief is denied under 21 U.S.C. §

853(n)(1)(2), then in the alternative I seek relief under 28 C.F.R § 9.

1

For the reasons set forth below, I, Alyssa Kirchner, am contesting the forfeiture, ask that this motion be granted and ask for my real and personal property, equity or cash value to be returned to me.

### I. Background

I am Alyssa Kirchner, the innocent spouse of the Defendant (Christopher Kirchner). I submit this petition *pro se* as I have no means to retain and pay for an attorney due to the freezing and seizing of all my accounts and property.

I am a stay-at-home mom to a four-year-old boy and have been since my son was born on September 17, 2019. Since becoming a mother, I have not worked in order to care for my son; and since the defendant's arrest, the freezing of my bank & investment accounts in September 2022, the raid of my home and seizure of my personal property on February 14, 2023, filing of the indictment filed on May 2, 2023, superseding indictment filed on December 19, 2023, and the trial in January 2024; I have not been able to obtain full-time employment with benefits, have a steady income, or receive employer-sponsored health insurance. I am awaiting the foreclosure notice of my home any day. Furthermore, I do not have a vehicle to transport myself to a job, my son to daycare, the doctor or to the grocery store. As a result of the Defendant's indictment, I have been surviving on miniscule paychecks that I earn through remote, temporary jobs. During the past 1.5 years, without the ability to pay for a lawyer, I've received minimal communications about proceedings and what rights as an innocent spouse I have.

Please, I ask that I am included on all notices and court filings related to the seized assets.  I have a good faith claim for various items and cash that I can prove were earned through my own efforts, acquired as a bona fide purchaser or otherwise pre-dated the Defendant's conduct or was otherwise acquired with no connection to the Defendant's criminal conduct.

## II. Analysis

I, Alyssa Kirchner, ask the Court to find the forfeiture invalid and that I do not presume the validity of the seizure based on the "unconstitutionally overbroad search" resulting in the seizure of anything small and valuable. The raid, search and seizure, and proposed forfeiture that took place at my residence at 1209 Perdenalas Trail, Westlake,Tarrant County, on February 14, 2023 is not legitimate or valid. A valid and legitimate search and seizure may be presumed with the original items from the warrant, which is attached, and can be referenced as: "Original Search and Seizure Warrant".

Based on the findings below, I request the return of specific items of seized property pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure and/or ancillary  proceeding pursuant to 21 U.S.C. § 853(n), Rule 32.2(c) of the Federal Rules of Criminal Procedure.Rule 41(g) provides: A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. *See also United Development Funding ("UDF") v. United States*, or *Harbor Healthcare System, L.P v. United States, No. 19-20624, 2021 WL3009732 (2021)* "unconstitutionally overbroad search resulted in the seizure of virtually everything…UDF now seeks the return of the seized materials""ongoing intrusion into its privacy and the continued possession" [by DOJ"].

Forfeiture is an *in personam* proceeding aimed at punishing criminals and deterring crime. The the Court cannot forfeit my, the innocent spouse's interests in her own property, only the interests of

3

the defendant, Christopher Kirchner. "A criminal defendant can only be made to forfeit what was his in the first place." (*Pacheco v. Serendensky*, 393 F.3d 348 (2d Cir. 2004)). The government should be entitled to a partial forfeiture, as to do otherwise would give the government a windfall and deny an innocent third party of her ownership interests.

I left my successful career and the workforce, with the understanding that I would be entitled to joint ownership of income and assets. I did nothing wrong; I did not break any laws. I did not participate in, or even know about, any wrongdoing. I am entitled to ownership of half of the marital assets, therefore any seizure of my, Alyssa Kirchner, the innocent spouse's, assets should not be permitted.

Texas is a community property jurisdiction. Any property acquired by a couple during their marriage is equally owned by both spouses, with the exception of ownership by one spouse before the date of marriage, or gifted to one spouse. I, Alyssa Kirchner, hold a *partial* interest in all of the forfeited property and the government deems the *entire* property forfeited, it would violate constitutional due process.

### III. In for Return of Innocent Spouse's Property Wrongly Taken or Frozen In Asset Seizure On February 14, 2023

Specifically, individual Alyssa Kirchner, the innocent spouse of the defendant, Christopher Kirchner, has filed a Claim, as a third-party Petitioner/Claimant to the all of the property, but specific interests in the following property which is subject to the Preliminary Order of Forfeiture entered in this case, claiming an interest in same:

4

**Personal Property**

1. Up to half (50%) of the $271,258.09 in equity of the 2021 Mercedes Benz AMG G63, VIN W1NYC7HJ9MX401228; currently listed as 'a.' on page 2 of Document 114, PageID 2181.

   a. Up to half (50%) of the $12,019.69 in equity of the 2021 Mercedes Benz AMG G63, VIN W1NYC7HJ9MX401228; currently listed as 'a.' on page 3 of Document 114, PageID 2182 as a substitute asset.

2. Up to half (50%) of the $115,785.85 in equity of the 2022 Rolls Royce Cullinan, VIN SLATV4C05NU211445; currently listed as 'b.' on page 2 of Document 114, PageID 2181.

   a. Up to half (50%) of the $117,765.63 in equity of the 2022 Rolls Royce Cullinan, VIN SLATV4C05NU211445; currently listed as 'b.' on page 3 of Document 114, PageID 2182 as a substitute asset.

3. Ladies' Rolex Oyster Perpetual DateJust Watch in 18K Rose Gold, Model 8125, Serial No. J0560855; currently listed as 'e.' on page 2 of Document 114, PageID 2181.

   a. Ladies' Rolex Oyster Perpetual DateJust Watch in 18K Rose Gold, Model 8125, Serial No. J0560855; currently listed as 'e.' on page 4 of Document 114, PageID 2183 as "Subject Property."

4. Up to half (50%) of the $12,632.15 in equity of the Cartier Panther-Style Pendant Necklace in 18K Yellow Gold, seized on February 14, 2023; currently listed as 'g.' on page 2 of Document 114, PageID 2181.

   a. Up to half (50%) of the $8,151.85 in equity of the Cartier Panther-Style Pendant Necklace in 18K Yellow Gold, seized on February 14, 2023; currently listed as 'd.' on page 3 of Document 114, PageID 2182 as a substitute asset.

      i. Cartier Panther-Style Pendant Necklace in 18K Yellow Gold, seized on February 14, 2023; currently listed as 'g.' on page 4 of Document 114, PageID 2183 as "Subject Property."

5. *Round Monette with Pink Roses* Painting by Sarah Ashley Longshore; currently listed as 'h.' on page 2 of Document 114, PageID 2181.

   a. *Round Monette with Pink Roses* Painting by Sarah Ashley Longshore; currently listed as 'h.' on page 4 of Document 114, PageID 2183 as "Subject Property."

6. 3 bottles of 2008 Lokoya Mount Veeder ($2,922.70 charged on 1/20/23), 3 bottles of 2014 Lokoya Diamond Mountain, 3 bottles of 2014 Lokoya Howell Mountain, 3 bottles of 2014 Lokoya Spring Mountain ($1,500.00, $1,500.00, $1,500 + $371.25 = $4,871.25 charged on 12/2/22), and $1,623.75 also charged on 12/2/22, totaling: $9,417.70.

7. Audemars Piguet Automatic Chronograph Stainless Royal Oak Watch, Serial #K04977; currently listed as 'h.' on page 4 of Document 114, PageID 2183 as a substitute asset.

      a.  Audemars Piguet Automatic Chronograph Stainless Royal Oak Watch, Serial #K04977; currently listed as 'o.' on page 5 of Document 114, PageID 2184 as "Subject Property."

8. Ladies Rolex Oyster Perpetual DateJust Watch in Stainless, Model #178240, Serial No. 538M19L0; currently listed as 'i.' on page 4 of Document 114, PageID 2183 as a substitute asset.

9. $13,001.32 seized from Bank of America Account No. XXXXXXXX6744; currently listed as 'l.' on page 4 of Document 114, PageID 2183 as a substitute asset.

      a.  $13,001.32 seized from Bank of America Account No. XXXXXXXX6744; currently listed as 's.' on page 5 of Document 114, PageID 2184 as "Subject Property."

**Real Property**

Up to half (50%) of the $2,337,546.68 in equity, plus appreciation, in the real property located and situated at 1209 Perdenalas Trail, Westlake, Tarrant County; currently listed as 'j.' on page 2 of Document 114, PageID 2181.

Up to half (50%) of the $100,643.56 in equity, plus appreciation, in the real property located at 1209 Perdenalas Trail, Westlake, Tarrant County; currently listed as 'f.' on page 4 of Document 114, PageID 2183.

This property was the residence listed in the search and seizure.

Real Property located and situated at 1207 Perdenalas Trail, Westlake, Tarrant County, Texas, with all

buildings, appurtenances, and improvements thereon and any and all surface and subsurface rights,

title, and interests, if any. This property was not listed on the Original Search and Seizure Warrant.

**THIS PROPERTY IS NOT LISTED ON DOCUMENT 114,** This item is not listed on Document

#19 entitled, ***Indictment.*** This item is not listed on Document #68 entitled, ***Superseding Indictment.***

**Claims:**

      When the FBI raided my residence and seized my property on February 14, 2023, I was given

the handwritten and signed receipt upon their exit, included and entitled, ***Receipt for Property,*** as well

as the Original Warrant. This list does not include all of the items in which I have a good faith interest

that have nothing to do with the crimes alleged against the Defendant.

The original indictment and superseding indictment (Docket Entries #19 & #68) assert the

Defendant's first act of misconduct took place on June 17, 2020.

I claim an interest in the following property that was seized or frozen, all of which involved my

personal funds that either pre-dated or otherwise had nothing to do with any misconduct:

1. **Up to half (50%) of the $271,258.09 in equity of the 2021 Mercedes Benz AMG G63, VIN W1NYC7HJ9MX401228; and up to half (50%) of the $12,019.69 in equity of the 2021 Mercedes Benz AMG G63, VIN W1NYC7HJ9MX401228;**
   Texas is a community property jurisdiction. Any property acquired by a couple during their

   marriage is equally owned by both spouses. This vehicle was purchased, serviced, registered

   and insured in the state of Texas in the name of the petitioner and innocent spouse, Alyssa

   Kirchner.


2. **Up to half (50%) of the $115,785.85 in equity of the 2022 Rolls Royce Cullinan, VIN SLATV4C05NU211445; and up to half (50%) of the $117,765.63 in equity of the 2022 Rolls Royce Cullinan, VIN SLATV4C05NU211445; ("the Vehicle").**
   Texas is a community property jurisdiction. Any property acquired by a couple during their

   marriage is equally owned by both spouses. This vehicle was purchased, serviced, registered

   and insured in the state of Texas in the name of the petitioner and innocent spouse, Alyssa

   Kirchner.

   Additionally, **Enclosed is the 'Retail Purchase Agreement' and bill of sale for this Vehicle.**

   The alleged criminal conduct involving this Vehicle was count #13 on the original indictment

   (Docket Entry #19). Count #13 was dropped in the Superseding Indictment (Docket Entry

   #68). This was originally described as: "Down Payment on 3/15/22 of $75,000.00." The

   purchase price of this Vehicle was $478,274.00. To pay for the Vehicle, the Defendant and I

   traded in our two, used cars. As shown in the purchase agreement, the trade-in value of the cars

we used to help pay for the Vehicle was $220,000 (the "Trade-In Value"). The remainder of the

purchase price of $282,685.76 which was financed with the dealer (a debt which continues to

be negatively reflected on my credit report). As I have had no transportation since the raid

other than Uber & Lyft and/or borrowed cars, I claim 50% of the Trade-In Value under Texas'

spousal, community property rights so that I can purchase a basic car and am no longer trapped

at the marital home (which is going into foreclosure and which I cannot afford).

3. **Ladies' Rolex Oyster Perpetual DateJust Watch in 18K Rose Gold, Model 8125, Serial No. J0560855;**
This was gifted to me for my January Birthday, therefore the defendant bypassed his right

under Texas Community Property and it is owned solely by me. This item was not on the

Original Search and Seizure Warrant but was taken anyway by the Government - therefore

making the search, seizure and forfeiture illegitimate. For all items related to this reference the

enclosed attachment, entitled: **Original Search and Seizure Warrant.**

This piece of property was never subject to forfeiture and should be returned to my possession.

4. **Up to half (50%) of the $12,632.15 in equity of the Cartier Panther-Style Pendant Necklace in 18K Yellow Gold, and up to half (50%) of the $8,151.85 in equity of the Cartier Panther-Style Pendant Necklace in 18K Yellow Gold.** This was gifted to me,
therefore the defendant bypassed his right under Texas Community Property and it is owned

solely by me.

5. ***Round Monette with Pink Roses* Painting by Sarah Ashley Longshore**; currently listed as **'h.' on page 2 of Document 114, PageID 2181.** ***Round Monette with Pink Roses* Painting by Sarah Ashley Longshore; currently listed as 'h.' on page 4 of Document 114, PageID 2183**

8

**as "Subject Property."**

This item was not on the Original Search and Seizure Warrant but was taken anyway by the

Government - therefore making the search, seizure and forfeiture illegitimate. For all items

related to this and the associated pertinent information, please reference the enclosed

document, entitled: **Original Search and Seizure Warrant.**

This piece of property was never subject to forfeiture and should be returned to my possession.

I first identified this painting prior to moving to Texas in 2020, and was in communications

with the artist beginning in December 2020 and again in May 2020, well before the date of the

misconduct. At this time, I had the funds separately from working full time as a salaried

professional to pay for this. I researched the size, color and best fit for the space and also didn't

want to risk damaging it by buying ahead of time and having to move. This was a very coveted

and premeditated buy that only involved myself and the artist, not the defendant. I purchased it

after months of correspondence. I paid $17,234.25 on 12/29/20 with my own money using my

American Express card ending in 01007. **Enclosed as is a copy of the invoice and statement**

**and dated communications.** During the raid, as I was speaking with Agent Qiana Davis, she

and her fellow FBI agents pointed to the painting, asked how much it cost, and took it off the

wall. This item was not listed on the arrest warrant. It is listed as #23 on the Receipt of

Property.

6. **Item 43(k) on the Superseding Indictment - 57 bottles of wine ("Wine").** The Wine was

delivered as part of a prior wine allocation that I joined as a "thank you" to Barbara Banke

(whose family owns Jackson Family Wines) for whom I had worked in a professional capacity

9

prior to when I became a stay-at-home mom in 2019. When the wine was delivered in January

2023, it was as a result of the automatic payment and delivery plan set up year(s) prior

(allocation) and, given the shock of the FBI raid and freezing of my assets, I had not

considered it until the Wine was delivered. I would never have agreed to pay for it when I

cannot even pay the mortgage on the home. Critically, I continue to pay for this Wine using my

own money after my credit card on which it was purchased (American Express card ending

01007) was canceled. I am on a payment plan to pay off this credit card for another three more

years. **Enclosed as combined Attachment # 6 are the invoices (3), credit card statement(s)**

**reflecting this purchase, and the payment plan agreement.** I have concerns about whether

the FBI has properly stored this wine since it was seized. Unless the wine's been stored in a

cool, climate controlled facility (and not exposed to the Texas heat/humidity), it may have

turned into vinegar and may now be worthless. Since I continue to pay for the wine since it

was delivered (using whatever money I can generate from the random, temporary and remote

jobs I can pick up), I request its cash value, at the time of purchase, of $9,417.70. The

breakdown is: 3 bottles of 2008 Lokoya Mount Veeder ($2,922.70 charged on 1/20/23), 3

bottles of 2014 Lokoya Diamond Mountain, 3 bottles of 2014 Lokoya Howell Mountain, 3

bottles of 2014 Lokoya Spring Mountain ($1,500.00, $1,500.00, $1,500 + $371.25 = $4,871.25

charged on 12/2/22), and $1,623.75 also charged on 12/2/22, totaling: $9,417.70. As you are

aware, all accounts were frozen and locked in October of 2022, unbeknownst to me, credit card

payments on this account were returned starting in November 2022, and my card was finally

canceled upon a payback plan of $907/month that I am responsible for. These items were not

on the Original Search and Seizure Warrant but were taken anyway by the Government -

therefore making the search, seizure and forfeiture illegitimate.

7. **Audemars Piguet Automatic Chronograph Stainless Royal Oak Watch, Serial #K04977; currently listed as 'h.' on page 4 of Document 114, PageID 2183 as a substitute asset.** Audemars Piguet Automatic Chronograph Stainless Royal Oak Watch, Serial #K04977;

currently listed as 'o.' on page 5 of Document 114, PageID 2184 as "Subject Property." This

item was NOT on the Original Search and Seizure Warrant but was taken anyway by the

Government - therefore making the search, seizure and forfeiture illegitimate. This item was

obtained prior to any misconduct, well before September 2019, was never subject to forfeiture,

and should be returned to her possession. The government already has all the records, bill of

sale, and receipt for this item and can verify the date and time of the purchase. This item is not

listed on Document #80 entitled, ***Parties' Agreed Proposed Forfeiture Jury Instructions.*** This

item is not listed on Document #19 entitled, ***Indictment.*** This item is not listed on Document

#68 entitled, ***Superseding Indictment.***

8. **Ladies Rolex Oyster Perpetual DateJust Watch in Stainless, Model #178240, Serial No. 538M19L0**; currently listed as 'i.' on page 4 of Document 114, PageID 2183 as a substitute asset.

This item was improperly seized and it should automatically render the forfeiture invalid. There is no

presumption of validity of the seizure because this item was not on the original warrant. This item

belongs to me and predates the misconduct. All items pertinent to this item are listing below:

I received this watch as a gift on December 17, 2019 for when I became a mother, and as a Christmas

gift and my birthday present. **Enclosed is the invoice with date of purchase and backup**

**documentation about this gift**. This item was NEVER listed in the original warrant or the

superseding indictment. It was, however, seized on February 14, 2023. Please reference, ***Receipt of***

***Property***. This watch is listed as #16 "silver colored Rolex watch." This watch continues to be held

11

improperly, without documentation, due process, and without any form of notice. I have not received it back or ever been contacted about it. This item is not listed on Document #80 entitled, ***Parties' Agreed Proposed Forfeiture Jury Instructions.*** This item was listed on the original Indictment, Document #19, as Item 53(i) - Ladies Rolex Oyster Perpetual DateJust Watch in Stainless Steel, Model 178240, Serial No. 538M19L0 ("Watch"), but removed for Document #68 entitled, ***Superseding Indictment.*** However, there was never a mention of giving it back then, 5/2/23, either.

**9. $13,001.32 seized from Bank of America Account No. XXXXXXXX6744; currently listed as 'l.' on page 4 of Document 114, PageID 2183 as a substitute asset. $13,001.32 seized from Bank of America Account No. XXXXXXXX6744; currently listed as 's.' on page 5 of Document 114, PageID 2184 as "Subject Property." Bank of America Account No. XXXXXXXX6744.**

This account was in my name, Alyssa Kirchner, alone. I was the individual account holder and only signer ever associated with this account. At the time of the asset seizure, $13,000.04 was in this account. In May 2022, I opened this account by transferring funds from my prior savings account with Chase Bank ending in #2658 that I had funded prior to, and during the early part of, my marriage. I opened this Bank of America account in anticipation of leaving the Defendant as our relationship had been strained for years. I stayed only for the sake of my son. In November 2020, I spoke to my financial advisor at the time, Anthony Carpentieri, as to why I needed this account in my name alone. This account has never been listed in any asset seizure list or indictment. It was, however, frozen unjustly on September 15, 2022 with the same legal order as the other accounts referenced in the Defendant's indictment, listed on the statement as: Legal Order, LTS P091522000166. This account was seized without just cause. Furthermore, I was given no correspondence via the government or the bank that this had been frozen or was tied to the defendant, essentially stranding me. **Enclosed is the correspondence[1] involved in setting up this account and proof of the account balance in May 2020.** Evident from the attachments, this was a single deposit and never drawn from or contributed to. The May 2022 statement, named: 5.10.22to5.13.22BOAStatementAKAcct6744, included, further validates this by describing the deposit from the Chase Account naming the one Individual Account Holder as myself, Alyssa B. Kirchner: "INDN: ALYSSA B KIRCHNER". This is/was all that I have for my future and literally represents my life savings. This was obtained prior to the commission of

---

[1] I used my personal email which I had set up long before I was married. It is in my maiden name of Alyssa Strainer.

any misconduct, was never subject to forfeiture, and should be returned to her possession. This item predates the misconduct. This item is not listed on Document #80 entitled, ***Parties' Agreed Proposed Forfeiture Jury Instructions.*** This item is not listed on Document #19 entitled, ***Indictment.*** This item is not listed on Document #68 entitled, ***Superseding Indictment.***

10. Additionally, during the raid and designated on the original document entitled, ***Receipt for Property,*** I would like all of my certificates and receipts and authenticity guarantees for my property. These receipts and paperwork could easily verify the validity of my claims, and dates of purchase so that my property can be returned to me.

These were taken and listed in lines:
14. Certificates and Receipts for Watches and Jewelry;
15. Certificate of Authenticity for 'Round Monette with Pink Roses" Painting;
24. Three (3) Rolex Watch Boxes and One (1) Audemar Piguet Watch Box

### IV. Relief Sought

All of the foregoing items are all I have to show for ten years of living; and all that I have to begin a new life and take care of my son. Ideally, I would like half of all of my property, its equity or value returned to me. However, based on the 'claims' listed above, I, Alyssa Kirchner, petitioner ask:

   A. I would request the Bank of America Account ending in #6744 be unfrozen and all funds be released to me, the sole account holder, so that I can begin using them immediately.
   B. I would request the return of the Watches/jewelry and Painting be safely returned to me within thirty (30) days from the Court's Order.
   C. If the likely event that the Wine has spoiled or otherwise has not been properly stored since it was seized, I would, in the alternative, request its retail cash value of $9,417.70.
   D. I also request my spousal 50% of the Trade-In Value used to purchase the Rolls Royce Cullinan, referenced as the 'Vehicle', or $110,000.

Lastly, should the USA not agree with the totality of this Petition, I would respectfully request a hearing on this Petition.   In the event any element for petition of relief is denied under 21 U.S.C. § 853(n)(1)(2), then in the alternative I seek relief under 28 C.F.R § 9. The hearing on the petition shall, to the extent practicable and consistent with the interests of justice, be held within thirty days of the filing of the petition. Rule 32.3(c) provides in part: If, as prescribed by statute, a third party files a petition asserting an interest in the property to be forfeited, the court must conduct an ancillary proceeding.

I, Alyssa Kirchner, submit this under the penalty of perjury.

SIGNED this 02nd day of May, 2024.



ALYSSA KIRCHNER - Petitioner/Claimant

cc:    Counsel of Record (via electrical filing system)
       Petitioner (via email at alyssabstrainer@gmail.com)

14



**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **NO. 4:23-CR-127-P** |
| | ) | |
| **CHRISTOPHER KIRCHNER** | ) | |

**ORDER**

Before the Court is Third-Party Innocent Spouse's ("Petitioner" "Alyssa Kirchner") Request for Return of Wrongly Seized Personal Property. Having considered the Third-Party's Request, arguments for the USA, relevant docket entries and evidence, and applicable law, the Court **GRANTS** the Petition in full. The USA shall immediately notify Bank of America to unfreeze account ending in #6744, to return the Watches, Painting and the Wine to the Petitioner within thirty (30) days from the date of this Order, and the USA return $_____ via a government-issued check no later than seven (7) days from the date of this Order (the "Cash Payment").

In the event the Wine has spoiled or otherwise not properly maintained in a cool, climate-controlled facility since it was seized, the USA shall include an additional $_____ in the Cash Payment.

**SO ORDERED** on this _____ **day of** _____, **2024.**

_____
Leigha Simonton
United States Attorney

cc:    Mark T. Pittman, United States District Judge
       Dimitri N. Rocha, Assistant United States Attorney
       Petitioner (via email at alyssabstrainer@gmail.com)

15



**U.S. Department of Justice**

United States Attorney
Northern District of Texas

*1100 Commerce Street, Third Floor*    *Main: 214.659.8600*
*Dallas, Texas    75242-1699*          *Fax: 214.659.8803*

April 3, 2024

Regular Mail &
Certified Mail# 7022 2410 0002 7334 3703

Alyssa Kirchner
1209 Perdenalas Trail
Westlake, TX 76262

Re:    Filing of Petition in Third-Party Ancillary Proceeding for Adjudication of Legal
       Interest
       *United States v. Christopher Steven Kirchner* | No. 4:23-CR-127-P (N.D. Tex.)

To Whom It May Concern:

       The United States District Court for the Northern District of Texas has ordered
that the defendant forfeit certain property to the United States as part of the above-listed
criminal case. The enclosed Preliminary Order of Forfeiture describes the property
subject to forfeiture. By receipt of this letter, you are given actual notice of the forfeiture
of that property. This letter is only intended to apprise you of your rights, and does not
imply you have a legally valid interest in the forfeited property.

       Should you have a valid legal interest in the forfeited property, the procedure for
filing a petition to adjudicate that interest in federal court is set out in 21 U.S.C. §
853(n)[1]. If you choose to file a petition concerning the forfeited property, you must file it
in the United States District Court, 1100 Commerce Street, Room 1452, Dallas, Texas
75242, under the above-listed case number, within **30 days of receiving this letter**. You
must also send a copy of the petition to adjudicate your interest in the forfeited property
to the U.S. Attorney's Office, ATTN: Asset Recovery Section, 1100 Commerce Street,
Suite 300, Dallas, Texas 75242. As set out in 21 U.S.C. § 853(n), your petition must i)
be signed by you under penalty of perjury; ii) identify the particular property in which
you claim a legal right, title or interest; iii) identify the nature and extent of such right,

---

[1]A petitioner must demonstrate that (1) his legal right, title, or interest in the property was vested in him rather than
the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts
which gave rise to the forfeiture, or (2) he was a *bona fide* purchaser for value of the right, title, or interest in the
property and at the time of the purchase reasonably without cause to believe that the property was subject to
forfeiture.

title or interest in the forfeited property; iv) identify the time and circumstances of your acquisition of the right, title, and interest in the forfeited property; and v) provide any additional facts and documents supporting your claim and the relief sought. If you fail to timely file a judicial petition to assert your legal interest in the forfeited property, any right, title and interest you claim in this property shall be lost and forfeited to the Government.

As an alternative, or in addition to filing a judicial petition in the United States District Court, you may submit a petition for remission to the Attorney General concerning the forfeited property. A petition for remission presumes the validity of the forfeiture, but requests that the forfeited property nevertheless be released to you. The requirements for a petition for remission are found in 28 C.F.R. § 9. Through the petition, you may ask the Attorney General to return the forfeited property to you, or recognize your interest in the forfeited property. If you choose to submit a petition for remission concerning the forfeited property, you must submit it to the Attorney General, c/o U.S. Attorney's Office, Asset Recovery Section, 1100 Commerce Street, Suite 300, Dallas, Texas 75242, within **30 days of receiving this letter**. Your petition for remission must (I describe your interest in the property, (ii) be supported by documentation and any facts you believe justify the return of the property to you, and (iii) signed under penalty of perjury.

Please call me at 214.659.8600 with any questions or comments.

Very truly yours,

LEIGHA SIMONTON
United States Attorney

*/s/ Dimitri N. Rocha*
By: Dimitri N. Rocha
Assistant United States Attorney

*Enclosure*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA

v.

NO. 4:23-CR-127-P

CHRISTOPHER KIRCHNER

## **PRELIMINARY ORDER OF FORFEITURE**

Based on the government's Motion for Preliminary Order of Forfeiture, and
good cause appearing, the Court GRANTS the motion, and FINDS:

Considering defendant Christopher Kirchner's ("Kirchner") conviction as to
Count One, Two, Three, and/or Four charging him with wire fraud, in violation of 18
U.S.C. § 1343, the defendant must forfeit to the United States any property, real or
personal, which constitutes or is derived from proceeds traceable to the violation,
pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). In addition, considering
Kirchner's conviction as to Count Five, Nine, and/or Eleven charging him with
engaging in monetary transactions in property derived from specific unlawful activity,
in violation of 18 U.S.C. § 1957, the defendant must forfeit to the United States any
property that is involved in the money laundering or proceeds of the fraud, pursuant to
18 U.S.C. § 982(a)(1).

Regarding the wire fraud convictions, and based on the government's
motion and attached evidence, the following property is subject to forfeiture
under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. §2461(c) because the United

States has established the requisite nexus between the property and the wire

fraud offense:

    a.  Up to $271,258.09 in equity of the 2021 Mercedes Benz AMG G63, VIN W1NYC7HJ9MX401228.

    b.  Up to $115,785.85 in equity of the 2022 Rolls Royce Cullinan, VIN SLATV4C05NU211445.

    c.  Richard Mille 95% Platinum Watch with Sports Rubber Bracelet, Model RM008/AFPT/27, Serial No. PT950.

    d.  Up to $43,052.76 in equity in the Men's Rolex Oyster Cosmograph Dayton Watch, 18K Yellow Gold, Model 116508, Serial No. 124741T1.

    e.  Ladies' Rolex Oyster Perpetual Date Just Watch in 18K Rose Gold, Model 81285, Serial No. J0560855.

    f.  Men's Rolex Oyster Perpetual Cosmograph Daytona Watch in 18K White Gold, Model 116509, Serial No. Z071060.

    g.  Up to $12,632.15 in equity of the Cartier Panther-Style Pendant Necklace in 18K Yellow Gold, seized on February 14, 2023.

    h.  *Round Monette with Pink Roses* Painting by Sarah Ashley Longshore.

    i.  57 bottles of wine as follows:
        * Up to $5,166.16 in equity of the Four (4) bottles of Hundred Acre Ark Wine
        * Thirty-three (33) bottles of Lokoya 2018 Cabernet Sauvignon
        * Up to $454.28 in equity of the Two (2) bottles of Vineyard 7 and 8 Estate 2018 Cabernet Sauvignon
        * Up to $4,784.65 in equity of the Eighteen (18) bottles of Lokoya 2016 Cabernet Sauvignon

    j.  Up to $2,337,546.68 in equity, plus appreciation, in the real property located at 1209 Perdenalas Trail, Westlake, Tarrant County,

    k.  $3,508.99 seized from Bank of America Account No. XXXXXXXX3574, in the name of KFIM, LLC.

    l.  $500,000.00 of the $500,000.82 seized from Bank of America Account No. XXXXXXXX1186, in the name of Alyssa Kirchner.

    m.  $39,501.76 seized from Bank of America Account No. XXXXXXXX5469, in the name of Christopher Kirchner and/or Alyssa Kirchner.

    n.  $32,292.90 seized from Bank of America Account No. XXXXXXXX5472, in the name of Christopher Kirchner and/or Alyssa Kirchner.

Regarding the money laundering convictions at Count Five, Nine,

and/or Eleven, and based on the government's motion and attached evidence,

the following property is subject to forfeiture under 18 U.S.C. § 982(a)(1) because

the United States has established the requisite nexus between the property and the

offense:

    a.  2021 Mercedes Benz AMG G63, VIN W1NYC7HJ9MX401228.

    b.  The real property located at 1209 Perdenalas Trail, Westlake, Tarrant County.

       In addition, the Court finds that the defendant obtained fraud proceeds at least

equal to the amount used to purchase the Gulfstream private jet.  Pursuant to Fed. R.

Crim. P. 32.2(b)(1)(A) and 21 U.S.C. § 853(a), the Court imposes against the defendant a

personal money judgment of $16,131,500.00.  To satisfy the money judgment in whole or

in part, the United States may move at any time under Fed. R. Crim. P. 32.2(e) to amend

this order to include the forfeiture of substitute property having a value not to exceed

$16,131,500.00.  Payments towards the forfeiture money judgment shall be made to the

United States Marshals Service, 1100 Commerce Street, Room 1657, Dallas, Texas,

75242.  Telephone:  214-767-0836.

       Now considering the addition of the government's request for substitute assets to

the property for the preliminary order of forfeiture, the Court finds the following subject

to forfeiture as substitute assets:

    a.  Up to $12,019.69 in equity of the 2021 Mercedes Benz AMG G63, VIN
        W1NYC7HJ9MX401228.

    b.  Up to $117,765.63 in equity of the 2022 Rolls Royce Cullinan, VIN
        SLATV4C05NU211445.

    c.  Up to $2,341.88 in equity of the Men's Rolex Oyster Cosmograph Dayton
        Watch, 18K Yellow Gold, Model 116508, Serial No. 124741T1.

    d.  Up to $8,151.85 in equity of the Cartier Panther-Style Pendant Necklace in
        18K Yellow Gold, seized on February 14, 2023.

    e.  Bottles of wine as follows:

    * Up to $3,333.85 in equity of the Four (4) bottles of Hundred Acre Ark Wine
    * Up to $331.97 in equity of the Two (2) bottles of Vineyard 7 and 8 Estate
      2018 Cabernet Sauvignon
    * Up to $3,496.48 in equity of the Eighteen (18) bottles of Lokoya 2016
      Cabernet Sauvignon
  f. Up to $100,643.56 in equity, plus appreciation, in the real property located at
     1209 Perdenalas Trail, Westlake, Tarrant County,
  g. $0.82 of the $500,000.82 seized from Bank of America Account No.
     XXXXXXXX1186, in the name of Alyssa Kirchner.
  h. Audemars Piguet Automatic Chronograph Stainless Royal Oak Watch, Serial
     #K04977.
  i. Ladies Rolex Oyster Perpetual Date Just Watch in Stainless, Model #178240,
     Serial No. 538M19L0.
  j. One 3 liter 2016 Cabernet Sauvignon from Vineyard 7 and 8 Estate.
  k. One 1.5 liter 2013 Cabernet Sauvignon from Two Eight One.
  l. $13,001.32 seized from Bank of America Account No. XXXXXXXX6744.

  In considering the defendant's assets that are subject to forfeiture as proceeds of

the fraud and/or involved in the money laundering, and in conjunction with the substitute

assets, the following "Subject Property" is subject to forfeiture:

  a. 2021 Mercedes Benz AMG G63, VIN W1NYC7HJ9MX401228.
  b. 2022 Rolls Royce Cullinan, VIN SLATV4C05NU211445.
  c. Richard Mille 95% Platinum Watch with Sports Rubber Bracelet, Model
     RM008/AFPT/27, Serial No. PT950.
  d. Men's Rolex Oyster Cosmograph Dayton Watch, 18K Yellow Gold, Model
     116508, Serial No. 124741T1.
  e. Ladies' Rolex Oyster Perpetual Date Just Watch in 18K Rose Gold, Model
     81285, Serial No. J0560855.
  f. Men's Rolex Oyster Perpetual Cosmograph Daytona Watch in 18K White
     Gold, Model 116509, Serial No. Z071060.
  g. Cartier Panther-Style Pendant Necklace in 18K Yellow Gold, seized on
     February 14, 2023.
  h. *Round Monette with Pink Roses* Painting by Sarah Ashley Longshore.
  i. 57 bottles of wine as follows:
     * Four (4) bottles of Hundred Acre Ark Wine
     * Thirty-three (33) bottles of Lokoya 2018 Cabernet Sauvignon
     * Two (2) bottles of Vineyard 7 and 8 Estate 2018 Cabernet Sauvignon
     * Eighteen (18) bottles of Lokoya 2016 Cabernet Sauvignon

j.  The real property located at 1209 Perdenalas Trail, Westlake, Tarrant County, including any appreciation.[1]

k.  $3,508.99 seized from Bank of America Account No. XXXXXXXX3574, in the name of KFIM, LLC.

l.  $500,000.82 seized from Bank of America Account No. XXXXXXXX1186, in the name of Alyssa Kirchner.

m.  $39,501.76 seized from Bank of America Account No. XXXXXXXX5469, in the name of Christopher Kirchner and/or Alyssa Kirchner.

n.  $32,292.90 seized from Bank of America Account No. XXXXXXXX5472, in the name of Christopher Kirchner and/or Alyssa Kirchner.

o.  Audemars Piguet Automatic Chronograph Stainless Royal Oak Watch, Serial #K04977.

p.  Ladies Rolex Oyster Perpetual Date Just Watch in Stainless, Model #178240, Serial No. 538M19L0.

q.  One 3 liter 2016 Cabernet Sauvignon from Vineyard 7 and 8 Estate.

r.  One 1.5 liter 2013 Cabernet Sauvignon from Two Eight One.

s.  $13,001.32 seized from Bank of America Account No. XXXXXXXX6744.

Accordingly, IT IS HEREBY ORDERED:

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. §2461(c), 18 U.S.C. §

982(a)(1), Fed. R. Crim. P. 32.2(b)(1)(A), and Fed. R. Crim. P. 32.2(b), all right, title,

and interest in the Subject Property is forfeited to the United States of America.

Under Fed. R. Crim. P. 32.2(b)(3), the Attorney General (or designee) is

authorized to seize the Subject Property, conduct any discovery proper in identifying,

locating, or disposing of the property subject to forfeiture, and commence an ancillary

proceeding under 21 U.S.C. § 853(n) to account for potential third-party interests.

Under 21 U.S.C. § 853(n)(1), the United States shall publish notice of this Order

on the government's internet website, www.forfeiture.gov. The United States may

also, to the extent practicable, provide written notice to any person known to

---

[1] The legal description of this real property is in the Superseding Indictment.

have an alleged interest in the Subject Property.

Under 21 U.S.C. § 853(n)(2), any person, other than the defendant, asserting a legal interest in the Subject Property may, within thirty days of the final publication of notice or receipt of notice, whichever is earlier, petition the Court for a hearing without a jury to adjudicate the validity of his or her alleged interest in the Subject Property.

Under 21 U.S.C. § 853(n)(3), any third-party petition shall be signed by the petitioner under penalty of perjury and shall set forth the nature and extent of the petitioner's right, title, or interest in the Subject Property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the Subject Property, any additional facts supporting the petitioner's claims, and the relief sought.

Under Fed. R. Crim. P. 32.2(c)(1)(B), after the disposition of any motion filed under Fed. R. Crim. P. 32.2(c)(1)(A), and before a hearing on the petition, discovery may be conducted in accordance with the Federal Rules of Civil Procedure upon a showing that such discovery is necessary or desirable to resolve factual issues.

Under 21 U.S.C. § 853(n)(7), the United States shall have clear title to the Subject Property following the Court's disposition of all third-party interests, or if no petitions are filed, following the expiration of the period provided in 21 U.S.C. § 853(n)(2) for the filing of third-party petitions.

Under Fed. R. Crim. P. 32.2(b)(4), this order shall become final as to the defendant at the time of sentencing and shall be made part of the sentence and referenced in the judgment.

The Court shall retain jurisdiction to enforce this Order, and to amend it as

necessary under Fed. R. Crim. P. 32.2(e).

**SO ORDERED this 25th day of March 2024.**

Mark T. Pittman

**MARK T. PITTMAN**
**UNITED STATES DISTRICT JUDGE**

TRANSMISSION VERIFICATION REPORT

```
                                    TIME  : 05/02/2024 18:42
                                    NAME  :
                                    FAX   :
                                    TEL   :
                                    SER.# : U63274D0J782619
```

```
DATE,TIME            05/02  18:42
FAX NO./NAME         12146598803
DURATION             00:00:00
PAGE(S)              00
RESULT               BUSY
MODE                 STANDARD
```

BUSY: BUSY/NO RESPONSE

 **THE UPS STORE**

1540 Keller Parkway Ste 140
Keller, TX 76248
817.337.0233 Tel
817.337.4474 Fax
store3653@theupsstore.com
theupsstore.com/3653

# Fax

To _United States District Court_     From _Alyssa Kirchner_

Company _USDOJ / US Attorney_     Phone number _(859) 421-7820_
_Northern District of Texas_

Fax number _(214) 659-8803_     Fax number _____

Date _Thursday, May 2, 2024_     Total pages _18_

Job number _1_

Filing of Petition in Third-Party Ancillary Proceeding
for Adjudication of legal interest

United States v. Christopher Steven Kirchner

Case No. 4:23-CR-127-P (N.D. Tex.)

LEGAL DOCUMENTS

UNITED STATES DISTRICT COURT
1100 COMMERCE STREET
ROOM 1452
DALLAS, TEXAS 75242

CASE NO· 4:23-CR-127-P(N.D.TEX)

· search & seizure warrant
· receipt of property
· indictment
· superseding indictment
· parties' agreed proposed
  forfeiture jury instructions

AO 93 (Rev. 12/09) Search and Seizure Warrant

## ORIGINAL UNITED STATES DISTRICT COURT

for the

Northern District of Texas

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The premises located at 1209 Perdenalas Trail,<br>Westlake, Tarrant County, Texas, including the<br>residence and any buildings located thereon | )<br>)<br>)  Case No.  4:23-MJ-120<br>)<br>)  FILED UNDER SEAL<br>) |

### SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Northern _____ District of _____ Texas _____ *(identify the person or describe the property to be searched and give its location)*:
The premises located at 1209 Perdenalas Trail, Westlake, Tarrant County, Texas, including the residence and any buildings located thereon, as further described in Attachment A.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before    **2 | 24 | 23**
                                                          *(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.        ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
United States Magistrate Judge Jeffrey L. Cureton
                *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*   ☐ for _____ days *(not to exceed 30)*.
                                         ☐ until, the facts justifying, the later specific date of

Date and time issued:   **2|10|23 @ 10:20 am** _____

                                                          *Judge's signature*

City and state:  Fort Worth, Texas _____    United States Magistrate Judge Jeffrey L. Cureton
                                                          *Printed name and title*

*AO 93  (Rev. 12/09) Search and Seizure Warrant (Page 2)*

| Return | | |
|---|---|---|
| *Case No.:*<br>4:23-MJ-120 | *Date and time warrant executed:* | *Copy of warrant and inventory left with:* |
| *Inventory made in the presence of :* | | |
| *Inventory of the property taken and name of any person(s) seized:* | | |

| Certification |
|---|
| *I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.* |

*Date:* _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A
## PROPERTY TO BE SEARCHED

The Premises is the brown one-story single-family residence with a tile roof and stone and stucco exterior walls located at 1209 Perdenalas Trail, Westlake, Tarrant County, Texas, and includes the following contained within the property lines: permanent and temporary structures (residences, garages, attics, basements, shops, sheds, greenhouses, and shelters); safes, lock boxes, or other security containers: cars, trucks, vans, vehicles, boats, trailers, and shipping containers; mailboxes; garbage cans or dumpsters; grounds/yards; and any other objects capable of holding, containing, or concealing any of the items listed in Attachment B.

The approximate GPS coordinates for the Premises are (32.96068, -97.18716). A photo of the main structure is shown here:



Attachment A

## ATTACHMENT B
## ITEMS TO BE SEIZED

1. Richard Mille RM008 AF PT watch, serial number RM0008 AF #27.
2. 2021 Mercedes Benz AMG G63, VIN W1NYC7HJ9MX401228.
3. Rolex Datejust Pearlmaster RG Auto 34mm White Goldust Dream Roman Dial RG Diamond Bezel RG Pearlmaster Bracelet 81285 with serial number 4577409.
4. Rolex Daytona Cosmograph WG Auto 40mm Sliver Black Arabic Dial Black Outlined Sub Dials WG Oyster Bracelet 116509 with serial number 4547691.
5. 2022 Rolls Royce Cullinan, VIN SLATV4C05NU211445.
6. Rolex Model M116508-0015 watch with serial number 124741T1.
7. Love bracelet, yellow gold, diamond, Article # CRN6035017, Serial # KMX181.
8. Necklace, yellow gold garnet onyx, Article # CRN7424210, Serial # KGN774.
9. Ring, yellow gold diamond emerald, Article # CRN4225052, Serial # LHX805.

Attachment B

FD-597 (Rev. 4-13-2015)

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property

Case ID: _____

On (date)  02/14/2023

item (s) listed below were:
☒ Collected/Seized
☐ Received From
☐ Returned To
☐ Released To

(Name)  Alyssa Kirchner

(Street Address)  1209 Pardonales Trail

(City)  Westlake, TX

Description of Item (s):  (1) Seven (7) Wood Cases with Seven (7) Bottles of Hundred Acre Cabernet Sauvignon;
(2) One (1) Large Bottle of Vineyard Seven on Eight Estate Cabernet Sauvignon;
(3) Richard Mille Watch  Serial # RM008 AF P4/27;
(4) Gold Colored "Rolex" watch with bezel marked "Skydwello Hillai Deput (Rose 2022";
(5) Gold Colored "Cartier" Necklace with Pendant;
(6) Rose Gold Richard Mille Watch;
(7) Two Wood Case/Six Bottles 2016 Lokoya Diamond Mountain Cabernet;
(8) One Wood Case/Three Bottles 2016 Lokoya Spring Mountain Cabernet;
(9) Three Wood Cases/Nine Bottles 2016 Lokoya Howell Mountain Cabernet;
(10) Two Wood Case/Six Bottles 2015 Lokoya Howell Mountain Cabernet;
(11) Three Wood Cases/Nine Bottles 2015 Lokoya Spring Mountain Cabernet;
(12) Three Wood Case/Nine Bottles 2018 Lokoya Mount Veeder Cabernet;
(13) Three Wood Cases/Nine Bottles 2018 Lokoya Diamond Mountain Cabernet;
(14) Certificates and Records for watches and Jewelry;
(15) Certificate of Authenticity for "Reid Noodle with Pink Roses" Painting;
(16) Silver Colored "Rolex" watch;
(17) Silver Colored "Rolex" watch with Dark Green Band;  GIFT

Received By: _____ (Signature)

Received From: _Alyssa Kirchner_ (Signature)

Printed Name/Title: Qiena Davis/Special Agent

Printed Name/Title: Alyssa Kirchner

FD-597 (Rev. 4-13-2015)                                                                                        Page ____ of ____

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property

Case ID: _____

On (date) _02/11/2023_                     item (s) listed below were:
                                           ☒ Collected/Seized
                                           ☐ Received From
                                           ☐ Returned To
                                           ☐ Released To

(Name) _Alyssa Kirchner_

(Street Address) _1209 Penderelns Trail_

(City) _Westlake, TX_

Description of Item (s): (18) _Cleveland "Axxxxx Putt" watch_

(19) _Silver colored "Breitling" watch with clear stones with case_  GIFT

(50) _Rose Gold colored "Rolex" watch with clear stones_

(21) _Silver colored "Rolex" watch_

(22) _Gold colored "Cartier" Bracelet with clear stones and case_

(23) _South Attby lux done "Band Marble with Pink Rose" Pendent_

(24) _Three (3) Rolex watch boxes and one (1) Aidxxxx Pendent Light Box_

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Received By: _____          Received From: _alyssa kirchner_
              (Signature)                                      (Signature)

Printed Name/Title: _Dana Davy/Special Agent_   Printed Name/Title: _Alyssa Kirchner_

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property

Case ID: _____

On (date)   02/14/2023

item(s) listed below were:
☑ Collected/Seized
☐ Received From
☐ Returned To
☐ Released To

(Name)   Alyssa Krchner

(Street Address)   1209 Perdenalas Tral

(City)   Westlake, TX

Description of Item (s):   ① 2021 Mercedes-Benz AMG G63, VIN =
WINYC7HJ9MX401328

② 2022 Roll Ryce Cullinan   VIN =
SLATV4C05NUZ11445

Received By:  _____
(Signature)

Printed Name/Title:  _____ / Spe   Da

Received From:   alyssa kruchner
(Signature)

Printed Name/Title:   alyssa kruchner

ORIGINAL

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

20__ MAY -2  PM 3: 0

DEPUTY CLERK **MS**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA

v.

CHRISTOPHER KIRCHNER

CRIMINAL NO.

**4:23-cr-127-P**

## **INDICTMENT**

At all times material to this Indictment:

### The Defendant and Relevant Entities

1.      Defendant **Christopher Kirchner** was the chief executive officer ("CEO")

of Slync.io ("Slync").  Slync was a supply-chain management software company.

2.      In or about 2017, defendant **Christopher Kirchner** founded Slync with

others.  **Kirchner** was Slync's CEO from approximately 2017 until July 2022, when he

was suspended by Slync's Board of Directors.  **Kirchner** was terminated from Slync in

or about August 2022.

3.      Slync was funded in part by private equity investors, both individuals and

venture capital groups.  This funding came largely from two primary fundraising

campaigns: a Series A offering and a Series B offering.  From in or about March 2020 to

May 2020, Slync raised approximately $7.2 million in the Series A preferred stock

offering, which valued Slync at approximately $32 million.  Then, from in or about

December 2020 to May 2021, Slync raised approximately $50 million in the Series B

preferred stock offering, which valued Slync at approximately $175 million.

4.      During his time as CEO, defendant **Christopher Kirchner** maintained close control over Slync's operations, sales, and recordkeeping.  **Kirchner** restricted other employees' access to information about the company's finances and because Slync never implemented formal accounting or financial control functions, **Kirchner** was the sole decisionmaker regarding when, how, and whether the company would record revenue.

5.      In or about July 2017, defendant **Christopher Kirchner** opened a bank account ending in 0392 on behalf of Slync at JPMorgan Chase Bank ("Slync Chase account").  **Kirchner** had sole signatory authority on the Slync Chase account.

6.      In or about October 2019, defendant **Christopher Kirchner** opened a bank account ending in 6437 on behalf of Slync at Silicon Valley Bank ("Slync SVB account").  Both **Kirchner** and another Slync employee known to the Grand Jury as Individual 1 had signatory authority on the Slync SVB account.  Whenever **Kirchner** initiated a wire or transfer of more than $100,000 from the Slync SVB account, Individual 1's approval was required to complete the transfer.  Similarly, whenever Individual 1 initiated a wire or transfer of more than $100,000 from the account, **Kirchner's** approval was required to complete the transfer.

7.      In or about January 2015, defendant **Christopher Kirchner** opened a personal checking account ending in 8697 at JPMorgan Chase Bank.

8.      In or about April 2020, defendant **Christopher Kirchner** opened a personal checking account ending in 2337 at JPMorgan Chase Bank.

2

9.    In or about June 2020, defendant **Christopher Kirchner** opened a personal checking account ending in 0637 at Silicon Valley Bank.

10.   In or about June 2020, defendant **Christopher Kirchner** opened a personal savings account ending in 0219 at Silicon Valley Bank.

11.   In or about December 2020, defendant **Christopher Kirchner** opened a personal checking account ending in 5469 at Bank of America.

12.   In or about January 2021, defendant **Christopher Kirchner** opened a checking account ending in 3574 in the name of KFIM—a limited liability company which **Kirchner** controlled—at Bank of America.

### The Scheme to Defraud

13.   From at least in or about 2020 through in or about August 2022, defendant **Christopher Kirchner** perpetrated a scheme to defraud Slync and Slync investors out of at least $25,000,000 by failing to use investors' funds as represented and converting Slync and Slync investors' money to his own use. Through bank transfers and direct payments from Slync accounts, **Kirchner** converted to his own use over $25,000,000 in Slync and Slync investors' funds that he had represented would go to the Slync's operations. Among other things, **Kirchner** spent Slync and Slync investors' money on a private jet, his residence in Westlake, Texas, and personal items such as credit card bills, jewelry, automobiles, and daily living expenses.

14.   On or about March 30, 2020, Slync and persons and entities known to the Grand Jury as Investors 1, 2, 3, 4, 5, and 6 entered into Series A Preferred Stock Purchase Agreements ("Series A Purchase Agreements"). The Series A Purchase Agreements

3

stipulated that Slync would use the proceeds received from the Series A investors "for product development and other general corporate purposes."

15.     After the execution of the Series A Purchase Agreements, Investors 1, 2, 3, 4, 5, and 6 initiated electronic wire transfers to invest money in Slync. In total, between on or about March 30, 2020, and on or about May 14, 2020, Slync raised approximately $7.2 million in financing through the Series A fundraising, which included the following:

| Date | Payer | Amount |
|---|---|---|
| 3/30/2020 | Investor 1 | $3,999,998.85 |
| 3/31/2020 | Investor 2 | $2,789,026.25 |
| 3/31/2020 | Investor 3 | $24,999.34 |
| 5/13/2020 | Investor 4 | $100,000.00 |
| 5/13/2020 | Investor 5 | $92,820.00 |
| 5/14/2020 | Investor 6 | $207,180.00 |
| | Total | $7,214,024.44 |

16.     On or about December 11, 2020, Slync and persons and entities known to the Grand Jury as Investors 1, 6, 7, 8, 9, and 10 entered into Series B Preferred Stock Purchase Agreements ("Series B Purchase Agreements"). The Series B Purchase Agreements stipulated that Slync would use the proceeds received from the Series B investors to repay an outstanding loan and "for product development and other general corporate purposes."

17.     After the execution of the Series B Purchase Agreements, Investors 1, 6, 7, 8, 9, and 10 initiated electronic wire transfers to invest money in Slync. In total, between

4

Case 4:23-cr-00127-P   Document 19   Filed 05/02/23   Page 5 of 25   PageID 39

on or about December 13, 2020, and on or about May 7, 2021, Slync raised

approximately $50 million in financing through the Series B fundraising, which included

the following:

| Date | Payer | Amount |
|---|---|---|
| 12/11/2020 | Investor 7 | $34,999,997.45 |
| 12/15/2020 | Investor 1 | $499,999.08 |
| 12/28/2020 | Investor 8 | $7,499,995.70 |
| 12/28/2020 | Investor 9 | $199,997.72 |
| 3/3/2021 | Investor 6 | $1,130,235.13 |
| 3/3/2021 | Investor 10 | $420,000.00 |
| 5/7/2021 | Investor 8 | $5,000,009.90 |
| 5/7/2021 | Investor 8 | $239,764.55 |
| | Total | $49,989,999.53 |

Kirchner's Misappropriation of Slync Funds

18.     All the investor funds obtained during the Series A and Series B

fundraising rounds were wired to the Slync SVB account.

19.     On or about March 30, 2020, Investor 1 sent $3,999,998.85 via wire

transfer to the Slync SVB account. Prior to Investor 1's wire transfer, which was the first

that Slync received from its Series A investors, the Slync SVB account was overdrawn by

approximately $693.21. Pursuant to the Series A Purchase Agreements, the invested

funds were to be used for product development and other general corporate purposes.

5

20.     Between on or about April 6, 2020, and on or about November 23, 2020,

defendant **Christopher Kirchner** initiated a series of approximately 27 wire transfers

totaling approximately $2,174,000 from the Slync SVB account to the Slync Chase

account. The amounts of these transfers varied between approximately $22,500 and

$99,750—each less than the $100,000 threshold requiring Individual 1's approval.  In

many instances, after **Kirchner** caused the transfer to the Slync Chase account, he then

moved the money to personal bank accounts and used it to fund his lifestyle, including,

but not limited to, the following:

    a.     Defendant **Christopher Kirchner** transferred approximately

$1,311,400 to personal bank accounts that he controlled as follows—

        i.     $1,145,900 to **Kirchner's** bank account ending in 2337 at

    JPMorgan Chase Bank;

        ii.     $153,000 to **Kirchner's** bank account ending in 8697 at

    JPMorgan Chase Bank; and

        iii.     $12,500 to **Kirchner's** bank account ending in 0219 at

    Silicon Valley Bank.

    b.     Defendant **Christopher Kirchner** paid approximately $484,895 to

two private jet charter companies.

    c.     Defendant **Christopher Kirchner** paid approximately $16,957 to a

vineyard located in Napa Valley, California.

    d.     Defendant **Christopher Kirchner** paid approximately $14,853 on

his personal credit cards.

6

21.     Prior to these 27 wire transfers from the Slync SVB account to the Slync
Chase account, the Slync Chase account had a balance of approximately $5,900.

22.     On or about December 11, 2020, Investor 7 sent $34,999,997.45 via wire
transfer to the Slync SVB account.  Prior to the transfer, which was the first that Slync
received from its Series B investors, the Slync SVB account was overdrawn by
approximately $232,423.  Pursuant to the Series B Purchase Agreements, the invested
funds were to be used for the repayment of a loan, product development, and other
general corporate purposes.

23.     On or about December 13, 2020, defendant **Christopher Kirchner**
communicated with Individual 1 via text message regarding the Slync SVB account.  In
this exchange, **Kirchner** represented to Individual 1 that he was transferring money from
the Slync SVB account to: (1) an "investment account"; and (2) a "chase" account.
Presumably because any transfer over $100,000 required Individual 1's approval,
**Kirchner** told Individual 1 that he would "have to approve those wires."

24.     Defendant **Christopher Kirchner's** representations to Individual 1 were
false.  That is, **Kirchner** did not move the funds to either an "investment account" or a
"chase" account.  Rather, on or about December 14, 2020, **Kirchner** transferred
$20,000,000 from the Slync SVB account to **Kirchner's** personal bank account ending in
0637 at Silicon Valley Bank.

25.     On or about December 14, 2020, defendant **Christopher Kirchner** emailed
private bankers at Silicon Valley Bank regarding the $20,000,000 transfer from the Slync
account to his personal checking account.  In the email, **Kirchner** stated:

7

I took a distribution from my company today and am moving money out for a few things that I need to get taken care of before year end.

One, is a wire for $5,000,000 to an escrow company for a plane that I am purchasing. I need this one completed ASAP as it's very time sensitive in order to complete a transaction this month.

Could you make sure this one in particular is done as fast as possible?

26.    At no point did defendant **Christopher Kirchner** receive authorization from Slync's Board of Directors for a $20,000,000 distribution of Series B investor funds into his personal checking account. **Kirchner** misappropriated the $20 million for his personal use, which included, but was not limited to, the following:

   a.    Defendant **Christopher Kirchner** paid approximately $16,000,000 for the deposit and purchase of a Gulfstream GV-SP (G550) private jet.

   b.    Defendant **Christopher Kirchner** transferred approximately $800,000 to his bank account ending in 5469 at Bank of America.

   c.    Defendant **Christopher Kirchner** paid approximately $495,000 to secure a private luxury suite at the stadium of a Dallas-area professional sports team.

   d.    Defendant **Christopher Kirchner** paid approximately $22,000 in membership fees for a private golf and social club located in Westlake, Texas, where he was a member.

27.    Between in or about January 15, 2021, and March 22, 2022, defendant **Christopher Kirchner** initiated a series of approximately 70 wire transfers totaling approximately $6,814,016 from the Slync SVB account to the Slync Chase account. The

8

amount of these transfers varied from $35,000 to $99,987—each less than the $100,000 threshold requiring Individual 1's approval. In many instances, **Kirchner** then moved money from the Slync Chase account to personal bank accounts and used it to fund his lifestyle, which included, but was not limited to, the following:

      a.    Defendant **Christopher Kirchner** transferred approximately

$5,931,100 to personal bank accounts that he controlled as follows—

      i.    $5,167,250 to the KFIM bank account ending in 3574 at Bank

of America that **Kirchner** controlled; and

      ii.    $763,850 to **Kirchner's** bank account ending in 2337 at

JPMorgan Chase.

      b.    Defendant **Christopher Kirchner** paid at least approximately

$516,360 on his personal credit cards.

<p align="center">Kirchner's Acts of Concealment</p>

28.    On multiple occasions in or about April, May, and June 2022, Slync paid employees late or missed payroll.

29.    As Slync struggled to pay payroll, defendant **Christopher Kirchner** took steps to replace some of the money that he had misappropriated. That is, in or about April and May 2022, **Kirchner** induced at least four persons known to the Grand Jury as Investors 11, 12, 13, and 14 to wire money to Slync as part of a purported "Series C" round of fundraising. **Kirchner** provided Investors 11, 12, 13, and 14 with copies of a document titled "Series C Preferred Stock Purchase Agreement." Each investor signed the document and, at **Kirchner's** instruction, caused wire transfers to transmit between

<p align="center">9</p>

approximately $200,000 and $250,000 to the Slync Chase account. **Kirchner** then transferred a portion of the funds to the Slync SVB account. The money was then used to pay Slync's employees.

30.    Between on or about April 25, 2022, and on or about May 9, 2022, Slync received approximately $850,000 in funds from these supposed "Series C" investors, which included the following:

| Date | Payer | Amount |
|------|-------|--------|
| 4/25/2022 | Investor 11 | $199,975.22 |
| 4/25/2022 | Investor 12 | $199,975.22 |
| 4/29/2022 | Investor 13 | $250,000.00 |
| 5/9/2022 | Investor 14 | $199,975.22 |
| | Total | $849,925.66 |

31.    Defendant **Christopher Kirchner** obtained these funds for Slync using misrepresentations because there was no "Series C" offering. **Kirchner's** misrepresentations included, but were not limited to, the following:

a.    On or about April 17, 2022, defendant **Christopher Kirchner** met with Investor 13 and asked if Investor 13 would like to invest in Slync during the company's Series C fundraising round.

b.    On or about April 18, 2022, defendant **Christopher Kirchner** emailed Investor 13 a link to an "overview of the business" titled "Slync Series C." **Kirchner** wrote: "Good catching up last night… spoke to my attorneys last night and the min for the round is $250k. Happy to chat more about it, but we are

10

closing it [in two days]." On or about April 27, 2022, Investor 13 signed the
document titled Series C Preferred Stock Purchase Agreement.

32.    Slync's Board of Directors did not authorize this "Series C" securities
offering, as would have been required. Defendant **Christopher Kirchner's**
misrepresentation that there was a "Series C" fundraising round was material and caused
Investors 11, 12, 13, and 14 to wire Slync money.

33.    In the summer of 2022, news outlets including Business Insider and Forbes
published stories detailing the payroll issues at Slync and highlighting defendant
**Christopher Kirchner's** lavish lifestyle. As these news articles started to emerge, the
"Series C" investors learned of derogatory allegations against defendant **Christopher
Kirchner** and asked for a return of their money. These requests went unfulfilled until in
or about August 2022, when **Kirchner** sold his Gulfstream jet after instructing his
aircraft broker to arrange a sale. **Kirchner** then used a portion of the aircraft sale
proceeds to repay the "Series C" investors.

34.    Specifically, on or about August 19, 2022, the KFIM bank account ending
in 3574 at Bank of America, that defendant **Christopher Kirchner** controlled, received a
wire transfer of approximately $2,303,126.78 from an aircraft title company for the sale
of **Kirchner's** Gulfstream jet. **Kirchner** then caused a series of wire transfers from the
KFIM bank account ending in 3574 at Bank of America—not one of Slync's—to repay
the "Series C" investors:

11

| Date | Payee | Amount |
|------|-------|--------|
| 8/22/2022 | Investor 13 | $250,000.00 |
| 8/23/2022 | Investor 14 | $200,000.00 |
| 8/23/2022 | Investor 11 | $200,000.00 |
| 8/24/2022 | Investor 12 | $200,000.00 |
| | Total | $850,000.00 |

35.    While defendant **Christopher Kirchner** was obtaining money from these Series C Investors, he misled others about the cause of Slync's payroll issues. That is, **Kirchner** told Slync's Board of Directors that the company's cash was invested in illiquid assets and Slync was having difficulty making payroll because it could not divest those assets quickly enough. **Kirchner** repeated a similar explanation to employees in meetings and company emails. Thereafter, **Kirchner** told members of Slync's Board of Directors that the United States government had frozen Slync's accounts because **Kirchner** had transacted in his personal capacity with sanctioned entities in Russia. All these explanations were untrue.

36.    On or about May 5, 2022, a representative from Slync's payroll management provider emailed Individual 1 that it had not received Slync's payroll payment. Individual 1 forwarded the email to defendant **Christopher Kirchner** and asked him to send the provider confirmation that **Kirchner** had initiated a wire transfer. **Kirchner** told Individual 1 that the delay was because he had sent the wire from the Slync Chase account instead of the Slync SVB account, which was the account usually used for payroll.

12

37. On or about May 6, 2022, defendant **Christopher Kirchner** emailed the representative at Slync's payroll management provider and wrote: "Please see wire confirmation for our payroll below." An accompanying message purported to be confirmation that Chase began processing a wire transfer of $566,241.06 on May 5, 2022. That confirmation message was falsified.

38. Defendant **Christopher Kirchner** also fired Slync employees who raised concerns over his management of the company's finances. A Slync employee known to the Grand Jury as Individual 2 joined Slync in or about September 2021. Individual 2's job responsibilities included managing Slync's financial records, which **Kirchner** had previously been doing by himself. From in about September 2021 to May 2022, Individual 2 repeatedly asked **Kirchner** for access to Slync's financial records. **Kirchner** never provided that access to Individual 2.

39. On or about May 26, 2022, Investor 7 sent Individual 2 a Slync financial statement that defendant **Christopher Kirchner** had provided to Investor 7. The statement listed certain financial metrics for 2020 and 2021, including quarterly annual recurring revenue ("ARR") and revenue figures, and the number of customers that Slync had at the end of each quarter.

40. Based on Individual 2's review of Slync's customer contracts and conversations with other Slync employees, Individual 2 believed that several of the figures on the financial statement were false, including the ARR and revenue figures, and the number of Slync's customers.

13

41.     On or about May 26, 2022, as a result of Individual 2's observations about the financial statement, Individual 2 called two members of Slync's Board of Directors known to the Grand Jury as Board Member 1 and Board Member 2. Individual 2 expressed concern that defendant **Christopher Kirchner** was falsely exaggerating Slync's financial performance and reported concerns regarding Slync's payroll issues. Thereafter, Board Members 1 and 2 spoke with **Kirchner**. On or about May 30, 2022, **Kirchner** directed Slync's information technology staff to remove Individual 2's access to Slync systems. On or about June 17, 2022, Individual 2 received a termination letter from Slync.

42.     On or about June 5, 2022, after Slync missed a payroll payment, Individual 3, a manager in Slync's engineering department, emailed Slync's Board of Directors to raise concerns about defendant **Christopher Kirchner's** management of Slync.

43.     On or about June 6, 2022, defendant **Christopher Kirchner** informed Slync executives that he decided to fire Individual 3. The following week, Individual 3 lost access to Slync's computer systems. On or about August 6, 2022, Individual 3 received a termination letter from Slync.

44.     On or about July 20, 2022, defendant **Christopher Kirchner** reported to Board Members 1 and 2 that Slync had paid its payroll. Board Members 1 and 2 asked **Kirchner** to prove that he was telling the truth. In response, **Kirchner** emailed Board Member 2 a document that purported to be an outgoing wire report showing that payroll had been paid. Board Member 2 forwarded the document to Board Member 1. Board Member 1 then called Individual 1—who prepared payroll for **Kirchner's** approval—to

14

confirm that Slync had in fact paid payroll. Individual 1 notified Board Member 1 that Slync had not paid payroll. The document **Kirchner** provided to Board Member 2 was falsified.

45.     On or about July 24, 2022, Slync's Board of Directors suspended defendant **Christopher Kirchner**. Soon thereafter, **Kirchner** removed certain information technology administrator privileges from key Slync employees, preventing the employees from accessing Slync's computer systems. **Kirchner** then attempted to delete approximately 18 gigabytes of Slync data, including emails.

46.     In or about August 2022, Slync terminated defendant **Christopher Kirchner**.

15

Counts One through Five
Wire Fraud
[Violation of 18 U.S.C. § 1343]

47.    The allegations contained in paragraphs 1 through 46 of this Indictment are
repeated and realleged as if fully set forth herein.

48.    On or about the dates set forth below, in the Northern District of Texas and
elsewhere, **Christopher Kirchner**, the defendant, willfully and knowingly, having
devised and intending to devise a scheme and artifice to defraud, and for obtaining
money and property by means of false and fraudulent pretenses, representations, and
promises, transmitted and caused to be transmitted by means of wire, radio, and
television communication in interstate and foreign commerce, writings, signs, signals,
pictures, and sounds for the purpose of executing such scheme and artifice, to wit,
**Kirchner**, through the use of interstate wire communications, made material
misrepresentations and omissions to Slync and Slync investors, and misappropriated
funds for his own use as more particularly described in each count below:

| Count | Date | Description of Wire Transmission |
|-------|------|----------------------------------|
| 1 | 10/15/2020 | Transfer of approximately $45,000 from Slync SVB account ending in 6347 to Slync Chase account ending in 0392. |
| 2 | 12/14/2020 | Transfer of approximately $20,000,000 from Slync SVB account ending in 6347 to **Kirchner's** SVB account ending in 0637. |
| 3 | 3/2/2021 | Transfer of approximately $99,950 from Slync SVB account ending in 6347 to Slync Chase account ending in 0392. |
| 4 | 3/4/2021 | Transfer of approximately $500,000 from Slync Chase bank account ending in 0392 to KFIM Bank of America Account ending in 3574. |

| Count | Date | Description of Wire Transmission |
|-------|------|----------------------------------|
| 5 | 4/29/2022 | Transfer of approximately $250,000 from Investor 13 to Slync Chase account ending in 0392. |

Each in violation of 18 U.S.C. § 1343.

17

Counts Six through Thirteen
Engaging in Monetary Transactions in Property
Derived from Specified Unlawful Activity
[Violation of 18 U.S.C. § 1957]

49.    The allegations contained in paragraphs 1 through 46 of this Indictment are

repeated and realleged as if fully set forth herein.

50.    On or about the dates set forth below, in the Northern District of Texas and

elsewhere, **Christopher Kirchner**, the defendant, did knowingly engage in monetary

transactions, affecting interstate commerce, in criminally derived property of a value

greater than $10,000.00, that is, numerous purchases, including vehicles, an airplane,

and real and personal property, with checks and wire transfers drawn on accounts at

financial institutions engaged in interstate commerce, the funds used to purchase such

property having been derived from wire fraud, a criminal offense under 18 U.S.C.

§ 1343, a specified unlawful activity.

| Count | Date | Description of Monetary Transaction | Amount |
|---|---|---|---|
| 6 | 6/17/2020 | Wire transfer from **Kirchner's** SVB account ending in 0637 for down payment for residence in Westlake, Texas. | $669,453.05 |
| 7 | 12/14/2020 | Wire transfer from **Kirchner's** SVB account ending in 0637 for deposit for Gulfstream GV-SP (G550) private jet aircraft. | $5,000,000.00 |
| 8 | 12/14/2020 | Wire transfer from **Kirchner's** SVB account ending in 0637 for lease payment for luxury suite at the stadium of a local professional sports team. | $495,000.00 |
| 9 | 12/22/2020 | Wire transfer from **Kirchner's** SVB account ending in 0219 to pay the remaining balance for the purchase of Gulfstream GV-SP (G550) private jet aircraft. | $11,131,500.00 |

18

| Count | Date | Description of Monetary Transaction | Amount |
|-------|------|-------------------------------------|--------|
| 10 | 3/5/2021 | Wire transfer from **Kirchner's** Bank of America account ending in 3574 for purchase of residential lot in Westlake, Texas. | $1,411,470.07 |
| 11 | 6/9/2021 | Personal check drawn on **Kirchner's** Bank of America account ending in 5469 for purchase of 2021 Porsche 911 Turbo S Cabriolet, VIN WP0CD2A90MS263853. | $287,106.72 |
| 12 | 8/16/2021 | Cashier's check drawn on **Kirchner's** Bank of America account ending in 5469 for purchase of 2021 Mercedes-Benz AMG G63, VIN W1NYC7HJ9MX401228. | $283,261.12 |
| 13 | 3/15/2022 | Personal check drawn on **Kirchner's** Bank of America account ending in 5469 for down payment for 2022 Rolls-Royce Cullinan, VIN SLATV4C05NU211445. | $75,000.00 |
| | | Total | $19,352,790.96 |

Each in violation of 18 U.S.C. § 1957.

## Notice of Forfeiture
[18 U.S.C § 981(a)(1)(C) and 28 U.S.C. § 2461(c); 18 U.S.C. § 982(a)(2)(A); 18 U.S.C. § 982(a)(1)]

51.    Upon conviction for any offense charged in Counts One through Five of

this Indictment, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and 18

U.S.C. § 982(a)(2)(A), the defendant, **Christopher Kirchner**, shall forfeit to the United

States any property, real or personal, which constitutes or is derived from proceeds

traceable to the respective offense.

52.    Upon conviction for any offense charged in Counts Six through Thirteen of

this Indictment, pursuant to 18 U.S.C. § 982(a)(1), the defendant, **Christopher**

**Kirchner**, shall forfeit to the United States any property, real or personal, involved in, or

traceable to property involved in, the respective offense.

53.    The property subject to forfeiture includes, but is not limited to, the

following:

a. The proceeds traceable to each of Counts One through Five, as well as the scheme to defraud underlying those Counts, in the form of a "money judgment" in the amount of at least $25,000,000.
b. The value of the property involved in each of Counts Six through Thirteen, in the form of a "money judgment" in the amount of the respective laundering transaction.
c. 2021 Mercedes Benz AMG G63, VIN W1NYC7HJ9MX401228.
d. 2022 Rolls Royce Cullinan, VIN SLATV4C05NU211445.
e. Richard Mille 95% Platinum Watch with Sports Rubber Bracelet, Model RM008/AFPT/27, Serial No. PT950.
f. Men's Rolex Oyster Cosmograph Dayton Watch, 18K Yellow Gold, Model 116508, Serial No. 124741T1.
g. Ladies' Rolex Oyster Perpetual Date Just Watch in 18K Rose Gold, Model 81285, Serial No. J0560855.
h. Men's Rolex Oyster Perpetual Cosmograph Daytona Watch in 18K White Gold, Model 116509, Serial No. Z071060.

20

i.  Ladies Rolex Oyster Perpetual Date Just Watch in Stainless, Model 178240 Serial No. 538M19L0.

j.  Cartier Panther-Style Pendant Necklace in 18K Yellow Gold, seized on February 14, 2023.

k.  *Round Monette with Pink Roses* Painting by Sarah Ashley Longshore.

l.  Eleven cases of wine, including bottles of wine from the Lokoya winery, seized from on February 14, 2023.

m. The real property located at 1209 Perdenalas Trail, Westlake, Tarrant County, Texas, a 2.313 acre tract of land situated in the Josiah Walker Survey, Abstract No. 1604, Town of Westlake, Tarrant County, Texas, and being all of Lots 19 and 20, Block L of the Vaquero ~ Arthur Addition, Phase 3 according to the Plat thereof recorded in Instrument No. D203426028 of said Map or Plat Records of Tarrant County, Texas, said 2.313 acre tract of land being more particularly described by metes and bounds as follows:

> BEGINNING at a ½" iron rod found for corner in the South line of Perdenalas Trail (35 foot wide Right-of-Way), at the Northwest corner of said Lot 20, same being the Southwest corner of Lot 21, Block L; THENCE South 64°32'49" East with the North line of said Lot 20, same being the south line of Lot 21 a distance of 284.19 feet to ½" iron rod found at the Northeast corner of said Lot 20, same being the Southeast corner of said Lot 21, and being in the West line of Lot 23, Block L;

> THENCE South 00°33'08" East with the West line of said Lot 20, same being the East line of said Lot 23 a distance of 233.51 feet to a point for corner at the Southeast corner of said Lot 20, same being the Southwest corner of said Lot 23, and being in the South line of said Block L of the above referenced Phase 3;

> THENCE South 89°47'42" West with the South line of said Lot 20, Block L at a distance of 172.19 feet passing a point for corner at the Southwest corner of said Lot 20, same being the Southeast corner of said Lot 19 and continuing a total distance of 362.80 feet to a point for corner in the South line of said Block L, and being at the Southwest corner of said Lot 19, same being the Southeast corner of Lot 18, Block L of said Vaquero – Arthur Addition Phase 3;

> THENCE North 00°37'05" West with the common line between said Lots 18 and 19 distance of 243.55 feet to a ½" iron rod found in the South line of Perdenalas Trail, at the Northwest corner of said Lot 19, same being the Northeast corner of Lot 18, and being at the beginning of a non-tangent curve to the left;

> THENCE in a Northeasterly direction with the South line of said Perdenalas Trail, the North line of said Lot 19, and with said curve to the left having a radius of 129.50 feet, whose chord bears North

21

79°03'05" East, a distance of 2.59 feet, for an arc length of 2.59 feet at the beginning of a reverse curve to the right;

THENCE in a Southeasterly direction with the Said North and South lines and with said reverse curve to the right having a radius of 14.00 feet, whose chord bears South 69°39'36" East, a distance of 14.78 feet, for an arc length of 15.57 feet at the beginning of a reverse curve to the left;

THENCE in a Northeasterly direction continuing with the said South line of Perdenalas with said reverse curve to the left having a radius of 50.00 feet, whose chord bears North 53°11'56" East, a distance of 99.98 feet, at an arc length of 128.85 feet passing a point for corner at the Northeast corner of Lot 19, same being an angle corner in the West line of Lot 20, and continuing with said curve to the left a total length of 155.08 feet to a point for corner at the beginning of a reverse curve to the right;

THENCE in the Northwesterly direction with the common line of Perdenalas Trail and said Lot 20 and with said reverse curve to the right having a radius of 14.00 feet, whose chord bears North 10°06'14" West, a distance of 12.14 feet, for an arc length of 12.56 feet to a point for corner in said common line;

THENCE North 15°35'44" East continuing with said common line a distance of 26.33 feet to ½" iron rod found at the beginning of a curve to the left;

THENCE in the Northeasterly direction with said common line and with said curve to the left having a radius of 367.50 feet, whose chord bears North 13°55'20" East, a distance of 21.47 feet, for an arc length of 21.47 feet;

Back to the POINT OF BEGINNING and CONTAINING 100,740 square feet or 2313 acres of land, more or less.

n. All funds currently contained in Bank of America Account No. XXXXXXXX3574, in the name of KFIM, LLC.

o. All funds currently contained in Bank of America Account No. XXXXXXXX1186, in the name of Alyssa Kirchner.

p. All funds currently contained in Bank of America Account No. XXXXXXXX5469, in the name of Christopher Kirchner and/or Alyssa Kirchner.

q. All funds currently contained in Bank of America Account No. XXXXXXXX5472, in the name of Christopher Kirchner and/or Alyssa Kirchner.